# EXHIBIT 1

 

# PROJECT AGREEMENT

### Between

### Savannah River Remediation LLC

### And

### The Augusta, GA Building

### And

### Construction Trades Council

### For Work performed for the

### DEPARTMENT OF ENERGY

### at the

### SAVANNAH RIVER SITE

*September 22, 2009*

## PREAMBLE

This Agreement entered into this twenty second day of September 2009, between Savannah River Remediation LLC. (hereafter referred to as SRR), and its subcontractors, (while performing Davis Bacon Act Work) all of whom are hereafter collectively referred to as the "EMPLOYER", the Building and Construction Trades Department, AFL-CIO, the Augusta, GA Building and Construction Trades Council and its affiliated local unions (all of whom are collectively referred to as the "UNION") and whose names are subscribed hereto and who have, through their duly authorized officers, executed this agreement for Energy Related Construction Projects being performed for the Department of Energy or successor agency (hereafter referred to as the "OWNER") at the Savannah River Site (hereafter referred to as the "SITE").

WHEREAS, the UNIONS have in their membership throughout the area members competent and qualified to perform the work of the EMPLOYER; and

WHEREAS, in order to insure relative equity and uniform interpretation and application, the UNIONS wish to negotiate and administer said Collective Agreement in concert with each other and all with the EMPLOYER; and

WHEREAS, the EMPLOYER and the UNIONS desire to continue our harmonious relationship for the benefit of both parties to this Agreement; and

WHEREAS, the UNIONS understand and agree that SRR has a maintenance department and an operations department that performs non-DBA work which is separate and distinct from the work covered by this agreement; and

IT IS THEREFORE AGREED by the undersigned EMPLOYER and UNIONS in consideration of the mutual promises and covenants contained herein that the Project Agreement be made as follows:

## ARTICLE I
## PURPOSE

The purpose of this agreement is to promote safety, quality of workmanship and efficiency of construction operations on the work covered by this Agreement.  It is also the intent of the parties to set out uniformly standard working conditions with due consideration for the protection of labor standards, wages and working conditions.

## ARTICLE II
## SCOPE OF AGREEMENT

Section 1.    This Agreement, hereinafter designated as the "Project Agreement" or "Agreement", shall apply and is limited to construction plant modernization, maintenance and modification work, subject to the Davis-Bacon Act, and/or the OWNERS Alternate Dispute Resolution Process, at the SITE.  In the event that the Davis-Bacon Act is repealed, or modified to the extent that it no longer applies, SRR and the Unions will negotiate appropriate scope language in accordance with Article XXII of this Project Agreement.

It is understood that SRR may assign non-DBA work to its union workforce at its sole prerogative.  Traditional craft jurisdiction shall be the initial work assignment, after which they will perform the work of that crew.  When working in a Maintenance or Operations crew, employees will work the shift hours of that crew, be paid the same wage premiums that are required by that shift and work under the direction of the Maintenance/Operations supervisors.  Unpaid holidays shall be those recognized by the Maintenance/Operations workforce.

The UNION and EMPLOYER agree to abide by the terms and conditions contained in this Agreement with respect to the administration of the Agreement by the EMPLOYER and the performance of the subcontractors of the Project.  This Agreement represents the complete understanding of the parties.  Issues regarding interpretation of this agreement are reserved exclusively between SRR and the signatory UNIONS.

It is agreed that all EMPLOYERS that are performing DBA work of whatever tier will be required to sign this agreement, accept and be governed by the terms and conditions of this Project Agreement.  It is agreed that the terms and conditions of this Project Agreement shall supersede and override terms and conditions of any and all other national, area or local collective bargaining agreements.  It is understood that this is a self-contained Agreement and that upon the signing of this Project Agreement, the EMPLOYER(S) will not be obligated to sign any other local, area or national agreement.

The parties agree that the total results of their bargaining and the entire understanding between the parties is embodied in this Agreement.  This Agreement shall not be amended or supplemented except by mutual consent of the Union and SRR, reduced to writing and duly signed by each.

Section 2.   This Agreement shall be limited to DBA work, and nothing contained herein shall be construed to prohibit, restrict or interfere with the performance of any other operations, work or function which may occur at the SITE or be associated with the development of the SITE.

Section 3.   This Agreement shall only be binding on the signatory parties hereto and shall not apply to parents, affiliates, subsidiaries or other ventures of such company unless they are performing DBA work within the scope of this agreement at this SITE.

Section 4.   SRR has the absolute right to select any qualified EMPLOYER for the award of contracts on the Site.

Section 5.   Items specifically excluded from the scope of this agreement include:

A.   Work performed under the National Cooling Tower agreement and the National Stack Agreement, National Silo Agreement, Elevator Constructors National Agreement, National Transient Division (NTD) and the National Refractory Agreement.

B.   Work of non-manual employees, including but not limited to superintendents, supervisors, engineers, field engineers, surveyors, inspectors, quality control personnel, quality assurance personnel, timekeepers, mail carriers, clerks, office workers, messengers, guards, emergency medical and first aid technicians and other professional, engineering, administrative, supervisory and management employees.

C.   Equipment and machinery in the care, custody and control of the OWNER or SRR's Operations and Maintenance Departments.

D.   All deliveries to and from anywhere on the SITE.

E.   The removal of trash, scrap, surplus, spoilage and waste materials from designated areas on the Site. (This does not apply to DBA work performed under a demolition or remedial action contract.)

F.   All employees of the EMPLOYER not performing manual labor.

G.   It is understood that the liability of any EMPLOYER and the liability of the separate UNIONS under this Project Agreement shall be several and not joint.  The UNIONS agree that this Agreement does not have the effect of creating any joint EMPLOYER status between the OWNER and the Unions.

H.   It is understood that the OWNER or SRR, at its sole option, may terminate, delay and/or suspend any or all portions of the Project at any time.

Section 6.   Nothing herein shall be construed to prohibit or restrict the OWNER or SRR or its Maintenance and Operations employees or its contractors from performing work not covered by this Project Agreement on the SITE.  As areas and systems of the SITE are inspected and construction tested by the EMPLOYER and accepted by the OWNER or SRR's Operations/Maintenance Departments, the Project Agreement will not have further force or effect on such items or areas, except when directed by the OWNER or SRR's Operations/Maintenance Department to engage in repairs, modification, checkout and warranty functions required by its contract with the OWNER.

### ARTICLE III
### MANAGEMENT'S RIGHTS

Section 1.     The EMPLOYER retains full and exclusive authority for the management of its operations.   The EMPLOYER shall direct their working forces at their prerogative, including, but not limited to hiring, promotion, transfer, lay-off administering disciplinary action, and the promulgation and subsequent revision of reasonable work rules, policies and procedures.   No rules, customs, or practices shall be permitted or observed within which limit or restrict production or limit or restrict the working efforts of employees.   The EMPLOYER shall schedule work, and shall determine when mandatory overtime will be worked.   The foregoing enumeration of management rights shall not be deemed to exclude other functions not specifically set forth.   The EMPLOYER, therefore, retains all management rights not specifically limited by the terms of this Agreement.

### ARTICLE IV
### RECOGNITION

Section 1.     The EMPLOYER recognizes the signatory UNIONS as the collective bargaining agents for its employees, working under this agreement who shall constitute a bargaining unit separate and distinct from all others.

Section 2.     Each EMPLOYER and each signatory UNION shall alone be liable and responsible for its own individual acts and conduct and for any breach or alleged breach of this Agreement.   Any alleged breach of this Agreement by an EMPLOYER or any dispute between the signatory UNION(S) and an EMPLOYER respecting compliance with the terms of this Agreement shall not affect the rights, liabilities, obligations and duties between the signatory UNION(S) and any other EMPLOYER covered by this Agreement.

### ARTICLE V
### EQUIPMENT INSTALLATION

Specialized, leased, or warranted equipment, such as computers and the like, and/or secret processing equipment may be installed and/or serviced by individuals not covered by this agreement.   Warranty service on any equipment may be performed by the vendor's personnel.

### ARTICLE VI
### REFERRAL OF EMPLOYEES

Section 1.   When craft employees are needed, the EMPLOYER shall notify the UNIONS as to the number and classification of employees required.

Section 2.   The Local UNIONS administer and control their referral, and it is agreed that these referrals will be made in a nondiscriminatory manner and in full compliance with federal, state and local laws and regulations.

In accordance with Section 3161 of the 1993 Defense Authorization Act, Hiring preference will be required under this agreement for any 3161 identified worker who is qualified to perform the work.   Referrals to the SITE shall be made, therefore, in accordance with the referral procedure defined in "Appendix B".

Section 3.   Applicants for the various classifications covered by the Agreement required by the EMPLOYER shall be referred to the EMPLOYER by the UNION(S).   Each EMPLOYER shall have the opportunity to hire up to three (3) key employees at the entire SITE. The EMPLOYER and the UNION(S) must comply with the referral process defined in "Appendix C". The EMPLOYER shall have the right to determine the competency of all employees, the right to determine the number of employees required, the right to request employees with special skills and qualifications and shall have the sole responsibility for selecting the employees to be laid off. The EMPLOYER shall also have the right to reject any applicant referred by the UNIONS.

Section 4.   The UNION shall not refer employees employed at the SITE by a signatory EMPLOYER to other employment, nor shall the UNION engage in other activities which encourage workforce turnover or absenteeism.

Section 5.   In the event a referral facility maintained by a Local Union is unable to refer workers as requested by the Employer within a forty-eight hour period after such requisition is made by the Employer (Saturdays, Sundays and Holidays excepted), the Employer may assign the work to workers of other crafts already employed on the project notwithstanding the provisions of Article VIII. Such workers shall be paid whichever Union's wage rate is higher, but all fringes shall be paid to the funds of the workers' Union. The Employer shall replace such workers as soon as qualified registered applicants for employment are available from the Local Union that was unable to meet the initial request for workers. In addition, the Local Union must be provided the opportunity to fulfill any subsequent request for workers from that craft. If no current employees are available from other crafts to perform the work, after five working days notice to the Unions, the Employer shall be entitled to hire employees who will not be dispatched by the Unions and will not be covered by this Agreement.

Section 6.   During a reduction in force, the EMPLOYERS have the right to retain the employees of their choice without regard to any other criteria.  Employees terminated for cause shall not again be referred for employment to the SITE for a period of ninety (90) days and the UNION may not require the rehire of such employees.

Section 7.   An employee or applicant required to satisfactorily demonstrate his/her ability to perform certain tasks through an examination or test (i.e., welding test) shall be paid for that time required to take the exam or test provided the employee or applicant successfully passes the exam or test.

Section 8.   The Employers and the Unions agree to facilitate the entry of veterans into the Building and Construction Trade Industry.  Therefore the parties agree to utilize the services of the center for military recruitment, assessment and veterans employment (hereinafter "Center") and the Center's Helmets to Hardhats program. The Center will serve as a resource to recruit applicants into the unions' apprenticeship and journeyman programs and the unions agree to keep the Center abreast of opportunities available of their trade.

## ARTICLE VII
## GRIEVANCE PROCEDURE

Section 1.   Represented manual craft EMPLOYEES are encouraged to process any EEO/AA related complaints or Employee Concerns through the grievance procedure contained in this AGREEMENT.

Section 2.   All disputes or grievances, including those identified in Section 1 of this Article, and all grievances over the interpretation and application of this AGREEMENT, exclusive of questions of jurisdiction on work, shall be handled in the following manner:

Step 1.      All disputes or grievances over EMPLOYER actions under this AGREEMENT, which are not resolved informally, shall be resolved between the aggrieved party, the designated craft steward, and the aggrieved party's immediate supervisor.

In order to encourage the resolution of disputes or grievances at STEP 1 of this grievance procedure, the parties agree that such settlements at STEP 1 shall not be precedent setting.

Step 2.      If the dispute or grievance is not resolved informally, as set forth in STEP 1, within five (5) working days, then either aggrieved party (the UNION or the EMPLOYER) shall reduce the dispute or grievance to writing on a form provided by the Employer/Union

The Business Representative of the UNION and the EMPLOYER'S designated representative shall meet at the SITE within five (5) working days after receipt of the written dispute or grievance. If there is no settlement at STEP 2, then the aggrieved parties shall proceed to STEP 3.

Grievances not resolved in STEP 1 or 2, and which proceed to STEP 3, shall be coordinated through and monitored by SRR.

Step 3.    If the dispute or grievance is not resolved at STEP 2, it shall be referred to the General President of the UNION or his designated International Representative and the appropriate representative of the EMPLOYER.  If the dispute or grievance is not promptly settled on this level, the parties may by mutual written agreement extend the period for settlement to a fixed date, or the dispute or grievance may promptly be submitted to arbitration as set forth below.

Step 4.    If, after referral to STEP 3, the dispute or grievance remains unresolved, and there is no mutual written agreement to extend the period for settlement to a fixed date, then the matter shall then be referred to arbitration by either party, upon written notice to the other.  If the parties are unable to agree upon an arbitrator, application may be made by either party to the Federal Mediation and Conciliation Service for a panel of five (5) arbitrators, upon receipt of which, both parties shall immediately alternately strike names until the last name remains, which person shall be designated as the arbitrator.  The decision of the arbitrator shall be rendered no later than fifteen (15) days from the date of submission and shall be final and binding upon the EMPLOYER and upon the UNION and its members.  The arbitrator shall have no authority to change, amend, add to, or detract from any of the provisions of this AGREEMENT.

Section 3.    In the event either party is entirely sustained by the arbitrator, the other party shall pay the entire cost of the proceedings, including compensation for the services of the arbitrator.  Should a split decision be rendered by the arbitrator, the arbitrator shall similarly determine the split in cost, as in the arbitrator's judgment, is equitable between the parties.

The EMPLOYER and UNION shall pay their own expense, including attorney fees, incidental to the preparation and presentation of its case.

Section 4.    At the request of either party, the arbitrator's decision shall be reduced to writing, setting forth at a minimum the pertinent facts of the grievance, the decision and the reasons for such decision.  Subject decision shall be final and binding on all parties herein, but shall be final and binding only with respect to the issue or issues submitted by the parties.  If either party refuses to abide by the decision of the arbitrator, then the aggrieved party shall be free to enforce the award in any legal manner.

Section 5.    The time limits specified in any step of the Grievance Procedure may be extended by mutual agreement of the parties initiated by the written request of one party to the other, at the appropriate step of the Grievance Procedure.  However, failure to process a grievance, or failure to respond in writing, within the time limits provided above, without a request for an extension of time, shall be deemed a waiver of such grievance to the other without prejudice, or without precedent to the processing of and/or resolution of like or similar grievances or disputes.

Section 6.    Grievances relating to the acts or failure to act of any particular party shall be filed against that party.  There shall be no actual or threatened work stoppage, work interruption, slowdown, featherbedding, sit-down, strike, picketing, hand billing, or public notice of any kind during the entire term of proceedings under this Grievance Procedure.

Section 7.    No adjustment or grievance decision may provide for retroactivity or back pay exceeding sixty (60) days prior to the date of the filing of the written grievance.


**ARTICLE VIII**
**JURISDICTION**

Section 1.    A crew assigned to a specific job assignment, when encountering some part of that assignment that necessitates the use of another craft not present, will be allowed to perform such work so as to allow the primary craft to continue their work unencumbered, providing the cumulative man hours of the ancillary work does not exceed two (2) man-hours.  In such cases, the craft with the proper jurisdiction would then be called.

Section 2.    The EMPLOYER and the UNIONS recognize the necessity for eliminating restrictions and promoting efficiency and agree that no rules, customs or practices shall be permitted that limit production or increase the time required to do the work.

Section 3.   Work shall be assigned by the EMPLOYER in accordance with the Procedural Rules and Regulations for the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry, and jurisdictional disputes will be settled in accordance with the procedural rules and decisions of such Board or successor agency.

Section 4.   SRR will insure that each EMPLOYER covered by this Agreement holds a pre-job conference prior to WORK actually starting at the SITE.   Good faith efforts will be made by SRR and EMPLOYER to resolve all anticipated disputes over work assignments.   These efforts will include pre-job conferences, mark-up meetings and jurisdictional disputes meetings between Business Representatives and/or International Representatives.

Section 5.   There shall be no work stoppage or interruption of WORK while any jurisdictional dispute is being resolved. The WORK shall proceed as originally assigned until the dispute is resolved.   No back pay or monetary penalty of any type shall be assessed as a result of the resolution of any jurisdiction dispute or work assignment dispute.

Section 6.   Work assignments of employees assigned to non-covered work with Maintenance and/or Operations personnel shall be at the sole prerogative of the Employer and shall not be subject to this Article.

**ARTICLE IX**
**UNION REPRESENTATION**

Section 1.   Authorized representatives of the UNION on UNION business shall have access to the SITE during working hours.  They shall comply with visitor and security rules established for the SITE.

Section 2.   Each craft signatory to this Agreement and working on the energy-related construction Project may place one (1) working steward for each EMPLOYER to act as a representative of the UNION in connection with UNION business.  Stewards shall be allowed reasonable time to conduct UNION business.  Each craft may have a steward on the job when work of that craft is being performed.  The steward will remain on the job as long as he/she is qualified, willing, and able to perform the work.  In the event of overtime work, the UNION may name one of the workers performing the overtime work to act as steward if the regular steward is not qualified to perform the overtime work.  The working steward will be paid at the applicable wage rate for the job classification in which he/she is employed.  There shall be no non-working stewards.
Each steward shall be concerned with the employees of the steward's employer and not with the employees of any other employer. New employees will be introduced to the steward on their first full day of employment.

Section 3.   If a steward is to be terminated for cause, the employer will notify the UNION by phone and follow up in writing prior to taking such action.

Section 4.   On work where the OWNER'S personnel or Maintenance/Operations personnel may be working in close proximity of the construction activities, the UNION agrees that UNION representatives, stewards and individual workers will not interfere with the OWNER'S or Maintenance/Operations personnel or with the work which is being performed by the OWNER'S or Maintenance/Operations personnel.

**ARTICLE X**
**WAGE AND BENEFITS**

Section 1.   The hourly base wage rates and UNION fringe benefits paid EMPLOYEES shall be the hourly wage rates and UNION benefits as contained in "Appendix A", attached hereto, and by reference made a part of this Agreement.

Section 2.   The EMPLOYER adopts and agrees to be bound by the written terms of legally established trust agreements specifying the detailed basis on which payments are to be made into, and benefits paid out of, such trust funds.  The EMPLOYER authorizes the parties to such trust agreements to appoint trustees and successor trustees to administer the trust funds and hereby ratifies and accepts the trustees so appointed as if made by the EMPLOYER.  Nothing contained in this Section is intended to require the EMPLOYER to become a party to nor be bound by a local collective bargaining agreement except for the EMPLOYEE benefit fund contributions as required herein, nor is the EMPLOYER required to become a member of any employer group or association as a condition for making such contributions.

Section 3.   The existing wage/fringe package may be reallocated to existing fringe benefit funds, with thirty (30) days written notice from the Union(s) to SRR.  In any reallocation, the total wage/fringe package shall not exceed the total of the existing wage/fringe package as contained in Appendix A.

Section 4.   Future hourly wage rates and UNION fringe benefit adjustments for the SITE will be made once a year, effective the first full pay period in October of each succeeding year, for all crafts and covering all contracts and signatory EMPLOYERS.  The adjustments will be determined by the M & O Contractor and a committee comprised of one (1) representative from each of the signatory UNIONS using the average wage and fringe benefit monetary adjustment as arrived at by the Southeastern States Survey with independent confirmation by the Construction Labor Research Council (CLRC) Southeast States Survey, or successor agency.

Section 5.   Existing "Amended Benefits" (Option A) will be recognized only for manual craft EMPLOYEES who selected Option A benefits and who were on the active manual craft payroll as of *September 22, 2009.* EMPLOYEES currently on Option A, who may subsequently be terminated and are rehired at a future date, shall be exclusively on UNION fringes.

Section 6.   Industry promotion or administrative funds or other funds which do not accrue to the direct benefit of SITE EMPLOYEES are not considered fringe benefits for purposes of this AGREEMENT will not be surveyed for future adjustments, and need not be paid by the EMPLOYER.

Section 7.   The EMPLOYER agrees that it will, when requested by the UNION, deduct from the pay of each EMPLOYEE, who is at the time a member of the UNION, or made application to become a member of the UNION, current UNION working dues from the gross wages.  These deductions shall be deducted upon presentation of a proper legal payroll deduction authorization signed by said EMPLOYEE requesting such deduction, and remitted monthly of the following month, the aggregate amount of such deduction directly to the respective Local UNION.

Section 8.   Fringe benefit payments shall be paid only on the basis of hours worked, not hours paid for, except where this is in violation of existing applicable trust agreements, in which case the provisions of existing applicable trust agreements will prevail.

## ARTICLE XI
## HOURS OF WORK, OVERTIME, SHIFT PROVISIONS

Section 1.  The Standard Work Day.

The standard work day shall be eight (8) hours and the standard work week shall be forty (40) hours, Monday through Friday, provided however that nothing herein shall be construed as guaranteeing any EMPLOYEE eight (8) hours of work per day or forty (40) hours of work per week.  The standard work week shall commence with the start of the first shift (day shift) on Monday morning.

Starting time for the standard work day or work week for service crafts such as drinking water crew, shuttle drivers, equipment mechanics, traffic flagman, fire watch etc., may be adjusted between the hours of 4:00 a.m. and 11:00 a.m. to accommodate weather conditions, traffic, emergency outages or other circumstances beyond the control of the EMPLOYER.

Section 2.  Standard Shift Work.

A.   The first shift (day shift) shall consist of eight (8) hours work for eight (8) hours pay at the basic straight time hourly wage rate, plus one-half (1/2) hour unpaid lunch period.  The first shift shall be worked between the hours of 7:00 a.m. and 3:30 p.m.

The second shift (swing shift) shall consist of seven and one-half (7 1/2) hours work for eight hours pay at the basic straight time hourly wage rate, plus one-half (1/2) hour unpaid lunch period.  The second shift shall be worked between the hours of 4:00 p.m. and 12:00 midnight.

The third shift (graveyard shift) shall consist of seven (7) hours work for eight (8) hours pay at the basic straight time hourly wage rate, plus one-half (1/2) hour unpaid lunch period.  The third shift shall be worked between the hours of 12:00 midnight and 7:30 a.m.

B. Fringe benefit contributions for EMPLOYEES working a full second or third shift shall be paid on the basis of eight (8) hours.

C. Shifts shall be established and continue for a minimum of five (5) consecutive work days.  If Saturday and/or Sunday are worked, they shall be included in the five (5) day minimum period.

D. The employer may adjust the starting time of any shift by up to one (1) hour, either before or after the starting times defined in Section 2 - A of this Article.  When changing the starting time to establish a new shift, the employer must comply with Section 2 - C of this Article.

E. Lunch is normally scheduled from 12 o'clock noon to 12:30 p.m.  If for any reason the time is changed, employees must be notified at least 30 minutes in advance or the employer will be required to pay the employee overtime pay for working during the regular scheduled lunch period.  The lunch period must be observed between the hours of 11 a.m. and 1 p.m.

Section 3.  Four-Ten Shift

The EMPLOYER shall have the right to establish a first and/or second shift consisting of four (4) consecutive ten (10) hour days, either Monday through Thursday or Tuesday through Friday.

The first shift shall be ten (10) hours work, for- ten (10) hours pay at the basic straight time hourly wage rate, plus a one-half (1/2) hour unpaid lunch period.  The first shift shall be worked between the hours of 7:00 a.m. and 5:30 p.m.

The second shift shall be nine and one-half (9 1/2) hours of work for ten (10) hours pay at the basic straight time hourly wage rate, plus a one-half (1/2) hour unpaid lunch period.  The second shift shall be worked between the hours of 5:30 p.m. and 3:30 a.m.

Fringe benefit contributions for EMPLOYEES working a full second shift shall be paid on the basis of ten (10) hours.

A. The EMPLOYER may adjust the starting time of any four ten shift by up to one (1) hour, either before or after the standard starting times defined in Section 3 of this Article. When changing the starting time to establish a new shift, the EMPLOYER must comply with Section 3 - B of this Article.

B. Liquid Waste is one contiguous area; therefore, any shift established under this agreement shall apply to that same contiguous area.  Shifts shall be established and continue for a minimum of four (4) consecutive work days.

C. Employees assigned to a four-ten shift can not be transferred to another four-ten shift when a holiday or make-up day falls on either of the shifts.

Section 4.  Alternating Four-Tens

Under this operation the day shift manual workforce is organized into two (2) teams.  The "A" team works four (4) consecutive ten (10) hour days.  On the fifth day the "B" team continues the work activities for four (4) consecutive ten (10) hour days.  On the ninth day the "A" team returns to work to continue the construction activities.  The four (4) day alternating "A" and "B" team operation can continue on a year-round basis.  The same pattern applies for second shift.  If two shifts are established, they shall be consecutive.

A. In this arrangement the standard work day for all EMPLOYEES will be ten (10) consecutive hours of work, exclusive of one-half (1/2) hour non-paid lunch period.

On "A" and "B" team operation; the first ten (10) hours worked shall be paid at the basic straight time hourly rate.  After ten (10) hours of work the rate shall be one and one-half (1 1/2) times the basic straight time hourly wage rate.  On a second alternating shift, the shift shall consist of nine and one-half (9 1/2) hours work for ten (10) hours pay at the basic straight time hourly wage rate.

Under this shift option, Saturday shall be paid at straight time and Sunday shall be paid at one and one-half (1 1/2) times the basic straight time hourly wage rate.  The work day for each EMPLOYEE shall be defined as the twenty-four (24) hour period which begins with the regular starting time of the EMPLOYEE'S shift and ends with the regular starting time of the EMPLOYEE'S shift the following day.  In this shift arrangement, the day shift shall be worked between the hours of 6:00 a.m. and 6:30 p.m., as described above.

B. Those General Foremen and selected Foremen who are directed to report to work the day before the first day of the four (4) day work cycle to complete preparations for their team's scheduled work activities shall work eight (8) hours on that day and be paid one and one-half (1 1/2) times the basic straight time hourly wage rate.

C. If, for any reason, an employee is directed to report to work the day after completion of their four (4) day shift, they shall be paid at the rate of two (2) times (double) the basic straight time hourly wage rate. The second day after shall be paid at one and one-half times.  The third day at double time and the fourth day at one and one-half times.   If, for any reason, an employee is directed to report to work the day before their shift, that day shall be paid at one and one-half the straight time hourly rate. Two days prior will be paid at double time.  Three days prior at one and one-half and four days prior at double time.

D. Changing from one alternating shift to another, including a standard shift work or a four-ten (4-10) shift, will not be permitted without a minimum of two (2) consecutive non-working days.   Work performed on either of the two consecutive non-working days shall be paid at the applicable overtime rate as defined in section 4 - C of this article.

E. Fringe benefit contributions for EMPLOYEES working a full second shift shall be paid on the basis of ten (10) hours.

Section 5.  Overtime

Except as specifically modified in, Sections 3, 4 and 6 of this article and Article II, Section 1,  all work performed in excess of the standard work day or shift, Monday through Friday, and all work performed on Saturday, shall be at the rate of one and one-half (1 1/2) times the basic straight time hourly wage rate.  All work performed on Sundays and Holidays, shall be paid at two (2) times the basic straight time hourly wage rate.   There shall be no duplications or pyramiding of overtime and/or premium pay.

Section 6.  Make-up Day

In the event it is not possible to work Monday through Friday on a standard work day because of weather conditions, the EMPLOYER shall have the option of having Saturday available as a make-up day at straight time pay up to forty (40) hours of work.  Time worked over forty (40) straight time hours in the work week or in excess of a standard work day, shall be at the applicable overtime rate.   This provision also applies to the four-ten shift, where Friday is the make-up day for the Monday through Thursday shift.  Employees must be told during their preceding shift (or sooner) that a make-up will be worked or the entire make-up day will be considered overtime.   Make-up days must be scheduled for at least eight or ten hours depending on the employer's normal shift hours.

Make-up days are voluntary.  If an employee informs his/her supervisor during the preceding shift, that he/she is unable to work the make-up day, failure to work the make-up day will not be considered as absenteeism.

## ARTICLE XII
## HOLIDAYS

Unpaid holidays recognized under this AGREEMENT shall be:  New Year's Day ¨ Last Monday in May ¨ Independence Day ¨ Labor Day ¨ Thanksgiving Day ¨ Christmas Day

Section 1.  Should any of these Holidays fall on a Saturday, the Holiday shall be observed on the day prior, being Friday.  Should any of these Holidays fall on Sunday, the Holiday shall be observed on the next day, being Monday.  When such Holidays fall on a Tuesday or Thursday, the EMPLOYER shall have the option to close down the job on Monday or Friday, as applicable, provided notice is given to the EMPLOYEES one (1) week in advance.  A Holiday shall be the 24-hour period commencing with the start time on the first shift on the day of the Holiday.  No work shall be performed on Labor Day except to save life or property.

Section 2.  It will not be a violation of this Agreement when the EMPLOYER or OWNER considers it necessary to shut down the project because of an emergency situation that could endanger life, safety, or property.  In such cases EMPLOYEES will be compensated only for actual time worked.

## ARTICLE XIII
## MINIMUM PAY AND REPORTING TIME

When employees report for work at the time and place specified by the EMPLOYER and they are not put to work or they work less than two (2) hours, they shall be paid for two (2) hours at the applicable straight time rate of pay.  If after working two (2) hours they are prevented from working a full shift, they shall be paid for actual hours worked.  It is the intent of this Section that employees who show up for work shall be paid at least two (2) hours of a shift except when they have been notified, at the EMPLOYER'S expense.   If employees leave the job on their own accord, they will be paid for actual hours worked.  If employees report to work in a condition unable to work, they will not be eligible for reporting pay.

## ARTICLE XIV
## SPECIAL PROCESSING TIME

To accommodate the OWNER'S requirements and procedures and to comply with DOE security regulations and applicable state, federal and OSHA requirements, the EMPLOYER shall be allowed up to a maximum of eight (8) hours straight time for pre-employment non-paid processing time on the first day of employment.  Employees must report to the EMPLOYER designated location within one (1) hour from the start of the shift.  Pre-employment processing will not extend into premium hours.  Applicants referred by the UNIONS to the EMPLOYER for employment who are not hired for reasons of substance abuse, medical, security, or craft qualification requirements will not be paid for any time spent in pre-employment processing.

## ARTICLE XV
## LABOR-MANAGEMENT COOPERATIVE COMMITTEE

Section 1.  The parties to this AGREEMENT hereby recognize the necessity of communication and cooperation and the elimination of disputes, misunderstandings or unfair practices on the part of any party.  To secure this end, it is hereby agreed that a Labor-Management Cooperative Committee shall be established to be composed of representatives of signatory EMPLOYERS at the SITE, and UNIONS that are a party to this AGREEMENT who shall meet as required, but not less than quarterly.  The UNIONS and EMPLOYERS shall at such meetings present facts concerning any alleged violation of any part of this AGREEMENT.  They shall also bring up any practice which, in their opinion, might lead to a misunderstanding or dispute between the Parties.

Section 2.  SRR shall chair the Labor-Management Cooperative Committee, develop procedures of operation, publish meeting agenda and issue minutes of each meeting.

Section 3.  The Labor-Management Cooperative Committee shall not be used for the purpose of arriving at any agreement to supersede, alter, modify, amend, add to or detract from this AGREEMENT.

**ARTICLE XVI**
**SUBCONTRACTING**

Section 1.   Any subcontractor, of whatever tier, performing DBA covered work on this project SITE where SRR is acting in the capacity of a constructor shall become signatory to this Project Agreement.  Such subcontractor shall indicate his/her acceptance of the terms and conditions of this Agreement by signing the Agreement and by delivering a copy to the appropriate UNION(S) and SRR prior to commencement of work on the SITE.  This Agreement shall apply to and be binding upon EMPLOYERS for DBA work performed by them on this Project only.  All subcontractors, of whatever tier, will arrange and conduct a pre-job conference with the signatory UNIONS prior to starting their work on the project.

Section 2.   All subcontractors will be required to pay the total wage and benefit package as contained in "Appendix A" of this Agreement through the duration of their work on the project and will provide certified payrolls to SRR which will be available to the UNION upon request.


**ARTICLE XVII**
**GENERAL CONDITIONS**

Section 1.   The OWNER and SRR retain the right to contract directly with other companies for work not covered by this Project Agreement at the SITE.  The UNION shall not interfere in any way with the OWNER'S or these companies' personnel, operation or facilities at the SITE.

Section 2.   The selection and number of Foreman and General Foremen, including the number and type required, shall be entirely the responsibility of the EMPLOYER with input from the UNIONS.   In the selection process, the EMPLOYER must consider safety, technical skill requirements, and the craft that has primary jurisdiction. The EMPLOYER may require Foremen to be working employees. (Excluding General Foreman)

Section 3.   There shall be no restriction other than may be required by safety regulations on the number assigned to any crew.

Section 4.   It is agreed and is the intent of the parties that there be a full day's work for a fair day's wages.

Section 5.   There will be no slowdowns, standby crews and make-work practices.

Section 6.   In the interest of the future of the construction industry in the Central Savannah River Area of which labor is a vital part, and to maintain the most efficient and competitive posture, the UNION pledges to work with management to produce the most efficient utilization of labor and equipment on the Project in accordance with this Agreement.

Section 7.   There shall be no organized coffee or rest breaks on the Project.

Section 8.   Pay day shall be once per week with no more than five (5) days held back.  Checks shall be distributed prior to the end of the employee's assigned shift. When employees are laid off for lack of work, the Employer shall be required to distribute the final pay check prior to the end of the employee's assigned shift. When employees are either terminated for cause or voluntarily quit, the Employer shall be required to mail the paycheck on the employees' normal payday to the employees' address of record unless he has made other arrangements.

Section 9.   The receipt, inspection and transportation of material and the methods, procedures and control for warehousing and storage of equipment, materials and tools shall be the strict prerogative of the EMPLOYER.

Section 10.  The EMPLOYER will have the right to determine crew sizes, including partial crews during inclement weather.

Section 11.  Practices not included or specifically set forth in the terms and conditions of this Agreement shall not be recognized.

Section 12.  The EMPLOYER shall provide sanitary toilet facilities and cool sanitary drinking water.

Section 13.  The welding torch, small power tools and chain falls are tools of the trade having jurisdiction over the work being performed.

Section 14. Clock, brass or other accountability system may be used at the option of the EMPLOYER to check employees in or out of the Project on a daily basis.

Section 15. Workmen shall be at their designated place of work at the starting time and shall remain at their designated place of work performing their assigned functions, including tool pickup, under the supervision of the EMPLOYER until quitting time.

Section 16. The EMPLOYER retains the right to use any off-site fabricated, factory assembled or pre-cast items, materials, apparatus or equipment purchased by the OWNER or SRR or at the direction of the OWNER or SRR in connection with this Project, as well as any labor saving devices or tools used in the construction of this Project.

Section 17. The EMPLOYERS shall not be required to pay for travel, premium zone or zone rates, or living allowances. There will be no wage premiums or extra pay for high time, low time, type of work or material, special skills, wearing of protective clothing or equipment, etc.  In no instance will employees be paid for standing by and/or observing operations unless they are specifically directed to do so by their EMPLOYER.

Section 18. The UNIONS and the EMPLOYER agree that specific work operations or conditions may be enhanced through the implementation of a composite crew.  If an EMPLOYER identifies a specific work operation that may be performed more efficiently by a composite craft arrangement, the EMPLOYER will notify the affected UNIONS.  A meeting will be held with the affected UNIONS where the EMPLOYER will provide forecasted staffing levels, duration and scope details. Upon agreement of the affected UNIONS, the EMPLOYER may implement the composite arrangement within the limitations set forth in the meeting.

## ARTICLE XVIII
## APPRENTICES/TRAINEES/HELPERS/SUB-JOURNEYMAN

Section 1. Recognizing the need to maintain continuing support of programs designed to develop adequate numbers of competent workers in the construction industry, the EMPLOYER will employ apprentices in the respective crafts to perform such work as is within their capabilities and which is customarily performed by the craft in which they are indentured.

Section 2. The combined employment of apprentices and non-journeymen classifications may be thirty-three and one-third percent (33-1/3%) of the craft workforce at all times, and the composition of this ratio shall be at the craft's discretion.

Section 3. This article will only apply to those crafts, which have the above classifications in their local agreements.

## ARTICLE XIX
## NON-DISCRIMINATION

It is agreed that equal employment opportunity shall be afforded to all qualified persons without regard to: handicapping conditions unrelated to the successful accomplishment of the job for which employed, age, race, creed, color, sex, or national origin.  This shall be applicable to all matters relating to hiring, training, promotion, transfer or termination of employees.  Where the male gender is used in this agreement it shall be gender neutral and apply equally to males and females.

## ARTICLE XX
## NO STRIKE - NO LOCKOUT

Section 1. The signatory UNIONS agree that there will be no strikes, sympathy strikes, work stoppages, picketing, hand billing, public notices or other disruptive action for any reason.  Participation by an employee or group of employees in an act violating the above provision will be cause for discharge by the EMPLOYER.  If there is a strike, threat of strike, work stoppage, informational picket or picket line in violation of this Agreement by any craft, it is agreed that the other crafts will be bound to ignore such action and continue to man the SITE without interruption.

Section 2.   The EMPLOYER agrees not to lockout the UNIONS during the term of this Agreement.  The EMPLOYER may suspend a portion of the work or shut down the project or any portion thereof in the event of a slow down by one or more UNIONS or a partial or complete work stoppage by one or more UNIONS.

Section 3.   Nothing in the Agreement shall be construed to limit or restrict the right of the UNIONS or the EMPLOYER to pursue fully any and all remedies available under law in the event of a violation of this Article.

## ARTICLE XXI
## ENVIROMENTAL, SAFETY AND HEALTH

Section 1.   It shall be the responsibility of each EMPLOYER to ensure safe working conditions and employee compliance with any safety rules contained herein or established by the DOE or Employer.  It is understood that the employees have an individual obligation to use diligent care to perform their work in a safe manner and to protect themselves and the property of the EMPLOYER and the DOE.  Each employee is obligated and authorized to initiate a "Time Out" or stop work if continuing a work task is deemed unsafe.

Section 2.   The UNIONS agree to support the implementation of the SRR approved Integrated Safety Management System and promote policies that encourage a safe and healthful working environment.

Section 3.   Employees shall be bound by the environmental, safety, and health compliance requirements established by the EMPLOYER or DOE.  These rules will be published and posted in conspicuous places at the work SITE.  An employee's failure to satisfy his obligations under this Section will subject them to disciplinary actions, up to and including termination.

Section 4.   **Joint Labor-Management Safety Sub-Committee.**   SRR and the UNIONS shall each designate a representative to act as a Joint Safety Sub-Committee.  The Sub-Committee shall be jointly chaired by SRR and a representative from the Building Trades UNIONS.  The Sub-Committee shall meet at the call of the Joint Chairs to receive reports on safety programs instituted by the OWNER, SRR, and EMPLOYERS on the site and to discuss and advise such parties with regard to recommended safety programs and procedures to maintain the highest level of occupational safety on the SITE, including the institution and operation of labor-management safety teams.  It is understood that the Sub-Committee's purpose is to assist the EMPLOYERS in fulfilling their obligations to establish and implement appropriate Worker Safety and Health Programs under 10 CFR 851 and thereby assure a safe and healthy work environment.  In performing the functions assigned to it, neither the Sub-Committee nor its members are assuming the EMPLOYERS' responsibilities.

Section 5.   **DOE Voluntary Protection Program (VPP).** The EMPLOYERS and UNIONS agree to jointly support the pursuit of achieving and maintaining DOE VPP certification and supporting Environmental, Safety, and Health Programs.  All parties agree to and understand that the DOE created VPP to encourage and recognize excellence in safety and health, and to accomplish DOE's mission of protecting America's workers through voluntary efforts.  We understand the requirements of the program are based on comprehensive safety and health management systems, with represented employees actively and meaningfully involved in the safety and health program.

## ARTICLE XXII
## GENERAL SAVINGS CLAUSE

Any provisions in this Agreement which are in contravention of any federal, state, local or county regulation or laws affecting all or part of the limits covered by this Agreement shall be suspended in operation within the limits to which such law or regulation is applicable for the period during which such law or regulation is in effect.  Such suspension shall not affect the operation of any such provisions covered by this Agreement to which the law or regulation is not applicable.  Nor shall it affect the operations of the remainder of the provisions of the agreement within the limits to which such law or regulations is applicable.  The EMPLOYER and the UNIONS agree that if and when any provision of this Agreement is held or determined to be illegal or void, they will then promptly enter into lawful negotiations concerning those provisions.

## ARTICLE XXIII


## DURATION

This Agreement shall be effective as of *September 22, 2009* and shall remain in full force and effect for the duration of any work assigned to SRR at the SITE within the scope of this Agreement.

This Agreement shall not be amended or supplemented except by mutual consent of SRR and the Unions, reduced to writing and duly signed by each.

In witness hereof, the Parties hereto have executed this Agreement this *twenty second day of September 2009.*

FOR: Savannah River Remediation LLC:

FOR: Augusta, GA Building and Construction Trades Council



By: _____

**James W. French**
**President and Project Manager**

By: _____

**Kenneth T. Ward**
**President**



By: _____

**Thomas W. Manley**
**Manager, Labor Relations**

By: _____

**John W. Wahl**
**Vice President**



By: _____

**Abe N. Dial**
**Project Field Superintendent**

EMPLOYER'S
LETTER OF ASSENT

Pursuant to Articles IV and XVI of the SRR Project Agreement for the Department of Energy at the Savannah River Site, the undersigned authorized representative of the employer hereby agrees that it will comply with and be bound by all of the terms and conditions of the Project Agreement.

The Letter of Assent shall remain in effect for the duration of all work performed under the SRR Project Agreement for the Department of Energy at the Savannah River Site, after which this letter of Assent will automatically terminate.  Please print or type requested information except for the signature.

FOR THE EMPLOYER:

Name of Employer: _____

Address: _____

City, State  Zip: _____

Phone Number: _____

FAX Number: _____

By (Signature): _____

By (Name Printed): _____

Title: _____

Date: _____


Name of Employer: _____

Address: _____

City, State  Zip: _____

Phone Number: _____

FAX Number: _____

By (Signature): _____

By (Name Printed): _____

Title: _____

Date: _____

**APPENDIX B:**
**REFERRAL PROCEDURE FOR THE**
**SAVANNAH RIVER SITE**

1) THE SIGNATORY UNIONS MAINTAIN AN EXCLUSIVE AND NONDISCRIMINATORY HIRING HALL.  ALL REFERRALS SHALL BE MADE UNIFORMLY IN ACCORDANCE WITH THESE POSTED RULES, SUBJECT TO THE PROJECT AGREEMENT.  THERE SHALL BE NO DISCRIMINATION BASED ON ANY FACTOR PROHIBITED BY LAW.

2) ALL APPLICANTS FOR REFERRAL MUST REGISTER AT THE LOCAL OFFICE BY APPEARING PERSONALLY.

3) THE EMPLOYER SHALL CALL UPON THE LOCAL UNION FOR REFERRAL OF EMPLOYEES. THE LOCAL UNION WILL REFER REGISTERED APPLICANTS IN ACCORDANCE WITH THE FOLLOWING PROCEDURES UNLESS OTHERWISE PROVIDED IN THE PROJECT AGREEMENT:

   A. EACH LOCAL UNION SHALL MAINTAIN TWO SEPARATE OUT-OF-WORK LISTS. ONE LIST SHALL BE THE STANDARD LIST, SUBJECT TO THE NONDISCRIMINATORY REFERRAL RULES OF THE LOCAL UNION.  THE OTHER LIST SHALL BE PROVIDED BY THE CONSTRUCTION MANAGER AND IDENTIFY ONLY ELIGIBLE 3161 APPLICANTS.  THIS LIST SHALL BE REFERRED TO AS THE 3161, OR THE "PREFERENTIAL HIRING" LIST.  IT WILL BE SORTED BY THE LAST DATE OF LAYOFF FROM THE SAVANNAH RIVER SITE.

   B. EACH LOCAL UNION WILL REFER APPLICANTS TO SIGNATORY EMPLOYERS, GIVING A THREE TO ONE RATIO OF PREFERENCE TO THOSE ON THE 3161 LIST. THIS PREFERENCE TO THOSE ON THE PREFERENTIAL LIST WILL BE OFFERED ONLY ONE TIME.  ONCE A 3161 APPLICANT ACCEPTS A PREFERENTIAL REFERRAL, HE/SHE WILL NO LONGER BE ELIGIBLE FOR SAME.

   C. THE BUSINESS MANAGER MAY SEND A QUALIFIED STEWARD AT THE BEGINNING OF A JOB, REGARDLESS OF POSITION ON THE OUT-OF-WORK LIST.

4) AVAILABLE FOR EMPLOYMENT, FOR PURPOSES OF THIS PROCEDURE, MEANS THE APPLICANT MUST BE CURRENTLY REGISTERED OR PRESENT AT A LOCATION WHERE HE/SHE CAN BE REACHED BY TELEPHONE.  THE APPLICANT MUST ALSO BE QUALIFIED TO FILL THE JOB.

5) THE EMPLOYER AT ALL TIMES MAKES THE ULTIMATE DETERMINATION OF QUALIFICATION OF APPLICANTS WHO ARE REFERRED.  THE EMPLOYER RETAINS THE RIGHT TO REJECT OR ACCEPT APPLICANTS FOR EMPLOYMENT.

6) THE RETENTION AND REMOVAL OF ALL 3161 APPLICANTS FROM REGISTRATION ON THE OUT-OF-WORK LIST WILL BE IN ACCORDANCE WITH THE FOLLOWING:

   A. AN APPLICANT WHO IS DISPATCHED TO A JOB AND COMPLETES FORTY HOURS OF WORK WILL BE REMOVED FROM THE 3161 OUT-OF-WORK LIST.  IF A DISPATCHED APPLICANT IS REJECTED BY THE EMPLOYER OR FAILS TO COMPLETE FORTY HOURS OF WORK, HE/SHE WILL STAY ON THE 3161 OUT-OF-WORK LIST.

   B. AN ELIGIBLE APPLICANT WHO FAILS TO ACCEPT DISPATCH TO EMPLOYMENT WILL BE REMOVED FROM THE 3161 OUT-OF-WORK LIST.

C.  AN APPLICANT WHO IS DISPATCHED TO A JOB AND FAILS TO REPORT TO WORK, VOLUNTARILY QUITS OR IS TERMINATED FOR CAUSE, WILL BE REMOVED FROM THE 3161 OUT-OF-WORK LIST.

D.  APPLICANTS WHO HAVE BEEN REMOVED FROM THE 3161 OUT-OF-WORK LIST MAY RE-REGISTER ON THE STANDARD LIST BY APPEARING PERSONALLY AT THE LOCAL UNION OFFICE.  3161 APPLICANTS WHO WERE REMOVED FOR DISPATCH TO A JOB UNDER SECTION "A" ABOVE, MUST SHOW PROOF OF TERMINATION-BY-TERMINATION SLIP AT THE TIME OF RE-REGISTRATION.

E.  TO INSURE MAINTENANCE OF THE 3161 OUT-OF-WORK LIST, APPLICANTS SHALL RE-REGISTER PROMPTLY, WITHIN FORTY-EIGHT (48) HOURS OF TERMINATION OR REJECTION FROM A JOB AS DEFINED IN "A" ABOVE.

7)  AN APPEALS COMMITTEE IS HEREBY ESTABLISHED COMPOSED OF ONE MEMBER APPOINTED BY THE SIGNATORY BUILDING AND CONSTRUCTION TRADES UNIONS, ONE MEMBER APPOINTED BY THE CONSTRUCTION MANAGER, AND A PUBLIC MEMBER APPOINTED BY BOTH THESE MEMBERS.  IT SHALL BE THE FUNCTION OF THE APPEALS COMMITTEE TO CONSIDER ANY COMPLAINT OF ANY EMPLOYEE OR APPLICANT FOR EMPLOYMENT ARISING OUT OF THE ADMINISTRATION BY THE LOCAL UNION OF THE 3161 OUT-OF-WORK LIST.  THE APPEALS COMMITTEE SHALL HAVE THE POWER TO MAKE A FINAL AND BINDING DECISION ON ANY SUCH COMPLAINT WHICH SHALL BE COMPLIED WITH BY THE LOCAL UNION.  THE APPEALS COMMITTEE IS AUTHORIZED TO ISSUE PROCEDURAL RULES FOR THE CONDUCT OF ITS BUSINESS, BUT IT IS NOT AUTHORIZED TO ADD TO, SUBTRACT FROM, OR MODIFY ANY OF THE PROVISIONS OF THIS PROCEDURE AND ITS DECISIONS SHALL BE IN ACCORD WITH THIS PROCEDURE. THE APPEALS COMMITTEE MAY NOT DETERMINE ANY MONETARY DAMAGES.

8)  THE EMPLOYER MAY REQUEST FROM THE SIGNATORY UNIONS EMPLOYEES WHO, IF AVAILABLE, POSSESS SPECIAL SKILLS AND/OR QUALIFICATIONS SUCH AS WELDER CERTIFICATIONS, OR OTHER SKILLS, CERTIFICATIONS AND QUALIFICATIONS.

9)  A COPY OF THESE PROCEDURES SHALL BE POSTED AT THE LOCAL UNION OFFICE.

# APPENDIX C
## KEY EMPLOYEE REFERRAL PROCEDURE FOR THE
## SAVANNAH RIVER SITE

1) EACH EMPLOYER WILL BE ALLOWED TO HAVE DESIGNATED AND REFERRED FOR EMPLOYMENT UP TO THREE (3) OF THEIR SUPERVISORY, REGULAR, ESSENTIAL OR KEY EMPLOYEES (HEREINAFTER KNOWN AS "KEY" EMPLOYEES).  THIS PROCEDURE WILL APPLY PER CONTRACTOR ONLY, NOT NUMBERS OF CONTRACTS. BOTH THE UNION AND EMPLOYER ACKNOWLEDGE THAT THE KEY EMPLOYEES ARE NOT PROHIBITED FROM PERFORMING ANY WORK, INCLUDING "HANDS ON" CRAFT ACTIVITY.

2) THE NAME AND CRAFT DESIGNATION OF THESE KEY EMPLOYEES WILL BE MADE KNOWN TO SRR AND THE UNIONS BEFORE WORK IS BEGUN ON THE SITE.

3) KEY EMPLOYEES WILL BE REFERRED ON A ONE-TO-ONE RATIO.  THE EMPLOYER IS ENTITLED TO THE FIRST EMPLOYEE AS A KEY EMPLOYEE, THE SECOND MUST BE REFERRED IN ACCORDANCE WITH THE REFERRAL PROCEDURE DEFINED IN "APPENDIX B".  THE THIRD AND FIFTH EMPLOYEES THEREAFTER, MAY ALSO BE KEY EMPLOYEES. THE ABOVE REFERENCED RATIOS SHALL BE MAINTAINED DURING LAYOFF.

4) ALL EMPLOYEES WILL PERFORM AND BE COMPENSATED FOR THE WORK OF THEIR CRAFT DESIGNATION IN ACCORDANCE WITH THE DAVIS BACON ACT.   IF AN EMPLOYER/EMPLOYEE WISHES TO CHANGE THE CRAFT DESIGNATION OF A KEY EMPLOYEE, THAT EMPLOYEE MUST BE REFERRED FROM THE APPROPRIATE HIRING HALL.  THE EMPLOYEE WILL REMAIN AS A KEY EMPLOYEE.

5) THE NUMBER OF KEY EMPLOYEES CAN BE CHANGED AT ANY TIME BY MUTUAL AGREEMENT BETWEEN THE UNION AND THE INDIVIDUAL EMPLOYER.

6) THE EMPLOYER SHALL NOT CONTRIBUTE INTO THE FRINGE BENEFITS IDENTIFIED IN THE IN THE AGREEMENT'S APPENDIX "A" AND THERE IS NOT A CONTRACTUAL REQUIREMENT FOR THE UNION TO EXTEND REPRESENTATION AND THE KEY EMPLOYEE SHALL NOT BE ELIGIBLE FOR BENEFITS FROM THE UNION TRUST FUNDS.

7) TO BE RECOGNIZED AS A "KEY EMPLOYEE EACH MUST SIGN THE ATTACHED WAIVER AS A CONDITION OF EMPLOYMENT. THE EMPLOYER OF THE KEY EMPLOYEE(S) MUST PROVIDE A COPY OF EXECUTED WAIVER(S) TO A DESIGNATED REPRESENTATIVE OF THE BUILDING AND CONSTRUCTION TRADES UNIONS.

WAIVER

I understand that my employer has listed me as a "key employee" under the Project Agreement for the Department of Energy at the Savannah River Site dated September 22, 2009.  Because I am a "key employee," I understand that my employer will not remit contributions to any union fringe benefit trust fund on my behalf for work performed at the Savannah River Site for this employer and I will not be eligible for pension benefits, health benefits, or any other benefit from any union fringe benefit trust funds while I am a "key employee."

_____
COMPANY NAME

_____
SIGNATURE

_____
WITNESS

_____
NAME

_____
DATE SIGNED

_____
ADDRESS

_____

_____
_____
TELEPHONE NUMBER

_____
SOCIAL SECURITY NUMBER

FOR THE UNIONS:

_____

(Copy Original - Signature Page 21)

**ARTICLE XXIII**

**DURATION**

This Agreement shall be effective as of *September 22, 2009* and shall remain in full force and effect for the duration of any work assigned to SRR at the SITE within the scope of this Agreement.

This Agreement shall not be amended or supplemented except by mutual consent of SRR and the Unions, reduced to writing and duly signed by each.

In witness hereof, the Parties hereto have executed this Agreement this *twenty second day of September 2009.*

FOR: Savannah River Remediation LLC:

By: _____

James W. French
President and Project Manager

By: _____

Thomas W. Manley
Manager, Labor Relations

By: _____

Abe N. Dial
Project Field Superintendent

FOR: Augusta, GA Building and Construction
Trades Council

By: _____

Kenneth T. Ward
President

By: _____

John W. Wahl
Vice President

21