# EXHIBIT 2

# Plan for the Settlement of Jurisdictional Disputes in the Construction Industry Including Procedural Rules and Regulations



**AGREEMENTS AND DECISIONS RENDERED AFFECTING THE BUILDING INDUSTRY**

## COVERING the U.S. and CANADA

Approved by the Building and Construction Trades Department, AFL-CIO

June 1984 As Amended Through December 2009

# Plan for the Settlement of Jurisdictional Disputes in the Construction Industry Including Procedural Rules and Regulations



**AGREEMENTS AND DECISIONS RENDERED AFFECTING THE BUILDING INDUSTRY**

## COVERING the U.S. and CANADA

Approved by the Building and Construction Trades Department, AFL-CIO

June 1984 As Amended Through December 2009

## TABLE OF CONTENTS

Procedural Rules and Regulations for the Plan
  for the Settlement of Jurisdictional Disputes
  in the Construction Industry ............................1-15
Plan for the Settlement of Jurisdictional
  Disputes in the Construction Industry.............16-38
Agreements and Decisions of Record.................39-176
Index.............................................................177-181

## PROCEDURAL RULES AND REGULATIONS FOR
## THE PLAN FOR THE SETTLEMENT OF
## JURISDICTIONAL DISPUTES IN THE
## CONSTRUCTION INDUSTRY

ARTICLE I

CONTRACTOR'S RESPONSIBILITY

1. The contractor who has the responsibility for the performance and installation shall make a specific assignment of the work which is included in his contract to a particular union(s). For instance, if contractor A subcontracts certain work to contractor B, then contractor B shall have the responsibility for making the specific assignments for the work included in his contract. If contractor B, in turn, shall subcontract certain work to contractor C, then contractor C shall have the responsibility for making the specific assignment for the work included in his contract. After work has been so assigned, such assignment will be maintained even though the assigning contractor is replaced and such work is subcontracted to another contractor. It is a violation of the Plan for the contractor to hold up disputed work or shut down a project because of a jurisdictional dispute.

2. When a contractor has made an assignment of work, he shall continue the assignment without alteration unless otherwise directed by an arbitrator or there is agreement between the National or International Unions involved.

1

a. Unloading and/or handling of materials to stockpile or storage by a trade for the convenience of the responsible contractor when his employees are not on the job site, or in an emergency situation, shall not be considered to be an original assignment to that trade.

b. Starting of work by a trade without a specific assignment by an authorized representative of the responsible contractor shall not be considered an original assignment to that trade, provided that the responsible contractor, or his authorized representative, promptly, and, in any event, within eight working hours following the start of work, takes positive steps to stop further unauthorized performance of the work by that trade.

c. The Administrator shall determine all questions of original assignment of work and render decisions regarding same. An appeal of the Administrator's determination of original assignment may be made to an arbitrator in a hearing under the terms and provisions of Article V of the Plan. Notice of the appeal shall be filed with the Administrator within seven (7) days of issuance of the determination. The appeal shall be processed only if the responsible contractor has complied with the Administrator's determination.

d. Criteria to be used in making assignments of work are set forth in Article V, Section 8, of the Plan.

2

## ARTICLE II
### UNION'S RESPONSIBILITY

1. The Plan provides (Article VI, Section 1) that during the existence of the Plan there shall be no strikes, work stoppages, or picketing arising out of any jurisdictional dispute.

2. When a contractor has made a specific work assignment, all unions shall remain at work and process any complaint over a jurisdictional dispute in accordance with the procedures herein established by the Administrator. Any union which protests that a contractor has failed to assign work in accordance with the procedures specified above, shall remain at work and process the complaint through its International office. The Administrator is prohibited from taking action on protests or requests to discuss jurisdictional matters from local unions or building and construction trades councils.

## ARTICLE III
### STRIKES AND IMPEDIMENTS TO JOB PROGRESS

1. When it is alleged, in a written notice, by a stipulated employer directly affected by the dispute, the signatory Employer Association representing such employer or a stipulated National or International Union, that a work stoppage, slowdown, or other impediment to job progress is taking place, the Administrator shall proceed as set forth in Article VI of the Plan.

3

2. Notice to the Administrator shall include:

a. Party engaged in strike, slowdown, or impediment to job progress [specify]

b. Unions directly involved (in most cases, trade receiving original assignment)

c. Brief description of work in dispute

d. Name of project and city and state where located

e. Contractor and subcontractor, if any, directly involved, and mailing address, phone number and facsimile number of each

f. A statement detailing how the responsible contractor and involved Unions are stipulated to be bound to the Plan and these procedures.

### Required Format for Notice

____[Name of Union or Employer]____ is [state basis for claim of violation, *e.g.* strike] over a jurisdictional dispute between____[Name of Unions]____over [Briefly describe work and name of job]____project, [City and state or, Province].____[Name of Contractor], [Mailing Address, Phone Number and Facsimile Number]. [Name of Subcontractor], [Mailing Address, Phone Number and Facsimile Number].

This contractor is stipulated to the Plan and these procedures by virtue of [provision in collective bargaining agreement or signed stipulation on file in

4

Plan office[*]]. The Unions are stipulated to the Plan by virtue of [being an affiliate of the Department, a signed stipulation on file in the Plan office, or a provision in collective bargaining agreement].

3. Impediments to job progress shall include, but not be limited to:

a. Filing a grievance under a collective bargaining agreement, or under a local plan for the settlement of jurisdictional disputes not recognized by the Department, where an issue is a case, dispute or controversy involving a jurisdictional dispute or assignment of work by a stipulated contractor, or by a stipulated subcontractor. Provided, that it shall not be considered an impediment to job progress if the responsible contractor or Union is not stipulated to the Plan or a grievance is filed over the failure of the responsible contractor to conduct a pre-job or mark-up meeting when required to do so under the terms of the applicable collective bargaining agreement.

b. Filing an unfair labor practice charge with the National Labor Relations Board, or appropriate Canadian equivalent, as determined by the Administrator, or action in any court against a stipulated employer or a stipulated National or International Union, or local affiliate thereof, where an issue is a case, dispute or controversy involving a jurisdictional dispute or assignment of work. Provided,

---

[*] A sample stipulation form is contained on page 15 of the Procedural Rules and Regulations.

that it shall not be considered an impediment to job progress if the responsible contractor is not stipulated to the Plan.

## ARTICLE IV
### FILING A COMPLAINT

1. When a dispute over an assignment of work arises, the National or International Union challenging the assignment, or the employer directly affected by the jurisdictional dispute, or the signatory Employer Association representing such employer, shall notify the Administrator in writing. Such notice shall include the following information:

a. Unions involved

b. A full and complete description of the work in dispute

c. Name and location of project

d. Contractors involved and their mailing addresses, telephone number and facsimile number

e. The assignment of work and the contractor who made the assignment

f. A statement indicating whether the responsible contractor and the involved Unions are stipulated to the Plan and these procedures.

g. A statement whether the representatives of the National and International Unions have met or attempted to meet at the local level in an effort to resolve the matter.

h. A statement whether the National and International Unions involved in the dispute have

6

voluntarily agreed to mediation.

2. The notice shall be in writing and sent to:

For Projects in the United States

Administrator
Plan for the Settlement of Jurisdictional Disputes
  in the Construction Industry
Suite 1000
900 Seventh Street, NW
Washington, DC 20001
Fax: (202) 775-1950

For Projects in Canada

Administrator
Plan for the Settlement of Jurisdictional Disputes
  in the Construction Industry
c/o Office of the Executive Secretary
Building and Construction Trades
  Department, AFL-CIO
Suite 1902
130 Albert Street
Ottawa, Ontario
K1P 5G4
Fax: (613) 230-5138

ARTICLE V
TIME CONSTRAINTS UNDER THE PLAN
In computing any period of time prescribed in the

Plan or the Procedural Rules and Regulations, the day from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, in which event the period runs until the end of the next day which is not a Saturday, a Sunday, or a legal holiday. When the period of time described or allowed is less than 7 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation. As used herein, "legal holiday" in the United States includes New Year's Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day, and any other Day designated as a holiday by the Administrator. "Legal holiday" in Canada includes New Year's Day, Victoria Day, Labour Day, Remembrance Day, Boxing Day, Good Friday, Canada Day (Dominion Day), Thanksgiving Day, Christmas Day, Civic Holiday, and any other day designated as a holiday by the Administrator.

## ARTICLE VI
### DIRECT RESOLUTION

1. Within two (2) days following receipt of a properly filed notice, the Administrator shall notify, by facsimile or other electronic means, all directly affected National and International Unions and employers that a dispute exists between local parties.

2. If any party intends to rely on a Decision of Record to support its claim to the work, that fact

8

must be disclosed to the Administrator and the other parties to the dispute within two days of receipt of the notice of the dispute from the Administrator. The title of the Decision of Record and the page number where the decision is located should be included in the notice. If any other party to the dispute intends to challenge the Decision of Record on the basis of the prevailing practice in the locality in the past ten years, pursuant to Article V, Section 8(b) of the Plan, notice of such challenge must be provided to the Administrator and to the other parties to the dispute by the day the list of arbitrators is due back in the Administrator's office.

3. If the directly affected National and International Unions and employers, parties to the dispute, are able to settle the dispute, each shall inform the Administrator, in writing, signed by an authorized representative of each party, that a settlement has been reached.

4. If the directly affected National and International Unions and employers are unable to resolve the dispute, any of the directly affected parties may request arbitration of the dispute within five (5) days from the date the matter was referred by the Administrator, by filing a notice in writing to arbitrate with the Administrator, with copies to all directly affected parties.

## ARTICLE VII
### SELECTING AN ARBITRATOR

1.   Upon receipt of a request to arbitrate, the Administrator shall send to all directly affected parties a list of impartial

arbitrators, knowledgeable about the construction industry, chosen by the Joint Administrative Committee.

2.   The directly affected National and International Unions and the responsible contractor(s) will each have three days in which to cross off the name of one arbitrator to which it objects, number the remaining names to indicate the order of preference and return the list to the Administrator. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on each party's list, and in accordance with the designated order of mutual preference, the Administrator shall notify the parties of the arbitrator selected who is able to schedule a hearing within the time constraints set forth in the Plan.

3.   If the parties are unable to select an arbitrator, the Administrator shall appoint an arbitrator.

## ARTICLE VIII
### RESOLUTION BY ARBITRATION

1.   Upon his selection, the arbitrator, with the assistance of the Administrator, shall set and hold a hearing within seven (7) days.

2.   The Administrator shall notify the responsible contractor(s) and the appropriate National and International Unions and signatory association(s) by facsimile or other electronic means of the place and time chosen for the hearing. Said hearing shall

be held in Washington, D.C. or, for a dispute arising in Canada, in Eastern, Central or Western Canada as determined by the Administrator.

3. Attendance at arbitration hearings by the parties shall be limited to one full-time employee of each National or International Union party, or its affiliate, as designated by the President of each National or International Union, and one full-time employee of the responsible contractor party. On appeals from Local Boards, each party may also have in attendance the individual who presented that party's case to the Local Board. Failure to attend by a party shall not delay a hearing, the taking of evidence, or the issuance of a decision.

4. Presentations shall be in writing with copies for each party, the arbitrator, and a file copy.

5. The arbitrator shall issue his decision within three (3) days after the case has been closed. The decision of the arbitrator shall be final and binding on all parties to the dispute.

6. Each party to the arbitration shall bear its own expenses for the arbitration and agrees that the fees and expenses of the arbitrator shall be borne by the losing party or parties as determined by the arbitrator if all parties are stipulated to the Plan, otherwise as determined by the arbitrator.

7. Following the issuance of the decision, the Administrator will send a statement to the party or parties responsible for payment of the arbitrator's fees and expenses. Such statement shall be payable within ten (10) days of receipt. If payment is not

11

received within 30 days, a late fee of $500 will be assessed on the delinquent party. A future request by a delinquent party to process a case will be held by the Administrator until all outstanding fees and expenses, including any late fee, have been paid.

### ARTICLE IX
#### POLICY REGARDING DIRECTIVES

1. The Plan and the Procedural Rules and Regulations provide for the settlement of a jurisdictional dispute on a specific job by agreement or understanding between or among the National and International Unions involved.

2. The Procedural Rules and Regulations also provide that an assignment of work may be changed by the responsible contractor(s) to conform to the terms of same, upon notification by the Administrator. Such notification shall be made by means of a directive sent to the responsible contractor(s) by the Administrator.

3. In order to give effect to the procedure set forth above, and before a directive may be sent to the affected contractor(s) by the Administrator, the National or International Unions involved shall submit for the records of the Plan the following:

a. A statement of the exact terms of the agreement or understanding reached. Such statement is to be jointly signed by authorized representatives of each of the National or International Unions involved. If separate communications are submitted by the parties, the terms of the agreement or

12

understanding must be identical in each communication.

b. A statement regarding the notification to the responsible contractor(s) of the agreement or understanding reached. If objection to the agreement or understanding was made by the contractor(s) or representatives, the nature of the objection must be stated.

4. In accordance with the Plan and the Procedural Rules and Regulations, any directive from the Administrator shall be complied with by the affected contractor(s) unless, and within 24 hours following receipt of such directive, the contractor(s) notifies the Administrator that he elects not to comply with the directive, and requests that the jurisdictional dispute be processed through arbitration to a decision. Such decision shall be made in accordance with the provisions of Article V of the Plan.

## ARTICLE X
### APPEALS FROM DECISIONS OF RECOGNIZED
### LOCAL BOARDS

1. Appeals from local settlements, agreements, or decisions issued by a plan for the settlement of jurisdictional disputes that has been recognized by the Department, may be filed with the Administrator within seven (7) days of issuance by the National or International Unions directly affected, or by the responsible contractor(s), or a signatory Employers

Association representing such employer.

a. Such filing shall include a copy of the local settlement, agreement, or decision being appealed and the specific basis for the appeal. Simultaneous notice shall be given all other parties.

2. The authority of the Administrator to refer an appeal to arbitration is discretionary. The Administrator shall, in exercising his authority, consider whether the parties were afforded an opportunity to present evidence at a hearing conducted for that purpose under the Plan and in conformity with generally recognized procedures not incompatible with the provisions and procedures of this Plan and whether the decision of the Local Board addresses the established criteria of Article V, Section 8, of the Plan.

3. Appeals referred to arbitration will be processed in accordance with Article V of the Plan.

4. Presentations shall be in writing and limited to that which was presented at the recognized local plan for the settlement of jurisdictional disputes.

## STIPULATION

In signing this stipulation, the undersigned [employer] [employer association on behalf of its members] [union] agrees to be bound by all the terms and provisions of the Agreement establishing procedures for the resolution of jurisdictional disputes in the construction industry known as the Plan for the Settlement of Jurisdictional Disputes in the Construction Industry. In particular, the undersigned agrees to abide by those provisions of the Plan requiring compliance with the decisions and awards of the Administrator, arbitrators or National Arbitration Panels established under the Plan, and to fulfill the obligations set forth in the Agreement.

This stipulation shall run for the term of the Agreement and shall continue in effect for each year thereafter unless specifically terminated effective upon the anniversary date of said Agreement, in accordance with the notice provisions contained in the Agreement. The effective date of this stipulation shall be the date it is received in the Plan Administrator's office.

(Signed) ...........................................................................

Company .........................................................................

Date ................................................................................

To facilitate expeditious processing of jurisdictional disputes, all parties are encouraged to file signed Stipulation forms with the Administrator.

### PLAN FOR THE SETTLEMENT OF
### JURISDICTIONAL DISPUTES IN THE
### CONSTRUCTION INDUSTRY

#### PREAMBLE

This Agreement is entered into by and among the Building and Construction Trades Department, AFL-CIO, on behalf of its constituent National and International Unions and their affiliated local unions (referred to hereinafter as the Department) and the Employer Associations signatory to this Agreement (referred to hereinafter as the Employer Associations).

The parties to this Agreement dedicate their efforts to improving the construction industry by providing machinery for the handling of disputes over work assignments without strikes or work stoppages thus stabilizing employment in the industry at the same time increasing both its efficiency and capacity to furnish construction services to the public at reasonable cost.

#### ARTICLE I
#### SCOPE OF APPLICATION

The procedures shall be available to resolve jurisdictional disputes between and among Employers and Unions engaged in the building and construction industry.

16

## ARTICLE II
### STIPULATION REQUIREMENTS

**Sec. 1.** In order to process Impediment to Job Progress disputes pursuant to Article III of the Procedural Rules and Regulations and Article VI of the Plan, all parties to the dispute must be stipulated to the Plan.

(a) A Union may become stipulated to the Plan by virtue of its affiliation with the Department or its National or International Union's affiliation with the Department, a signed a stipulation form setting forth that it is willing to be bound by the terms of the Plan or a provision in a collective bargaining agreement.

(b) An Employer may become stipulated to the Plan by virtue of its membership in a stipulated association of employers with authority to bind its members, a signed stipulation form setting forth that it is willing to be bound by the terms of the Plan or a provision in a collective bargaining agreement.

**Sec. 2.** Stipulation shall not be required in order to process jurisdictional disputes pursuant to Article V, requests for determination of changes of original assignment pursuant to Article I of the Procedural Rules and Regulations and requests for the issuance of directives pursuant to Article IX of the Procedural Rules and Regulations, except that the moving party must be stipulated to the Plan.

## ARTICLE III
### JOINT ADMINISTRATIVE COMMITTEE

**Sec. 1.** There shall be established a Joint Administrative Committee (hereinafter referred to as the "JAC"), to oversee the operation of the Plan.

**See. 2.** The JAC representing the Department and the signatory Employer Associations shall consist of eight (8) voting members, four (4) nominees from the Department and four (4) from the Employer Associations. There shall be a Chairman and a Vice-Chairman of the JAC. The Chairman shall be the President of the Department. The Vice-Chairman shall be designated by the signatory Employer Associations. The Chairman and the Vice-Chairman shall be non-voting members of the Committee.

**Sec. 3.** The JAC shall appoint two Administrators of the Plan. One Administrator shall handle all matters arising in the United States. The second Administrator shall handle all matters arising in Canada. References to the Administrator in this Agreement and the Procedural Rules and Regulations shall mean the appropriate U.S. or Canadian Administrator. The Administrators shall be compensated at a rate and under terms to be established by the JAC.

**Sec. 4.** The Administrator shall be responsible for disbursement of the funds, shall keep the books of the Plan and submit to the parties to the Agreement a quarterly financial statement; shall provide for an

18

annual audit of the books by a certified public accountant and shall prepare annually a proposed budget of the necessary expenses of the Plan for the following twelve (12) months and submit same to the JAC for approval. The total amount of the budget, when approved, shall be subscribed annually in advance, 50 percent by the Department and 50 percent by the signatory Employer Associations. All expenditures shall be within the approved budget. In order to assure adequate funding of the Plan, the JAC, may establish a schedule of fees to be charged to parties wishing to utilize the services of the Plan but who are not affiliated with one of the organizations signatory to this Agreement.

### ARTICLE IV
### RULES AND REGULATIONS

**Sec. 1.** The Administrator shall adapt his operations to assure that all cases submitted shall be disposed of as expeditiously as possible.

**Sec. 2**. The Administrator, with the prior approval of the JAC, shall establish such procedural regulations and administrative practices as may be required for the effective administration of this Agreement, provided such regulations and practices are consistent with the expressed terms of this Agreement.

**Sec. 3.** The JAC shall have the power to revise the procedural regulations and administrative practices of the Administrator. The Administrator shall promptly notify all parties to the Plan of any

19

revisions in the procedural or administrative practices.

**Sec. 4.** The Administrator shall keep records of disputes and decisions and develop such statistical and operational information as may be of value to the JAC. The Administrator shall from time to time make recommendations to the JAC for changes in the Procedural Rules and Regulations or provisions of the Plan which will strengthen and improve the effectiveness of the Plan.

**Sec. 5.** It shall be the duty of the Administrator to process cases of jurisdictional disputes in the Building and Construction Industry when disputes are referred to him by any of the National and International Unions involved in the dispute, or an Employer directly affected by the dispute on the work in which he is engaged or by the signatory Employer Association representing such Employer.

**Sec. 6.** If any party is not stipulated to the Plan, any of the National or International Unions involved in a dispute may file a statement with the Plan Administrator indicating that, if all parties had been stipulated to the Plan, the Union would have filed a jurisdictional dispute pursuant to Article V of the Plan. The notice shall include the unions involved, a description of the work in dispute, the name and location of the project, the name of the responsible contractor, the assignment that was made by the contractor and which of the Article V, Section 8, criteria the Union contends supports its claim to the work. The Plan Administrator shall compile a list of

20

such statements and distribute it to the parties to
the Plan monthly.

**Sec. 7.** In the interest of expediting resolutions of
jurisdictional disputes, the Administrator shall
undertake to keep a record of decisions involving the
same type of dispute and involving the same trades
and report such record quarterly to the JAC.

## ARTICLE V

### RESOLUTION OF JURISDICTIONAL DISPUTES

**Sec. 1.** When a dispute over an assignment of
work arises, the National or International Union
challenging the assignment, or the Employer directly
affected by the dispute or the signatory Employer
Association representing such Employer shall notify
the Administrator in writing, with copies to the other
parties to the dispute. The notice shall include a
statement whether representatives of the National and
International Unions have met or attempted to meet
with the local parties to attempt to resolve the
matter. For disputes in the United States, if the
National and International Unions involved in the
dispute voluntarily agree to mediation, the notice shall
so advise the Administrator. The mediation may be
used in lieu of the meeting of the International
Representatives.

**Sec. 2.** Upon receipt of said notice, the
Administrator or his designee shall notify within
two (2) days by facsimile or other electronic means

all directly affected National and International Unions and employers that a dispute exists between the local parties. The Administrator shall also provide notice of the dispute to all other National and International Unions party to this Agreement. At the same time, if the National and International Unions involved in a dispute in the United States have consented to voluntary mediation, the Administrator shall contact the Federal Mediation and Conciliation Service and request the appointment of a mediator to assist the parties in the local area in settling the dispute. The mediator shall have three (3) days from the date the matter is referred by the Administrator to mediate the dispute. The mediator shall submit by facsimile or other electronic means a report to the parties and the Administrator indicating whether the dispute has been resolved no later than the end of the three (3) day period. The report of the mediator shall not be submitted to a Plan Arbitrator.

**Sec.  3.**  If the respective National and International Unions of the disputing locals and the directly affected Employer are unable to resolve the dispute, any of the directly affected parties may request arbitration of the dispute, within five (5) days, from the date the matter is referred by the Administrator, by filing a notice to arbitrate with the Administrator, with copies to all directly affected parties. The Administrator will only honor a request to submit the matter to arbitration prior to the expiration of the five (5) day period if the requesting party has demonstrated that the International Representatives have met or attempted to meet with the local parties to resolve the matter or have been through the mediation process set forth in Section 2.

**Sec. 4.** Upon receipt of said notice, the Administrator shall send to all directly affected parties a list of impartial arbitrators knowledgeable about the construction industry, chosen by the JAC.

**Sec. 5.** The directly affected National and International Unions and the responsible contractor(s) will each have three days in which to cross off the name of one arbitrator to which it objects, number the remaining names to indicate the order of preference and return the list to the Administrator. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on each party's list, and in accordance with the designated order of mutual preference, the Administrator shall notify the parties of the arbitrator selected. If the parties are unable to select an arbitrator, the Administrator shall appoint the arbitrator.

**Sec. 6.** Upon his selection the Arbitrator, with the assistance of the Administrator, shall set and hold a hearing within seven (7) days. The Administrator shall notify the employer and the appropriate National and International Unions and Employer Associations by facsimile or other electronic means of the place and time chosen for the hearing. Said hearing shall be held in Washington, D.C. or, for a dispute arising in Canada, in Eastern, Central or Western Canada as determined by the Administrator. A failure of any party or parties to attend said hearing without good cause, as determined by the Administrator, shall not delay the hearing of evidence or issuance of a decision by the Arbitrator.

**Sec. 7.** The Arbitrator shall issue his decision within three (3) days after the case has been closed. The decision of the Arbitrator shall be final and binding on all parties to the dispute.

**Sec. 8.** In rendering his decision, the Arbitrator shall determine:

(a)     First whether a previous agreement of record or applicable agreement, including a disclaimer agreement, between the National or International Unions to the dispute governs;

(b) Only if the Arbitrator finds that the dispute is not covered by an appropriate or applicable agreement of record or agreement between the crafts to the dispute, he shall then consider the established trade practice in the industry and prevailing practice in the locality. Where there is a previous decision of record governing the case, the Arbitrator shall give equal weight to such decision of record, unless the prevailing practice in the locality in the past ten years favors one craft.     In that case, the Arbitrator shall base his decision on the prevailing practice in the locality. Except, that if the Arbitrator finds that a craft has improperly obtained the prevailing practice in the locality through raiding, the undercutting of wages or by the use of vertical agreements, the Arbitrator shall rely on the decision of record and established trade practice in the industry rather than the prevailing practice in the locality; and

(c) Only if none of the above criteria is found to exist, the Arbitrator shall then consider that because efficiency, cost or continuity and good management are essential to the well being of the industry, the interests

24

of the consumer or the past practices of the employer shall not be ignored.

The Arbitrator shall set forth the basis for his decision and shall explain his findings regarding the applicability of the above criteria. If lower-ranked criteria are relied upon, the Arbitrator shall explain why the higher-ranked criteria were not deemed applicable. The Arbitrator's decision shall only apply to the job in dispute.

**Sec. 9.** Agreements of record are applicable only to the parties signatory to such agreements. Decisions of record are applicable to all trades except as provided for in the Decision of Record.

**Sec. 10.** The Arbitrator is not authorized to award back pay or any other damages for a misassignment of work. Nor may any party to this Plan bring an independent action for back pay or any other damages, based upon a decision of an Arbitrator.

**Sec. 11.** Each party to the arbitration shall bear its own expense for the arbitration and agrees that the fees and expenses of the Arbitrator shall be borne by the losing party or parties as determined by the arbitrator if all parties are stipulated to the Plan, otherwise as determined by the Arbitrator. An administrative fee, in accordance with the fee schedule established by the JAC, shall be paid to the Plan by any party that is not affiliated with one of the organizations signatory to this Agreement.

**Sec. 12.** Any party to a dispute that has been

25

arbitrated that believes the Arbitrator failed to address the established criteria of Article V, Section 8, may request the JAC to consider an appeal. No appeal may be processed unless the Arbitrator's decision has been implemented.

**Sec. 13.** A request to consider an appeal from a final decision of a Plan Arbitrator shall be filed with the Administrator, with copies to the other parties to the dispute, within five days of the date the Administrator transmitted the Arbitrator's decision. The request to consider an appeal shall include a copy of the Arbitrator's decision being appealed and a statement describing the basis of the claim that the Arbitrator failed to address the established criteria of Article V, Section 8. The other parties to the dispute shall have three days to submit to the Administrator, with copies to the other parties, a response to the request for appeal.

**Sec. 14.** Once the submissions of the parties are complete, the Administrator shall distribute copies of the appeal to the members of the JAC that are not parties to the dispute. Within five days from receipt of the submissions, each member of the JAC shall notify the Administrator whether the appeal should be heard. If a majority of the JAC does not wish to consider the appeal, the decision of the Arbitrator shall be final and binding. If a majority of the JAC members believes the appeal has merit, the Administrator shall arrange for a meeting of the JAC, which may be by telephone conference, to consider the appeal. The sole issue to be considered on appeal is whether the Arbitrator failed to address the established criteria of Article V, Section 8**.**

26

**Sec. 15.** If the JAC determines that the Arbitrator failed to address the established criteria of Article V, Section 8, it shall remand the case to the Administrator to process for a hearing before a new Plan Arbitrator.

### ARTICLE VI
### CONTINUATION OF WORK

**Sec. 1.** During the existence of this Agreement, there shall be no strikes, work stoppages or picketing arising out of any jurisdictional dispute. Contractors and subcontractors shall make work assignments in accordance with Article I of the Procedural Rules and Regulations. Members of National and International Unions and their Local affiliates stipulated to the Plan shall continue to work on the basis of their original assignment.

**Sec. 2.** Recognizing that it is in the best interests of the parties to this Agreement, the Department, on behalf of itself and the General Presidents of each of the National and International Unions stipulated to the Plan reaffirm their desire to eliminate work stoppages, slowdowns and other impediments to job progress and their intent to comply with the provisions of the Plan prohibiting jurisdictional strikes and agree to enforce these provisions by direction and action of their respective National or International offices. In the event of a work stoppage, slowdown or other impediment to job progress, the employer or National or International Union may take the following course

of action:

(a)  The employer or National or International Union shall notify the Administrator or his designee of the alleged breach of this Article. Notice to the Administrator shall be by the most expeditious means available, with simultaneous notice by facsimile or other electronic means to the party alleged to be in violation and the involved employer and National or International Union President(s). The employer will immediately use its best efforts to cease any violation of this article.   The International President(s) will immediately instruct, order and use the best efforts of his office to cause the local union or unions to cease any violation of this article. A National or International Union complying with this obligation shall not be liable for unauthorized acts of its local union.

(b)  Upon receipt of said notice, the Administrator or his designee shall select an arbitrator from a panel of arbitrators chosen by the JAC.

(c)  Upon his selection, the Arbitrator shall hold a hearing within 24 hours if it is contended that the violation still exists.

(d)  The Arbitrator, with the assistance of the Administrator, shall notify the employer, the local union(s) and the appropriate National or International Union(s) and Employer Association(s) by facsimile or other electronic means of the place and time he has chosen for this hearing. Said hearing shall be held in Washington, D.C. or, for a dispute arising in Canada, in Eastern, Central or Western Canada as determined by the Administrator, and shall be

28

completed in one session. A failure of any party or parties to attend said hearing shall not delay the hearing of evidence or issuance of a decision by the Arbitrator.

(e)  The sole issue at the hearing shall be whether or not a violation of this Article has in fact occurred, and the Arbitrator shall have no authority to consider any matter in justification, explanation or mitigation of such violation or to award damages. The Arbitrator's decision shall be issued in writing within 3 hours after the close of the hearing, and may be issued without an opinion. If any party desires an opinion, one shall be issued within 15 days, but its issuance shall not delay compliance with, or enforcement of, the decision. The Arbitrator may order cessation of the violation of this Article and other appropriate relief, and such decision shall be served on all parties by facsimile or other electronic means upon issuance.

(f)  Each party to the arbitration shall bear its own expense for the arbitration and agrees that the fees and expenses of the Arbitrator shall be borne by the losing party or parties as determined by the arbitrator.

## ARTICLE VII
### ENFORCEMENT

**Sec. 1.** When the JAC has determined that an Employer or National or International Union is in violation of this Agreement, such Employer or National or International Union shall be denied a representative on any committee established by this Agreement during the

29

period of violation.

**Sec. 2.** Any decision or interpretation rendered by an arbitrator shall be immediately accepted and complied with by all parties subject to this Agreement. If a party fails to accept and comply with a decision or interpretation rendered by an arbitrator or a ruling of the Administrator or the JAC, any party to the dispute may seek court enforcement of the decision or ruling.

(a)   At the election of the party seeking enforcement, an Arbitrator's decision or a ruling of the Administrator or the JAC may be enforced in the United States District Court for the District of Columbia or any other court which has jurisdiction of the parties. All parties signatory or stipulated to this agreement consent to the jurisdiction of the United States District Court for the District of Columbia. For a dispute arising in Canada, an Arbitrator's decision or a ruling of the Administrator or the JAC may be enforced in the appropriate Canadian court.

(b)   Any rights created by statute or law governing arbitration proceedings which are inconsistent with this Agreement or which interfere with compliance therewith are hereby waived by the parties to whom they accrue.

(c)   A party seeking enforcement of an Arbitrator's decision or ruling of the Administrator or JAC due to the failure of another party to abide by the decision or ruling shall be reimbursed by the party failing to abide by the decision or ruling for any attorneys' fees, court costs and expenses incurred.

## ARTICLE VIII
### LOCAL BOARDS

**Sec. 1.** In any community or locality where a plan for the settlement of jurisdictional disputes has been recognized by the Department, it shall be used in the first instance to bring about an agreement, settlement or decision. However, any such local settlement, agreement or decision may be appealed by any of the involved parties in accordance with Section 2 and 3 of this Article.

**Sec. 2.** The Administrator is empowered to refer to arbitration, in accordance with Article V, Sections 5-10, any appeal from a decision or ruling of a Local Board recognized under Section 1. The authority of the Administrator to refer a case to arbitration shall be discretionary. The Administrator is authorized, subject to the prior approval of the JAC, to prescribe rules as to the types of cases he will refer to arbitration.

**Sec. 3.** The Administrator shall have the authority to establish such procedural regulations and administrative practices as may be required for the effective administration of this appeals procedure, subject to the prior approval of the JAC.

## ARTICLE IX
### OBLIGATIONS OF THE PARTIES

**Sec. 1.** Each Employer agrees that all cases, disputes

31

or controversies involving jurisdictional disputes or assignments of work arising under this Agreement shall be resolved as provided herein, and shall comply with the decisions and rulings of the Administrator, the JAC, arbitrators or National Arbitration Panels established hereunder.

**Sec. 2.** Each Union agrees that all cases, disputes or controversies involving jurisdictional disputes or assignments of work arising under this Agreement shall be resolved as provided herein, and shall comply with the decisions and rulings of the Administrator, the JAC, arbitrators or National Arbitration Panels established hereunder.   Each Union agrees that the establishment of picket lines and/or the stoppage of work by reason of an Employer's assignment of work are prohibited.

**Sec. 3.** The Administrator shall send a monthly report to the parties to this Agreement setting forth all information on jurisdictional disputes for that month. The report should include the location and job where the dispute occurred, the parties involved, the subject of the dispute and shall indicate whether any stoppage occurred or picket lines were established.

ARTICLE X

NATIONAL ARBITRATION PANEL

**Sec. 1.** National Arbitration Panels shall be established hereunder and shall be composed of three arbitrators, knowledgeable in the construction

32

industry, appointed by the JAC.

**Sec. 2.**

(a) The JAC shall meet quarterly and among its other duties and responsibilities it shall, at each meeting, review the record of disputes filed with the Administrator and in particular shall review the record of decisions involving the same trades as submitted by the Administrator in accordance with Article IV, Section 6 hereof.

(b) A dispute will be declared repetitive by the JAC when in its judgment such dispute is disruptive to the industry or seriously jeopardizes the operational integrity of the Plan. All parties to the Plan may bring a dispute to the JAC for such determination. The JAC will develop such criteria and guidelines to determine what constitutes a repetitive dispute. The JAC will issue a written report to the party or parties who have requested a decision from the JAC involving the dispute referred for such consideration. The written report will be timely and reflect the circumstances and criteria used by the JAC to determine whether or not said dispute is in fact considered repetitive.

(c) In the event the JAC declares a dispute to be repetitive, the JAC shall refer the matter to the National and International Unions involved for a period of not more than 90 days during which time the Unions shall consult with the Employer Associations who represent Employers who have responsibility for that type of work. The Unions shall endeavor to reach a national

33

agreement governing future jurisdiction. The Administrator shall assist the Unions and may appoint a mediator to facilitate settlement. If an agreement is reached, it shall be attested to by the Administrator and shall serve as a criterion for decisions in future disputes. Should the National and International Unions fail to reach an agreement within 90 days, the Administrator shall refer the dispute to a National Arbitration Panel.

**Sec. 3.** In any case to go to a National Arbitration Panel, the Administrator shall notify all General Presidents of National and International Unions affiliated with the Department and the signatory Employer Associations stating the controversy to be considered. Only directly affected parties as determined by the JAC shall be allowed to intervene. Thirty days notice shall be given of the date set for the hearing. Briefs shall be submitted and exchanged by all parties to the dispute at least ten days prior to the hearing date.

**Sec. 4.** The National Arbitration Panel shall in every instance consider all pertinent evidence, including the criteria set forth in Article V, Section 8, and shall render a decision, if possible, within ten (10) days after the conclusion of the hearings. Copies of the National Arbitration Panel's decision shall be sent to all parties signatory to this Agreement.

Decisions of the National Arbitration Panel shall be immediately recognized under the provisions of the Constitution of the Department. Decisions of the National Arbitration Panel shall be immediately

accepted and complied with by the disputing unions.

**Sec. 5.** In the event any party to a dispute fails to present its case within the stated time, the National Arbitration Panel shall, nevertheless, proceed with the case and make its decision on the basis of the evidence presented.

## ARTICLE XI
### TECHNOLOGICAL CHANGES

**Sec. 1.** The JAC shall establish a standing Technological Change Committee. The Committee shall concern itself with technological changes in the building and construction industry as they affect the jurisdiction of the various unions in the building and construction industry. The Committee shall consist of ten members from the Building and Construction Trades Department and ten members from the signatory Employer Associations, respectively. The Committee shall select a chairman and a secretary.

**Sec. 2.** The Committee is authorized to establish subcommittees provided that there is equal representation of labor and management on each subcommittee. Each subcommittee shall elect a chairman and a secretary.

**Sec. 3.** The Committee shall study existing methods of construction and procedures as they relate to technological changes in the industry and make recommendations to the JAC. The Committee may refer particular items to the crafts concerned who may establish committees to determine craft

35

jurisdiction and report their decisions to the Department and the signatory Employer Associations.

**Sec. 4.** The Committee shall submit a report of its activities, including reports from any subcommittees, quarterly to the JAC.

## ARTICLE XII
### NATIONAL AGREEMENTS REGARDING JURISDICTION

**Sec. 1.** When national agreements regarding jurisdiction between National or International Unions have been negotiated, immediate notice of such agreements shall be given to the appropriate management groups. Prior consultation with such groups regarding the making of agreements between National or International Unions is desirable and should be carried on.

**Sec. 2.** National agreements entered into and properly signed by disputing National or International Unions shall be filed with the Administrator and attested by the Administrator. Such national agreements shall take effect prospectively and shall not apply to jobs in process at the time of execution. "Jobs in process" means any construction contract upon which the date for submission of bids or proposals has passed.

ARTICLE XIII
EFFECTIVE DATE, TERMINATION, CHANGE
AND WITHDRAWAL

**Sec. 1.** This Agreement shall take effect on January 1, 2009, and shall remain in force and effect until December 31, 2009, and shall continue in effect for each year thereafter unless terminated as provided for herein. Changes or amendments to this Agreement may be made as provided for herein.

**Sec. 2.** If either the Department or any signatory Employer Association desires to change or terminate this Agreement it shall notify the other party in writing at least ninety (90) days before the anniversary date of this agreement. When notice for change is given, the nature of the changes desired must be specified in the notice. This Agreement shall be subject to change at any time by mutual consent of the parties hereto.

Any changes agreed upon shall be reduced to writing and signed by the parties hereto, the same as this Agreement.

IN WITNESS WHEREOF the parties have caused this Agreement to be executed and effective as of the day and year above written.

FOR THE BUILDING AND CONSTRUCTION
TRADES DEPARTMENT, AFL-CIO

MARK H. AYERS
*President*

FOR THE EMPLOYER ASSOCIATIONS

*North American Contractors Association*
IZ CAKRANE

*National Electrical Contractors Association*
JOHN M. GRAU

*Mechanical Contractors Association of America, Inc.*
JOHN McNERNEY

*The Association of Union Constructors*
STEPHEN R. LINDAUER

*Sheet Metal and Air Conditioning Contractors
National Association*
DEBORAH WYANDT

**JURISDICTIONAL AGREEMENTS ENTERED INTO BETWEEN AFFILIATED INTERNATIONAL UNIONS AND DECISIONS RENDERED AFFECTING THE BUILDING INDUSTRY THAT ARE HELD TO BE OPERATIVE BY THE BUILDING AND CONSTRUCTION TRADES DEPARTMENT**

**By the**

**American Federation of Labor, Building and Construction Trades Department, A. F. of L., National Board for Jurisdictional Awards**

————

### Carpenters and Painters

For the purpose of bringing about conditions of harmony and co-operation, the following agreement has this day been entered into and agreed to by and between the Brotherhood of Painters, Decorators and Paperhangers of America and the United Brotherhood of Carpenters and Joiners of America:

(1) It is agreed that the members of the United Brotherhood of Carpenters and Joiners of America shall erect and install all work in connection with and required for, acoustical purposes up to the point of applying canvas, muslin or similar materials to take the finished decorations, which work shall be done by the members of the Brotherhood of Painters, Decorators and Paperhangers of America.

(2) The applying and erection of all mouldings, in connection with acoustical work, shall be done by members of the United Brotherhood of Carpenters and Joiners of America.

39

(3) If any misunderstanding arises as to the meaning or carrying out of any of the provisions contained herein, the same shall be taken up with the General Presidents of the two organizations parties hereto.

(4) This agreement to be in force and effect when approved by the Executive Board of the two organizations signatory hereto.

For the United Brotherhood of Carpenters and Joiners of America:

> GEO. H. LAKEY
> J.W. WILLIAMS
> W.T. ALLEN

For the Brotherhood of Painters, Decorators and Paperhangers of America:

> JOS. F. KELLEY
> CHARLES A. CULLEN
> CLARENCE E. SWICK

Dated December 17, 1928.
Witness:

WM. J. MCSORLEY
*President, Building Trades Department*

### Lathers and Sheet Metal Workers

Agreement between the Wood, Wire and Metal Lathers' International Union and the Sheet Metal Workers' International Association to govern the installation of products manufactured by the Knapp Brothers' Manufacturing Company of Chicago, Ill., and similar products.

In order to simplify any differences that may arise on building operations, it is agreed by both parties to this

40

agreement that the following products are conceded by the Wood, Wire and Metal Lathers' International Union as the work of the members of the Sheet Metal Workers' International Association:

> Sanitary Metal Cove Base, No. 202.
> Sanitary Metal Cove Base, No. 203.
> Sanitary Metal Cove Base, No. 204.
> Sanitary Metal Cove Base, No. 205.
> Sanitary Metal Cove Base, No. 501.
> Sanitary Metal Window Stool and Frame, No. 302.
> Sanitary Metal Window Stool, No. 304.
> Sanitary Metal Chalk Trough, No. 303.

It is conceded by the Sheet Metal Workers' International Association that the following products are the work of the members of the Wood, Window and Metal Lathers' International Union:

> Knapp Metal Base Grounds and Screeds, style Nos. 1, 1½, 2, 42, 49.
> Knapp Metal Casing Beads, Nos. 39 and 41.
> Eclipse Metal Picture Mould, No. 23.
> "Royal" Metal Picture Mould, No. 20.
> Knapp Sanitary Metal Chair Rail, No. 300.
> Metal Bull Nose Beads and Metal Corner Beads of every description.
> Inside and Outside Corner Fittings.

This agreement made and entered into January 12, 1926.

> WOOD, WIRE AND METAL LATHERS' INTERNATIONAL UNION.
>
> JOHN H. BELL, *Gen. Pres.*
> WM. J. MCSORLEY, *1st Gen. Vice Pres.*
> A. D. YODER, *Gen. Sec.-Treas.*

41

SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION.

> JOHN J. HYNES, *Gen. Pres.*
> WM. L. SULLIVAN, *Gen. Sec.-Treas.*
> ROBERT BYRON, *Int. Rep.*

EXPLANATION

Sanitary Metal Cove Base, No. 202:
> Used at intersections of floors and walls or partitions and comes 4 in. and 6 in. high. This base is erected before plastering and is so set as to form a ground screed for plastering and for the finished cement floor.

Sanitary Metal Cove Base, No. 203:
> Used at intersections of floors and walls or partitions and comes in widths of 4 in. and 6 in. This is a flush base placed after floors and plastering is completed.

Sanitary Metal Cove Base, No. 204:
> Is similar to No. 203 except that it comes in two sections where No. 203 comes in but one section.

Sanitary Metal Cove Base, No. 205:
> Is similar to No. 204 except that the base is put in place before plastering and the top portion of it forms a ground for plastering. It comes 4 in. and 6 in. wide.

Sanitary Metal Cove Base, No. 501:
> Is similar to No. 202 with the exception of very little change in its form.

Sanitary Metal Window Stool and Frame, Nos. 302 and 304:

> Is a metal jamb running from 4 in. to 6 in. in width and a return on wall which forms a plaster ground.

Sanitary Metal Chalk Trough, No. 303:

> As its name implies, is a chalk trough to go under blackboards in schoolhouses and is placed after plastering is completed.

It will hardly be necessary for me to explain that portion of the work which the Sheet Metal Workers concede to come under our jurisdiction, as you must be familiar with the names of the different materials mentioned in the agreement.

### Painters and Plasterers

New York, N.Y., February 16, 1928.

This agreement entered into by and between the Operative Plasterers and Cement Finishers' International Association and the Brotherhood of Painters, Decorators and Paperhangers of America, in the matter of jurisdiction to govern the application of California Stucco "CRAFTEX," "TEXTONE" and other materials of like character, shall be as follows:

This agreement shall become effective February 16, 1928, that the applying of all California Stucco shall be the work of the Plasterers' organization. That the finishing of the same it is agreed that the Plasterers shall be permitted to apply one wash and thereafter all washing and the applying of colors shall be under the jurisdiction of the Brotherhood of Painters.

It is hereby agreed that all "CRAFTEX," "TEXTONE" or other material of the same character, when applied over a scratch or brown coat of plaster, shall be the work of the Plasterer, said material to be applied with a trowel, or other usual methods of plastering.

It is hereby agreed that all "CRAFTEX," "TEXTONE" or other material of like character, when applied over a sand finish or white coat of plaster, shall be the work of the Painter, said material to be applied with a brush, or other usual method of painting.

It is agreed that when the material in question is applied to show windows for decorative purposes, and does not exceed 150 yards in all, it shall be the work of the Painter, and when the work exceeds 150 yards and applied over a scratch or brown coat of plaster, it shall be the work of the Plasterer.

For Plasterers:

> EDW. J. MCGIVERN
> T. A. SCULLY

For Painters:

> JOS. F. KELLEY, *2d G.V.P.*
> CHAS. A. CULLEN, *3d G.V.P.*

Attest:

WM. J. MCSORLEY,
  *Pres., Building Trades Department.*

44

**Carpenters and Lathers**

Agreement entered into between the representatives of the United Brotherhood of Carpenters and Joiners and Wood, Wire and Metal Lathers' International Union, January 14, 1903.

Pending the action of their convention, the United Brotherhood of Carpenters and Joiners of America agree not to assert jurisdiction over any iron work including iron or wire lathing, studding, or any other exclusively iron work claimed by the Wood, Wire and Metal Lathers' International Union.

The Wood, Wire and Metal Lathers' International Union agree that we will not assert jurisdiction over or allow our members to perform any wood work, including shingling, wooden arches, door or window frames, wooden studding or furring, or any other carpenter or wood work, except wooden lath to receive plastic material.

Signed for the United Brotherhood of Carpenters and Joiners of America:

> WM. D. HUBER, *President.*
> FRANK DUFFY, *General Secretary.*

Signed for the Wood, Wire and Metal Lathers' International Union:

> CHAS. LANGLANDS,
> JOHN STEVENS, *Committee.*

#### Carpenters and Lathers

August 21, 1928.

RELATIVE TO JURISDICTION OVER MATERIAL KNOWN
AS CELOTEX

45

Further taking up the question of jurisdiction over the material know as "CELOTEX," and in accordance with the tentative proposals on this subject between our organizations, we, the undersigned, hereby agree that the material known as Celotex Lath comes under the jurisdiction of the Lathers' International Union; all other Celotex material comes under the jurisdiction of the United Brotherhood of Carpenters and Joiners.

> UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA.
>
> > WM. L. HUTCHESON, *Gen. Pres.*
> > FRANK DUFFY, *Gen. Sec.*
>
> WOOD, WIRE AND METAL LATHERS' INTERNATIONAL UNION.
>
> > JOHN H. BELL, *Gen. Pres.*
> > A. D. YODER, *Sec.-Treas.*

## Boiler Makers and Iron Workers

Approved May 28, 1926

It is agreed that the following work shall be recognized as coming under the jurisdiction of the International Brotherhood of Boiler Makers, Iron Ship Builders and Helpers of America:

SECTION 1. The construction, erection and assembling of all boilers, parts and work in connection therewith, including boiler fronts, heat units, water walls, tube supports and casings (except the unloading, hoisting, or lowering and placing of complete boilers, steam drums and assembled sections of water tube boilers to their approximate positions), all connections between the boiler and stack (commonly known as breeching), built

of sheet steel or iron, supports for the same (which are not part of the building structure), uptakes, smoke boxes, air and water heaters, smoke consumers, hot or cold air ducts (except when used for ventilating purposes).

SEC. 2. Iron and steel ship building.

SEC. 3. Pontoons, purifying boxes, gas generators and wash tanks or scrubbers, standpipes, brewery vats (except glass enameled tanks), water tower (except structural frames and balconies), all iron and steel pipe line, penstock and flume work, steam, air, gas, oil, water, or other liquid tanks or containers requiring tight joint, including tanks of riveted, caulked or welded construction in connection with swimming pools.

SEC. 4. The following work in and around blast furnaces and rolling mills, viz.: hot stoves, blast furnaces, cupolas and dump cars, and all steam, air, water, gas, oil or other liquid tight work (all other iron and steel work in such buildings shall be done by Iron Workers).

SEC. 5. Gasometers, including all frame work in connection with same.

SEC. 6. All iron or steel stacks, in connection with power plants, furnaces, rolling mills, manufacturing plants, and all other power plants (except small power plants in connection with hotels or office buildings and sectional or other steel stacks erected in office buildings or hotels), and all extensions or repairs of such stacks shall be done by Boiler Makers.

It is agreed that the following work shall be recognized as coming under the jurisdiction of the International Association of Bridge, Structural and Ornamental Iron Workers:

47

SECTION 1. The erection and construction of all iron, steel and ornamental iron entering into the erection and construction of the following: Buildings, bridges, viaducts, subways and tunnels, towers, hoists, car dumpers, cranes, coal conveyors, ore unloaders, stokers, supports for boilers, coal bins and hoppers, ash chutes and hoppers, rock, coke, sand and ore bins and hoppers, kilns, driers, coolers, crushers, mixers, pulverizers, roasters, all caisson work, safe deposit boxes, vaults, vestibules and doors, glass enameled tanks, malt drums, fans, and hot rooms and ventilators including air ducts in connection therewith, all swimming pools (except as specified in Section 3 of the Boiler Makers' classification of work in this agreement) and the wrecking of all of the above work shall be done by Iron Workers.

SEC. 2. The erection and construction of all sectional and other steel or iron stacks, erected in office buildings and hotels; and all stacks erected in small power plants in connection with hotels and office buildings, and the extension and repair to such stacks shall be the work of the Iron Workers.

SEC. 3. The erection and construction of structural iron work and balconies in connection with water towers shall be the work of the Iron Workers.

SEC. 4. The erection and construction of all steel and iron work around rolling mills and blast furnaces (except that specified in Section 4 of the Boiler Makers' classification of work) shall be done by Iron Workers.

SEC. 5. The unloading, hoisting or lowering and placing of complete boilers, steam drums, and assembled sections of water tube boilers to their approximate positions shall be done by Iron Workers.

48

SEC. 6. The burning and welding on work awarded to the Boiler Makers shall be done by Boiler Makers, and the burning and welding on work awarded to the Iron Workers shall be done by Iron Workers.

SEC. 7. Any further disputes that may arise between the parties of this agreement shall be first considered by the respective General Presidents. Upon their failure to agree, the question shall be submitted to arbitration. None of the work definitely decided upon in this agreement shall be subject to further arbitration.

For the International Brotherhood of Boiler Makers, Iron Ship Builders and Helpers of America:

> (Signed) J.A. FRANKLIN.
> WM. ATKINSON.
> JOS. P. RYAN.
> MARTIN DALEY.

For the International Association of Bridge, Structural and Ornamental Iron Workers:

> (Signed) P. J. MORRIN.
> W. J. MCCAIN.
> DAN J. O'SHEA.
> MICHAEL C. ARTERY.

### Sheet Metal Workers and Boiler Makers

Mr. John J. Hynes, *General President*
642 Transportation Building
Washington, D.C.

Dear Sir and Brother:

The International Brotherhood of Boiler Makers, Iron Ship Builders and Helpers of America, through the un-

49

dersigned duly authorized officers, hereby officially recognize and acknowledge the established jurisdictional rights of the members of the Sheet Metal Workers' International Association to manufacture, assemble, erect and install all sheet metal work of No. 10 gauge or lighter when used in connection with the construction, equipment, alteration and repair of buildings.

In witness thereof we hereby affix our hand and seal this 16th day of October, 1930.

For the International Brotherhood of Boiler Makers, Iron Ship Builders and Helpers of America:

> (Signed) J. A. FRANKLIN,
> *International President.*

For the Sheet Metal Workers' International Association:

> (Signed) JOHN J. HYNES,
> *General President.*

### Iron Workers and Elevator Constructors

June 9, 1931.

The undersigned representatives of the International Association of Bridge, Structural and Ornamental Iron Workers, and the International Union of Elevator Constructors, Operators and Starters mutually agree that both organizations shall co-operate with and support each other to maintain Union conditions and their members upon the work of their respective trades, and that for the purpose of establishing complete harmony between both organizations, this agreement is hereby entered into, effective on and from this date.

All semi or full automatic elevator doors or gates, and all operating devices shall be the work of the Elevator Constructors.

All elevator doors or gates manually operated, including all elevator enclosures, front, facias, sills, frames and bucks, shall be the work of the Iron Workers.

Steel trusses, girders and supports for escalators, where riveted or welded, shall be the work of the Iron Workers.

All other escalator work shall be the work of the Elevator Constructors.

All theater curtains, back-stage lifts, and equipment in connection therewith, shall be assembled and erected by the Iron Workers, excepting the operating machinery.

Orchestra and Console lifts shall be assembled and erected by the Elevator Constructors, including the machinery in connection therewith, and all machinery in connection with theater curtains and back-stage lifts.

(The above two paragraphs shall also apply to auditoriums, schools, convention halls, and other buildings similarly equipped.)

All of the above is hereby agreed to and accepted by the signatories to this agreement for their respective organizations.

For the International Association of Bridge, Structural and Ornamental Iron Workers:

(Signed) P. J. MORRIN,
*General President.*

51

WM. H. POPE,
*5th Gen. Vice-Pres.*

JOHN M. SCHILLING,
*7th Gen. Vice-Pres.*

W. J. MCCAIN,
*General Secretary*

For the International Union of Elevator Constructors,
Operators and Starters:

(Signed) FRANK FEENEY,
*International President*

J. C. MACDONALD,
*1st Int. Vice-Pres.*

WALTER SNOW,
*2nd Int. Vice-Pres.*

JOSEPH F. MURPHY,
*Int. Sec.-Treas.*

### International Union of Operating Engineers and United Association of Journeymen Plumbers and Steam Fitters

#### AGREEMENT

In the controversy between the United Association of
Plumbers and Steam Fitters and the International Union
of Steam and Operating Engineers in Cleveland, Ohio,
over an air compressor that was used by the Plumbers
for boring holes in a concrete floor, and which was re-
ferred by the local unions of Cleveland and the Interna-
tional representatives of both organizations to the Inter-
national Presidents of the United Association of
Plumbers and Steam Fitters and the International Union

of Steam and Operating Engineers for adjustment, we find that at the A. F. of L. Convention held in Norfolk, Va., in 1907, Resolution No. 124, which was presented by the International Union of Steam and Operating Engineers and adopted by the Convention, gives jurisdiction over this work to the International Union of Steam and Operating Engineers.

We also find in the jurisdiction claims filed by the International Union of Steam and Operating Engineers with the Building Trades Department upon their entrance into the Department, that this work is covered in their jurisdiction by the following paragraph:

### "HOISTING AND PORTABLE"

"All hoisting and portable engines on building and construction work, where operated by steam, electricity, gasoline, hydraulic or compressed air, including pumps, siphons, pulsometers, concrete mixers, air compressors and elevators, where used for hoisting building material, street rollers, steam shovels, dinky locomotives, cableway, clam shells and pile drivers."

Both International Presidents met in Washington on January 5, 1925, at the headquarters of the Building Trades Department, and upon finding the action of the A. F. of L. Convention upon Resolution No. 124 and the jurisdiction filed with the Building Trades Department that this work of operating air compressors belongs to the Hoisting and Portable Engineers, it is agreed that the local unions will be notified to that effect.

(Signed) JOHN COEFIELD,
(Signed) ARTHUR M. HUDDELL.

**Sheet Metal Workers' International Association
and United Association of Journeymen
Plumbers and Steam Fitters**

AGREEMENT

INDIANAPOLIS, IND.
January 28, 1928.

Report of the Committees appointed by the United Association of Journeymen Plumbers and Steam Fitters and the Sheet Metal Workers' International Association, to take up the matter of sheet lead in building construction.

This Committee met at Hotel Severin, Indianapolis, Ind., Friday, January 27, 1928, with the following representatives in attendance: Wm. Lynn, George Masterton and Bert Stephenson, representing the United Association of Plumbers and Steam Fitters, and James Lennon, Richard Pattison and James T. Moriarity, representing the Sheet Metal Workers International Association.

The Committee organized with Wm. Lynn, Chairman; James T. Moriarty, Secretary. The Committee was visited by Robert Fox, Local Agent of the Plumbers, and Charles Wilson, Local Agent of the Sheet Metal Workers. After hearing both agents, the Committee went into executive session and after holding several meetings, reached the following agreement:

"Sheet lead work used in roofing, gutters, valleys, flashings in connection with roofing and ducts in direct connection with ventilation systems shall be the work of the Sheet Metal Workers, members of the Sheet Metal Workers' International Association. All other sheet lead work including roof flashings in con-

54

nection with plumbing, shall be the work of the
Plumbers, members of the United Association of Jour-
neymen Plumbers and Steam Fitters."

We, the undersigned committee, recommend that this
agreement shall go into effect when approved and
signed by the International Presidents of the above or-
ganizations.

> (Signed) WM. LYNN,
> (Signed) GEORGE MASTERTON,
> (Signed) BERT STEPHENSON,

*Representing United Association of Journeymen*
*Plumbers and Steam Fitters,*

> (Signed) JOHN COEFIELD,
> *General President,*
> (Signed) JAMES LENNON,
> (Signed) R. PATTISON,
> (Signed) JAMES T. MORIARTY,

*Representing Sheet Metal Workers' International*
*Association,*

> (Signed) JOHN J. HYNES,
> *General President.*

### Bricklayers, Masons and Plasterers' International Union and Operative Plasterers and Cement Finishers' International Association

Agreement entered into between the B.M. & P.I.U. of
America and the O.P.&C.F.I.A. at the Headquarters of
First-Named Organization, Odd Fellows Bldg., Indi-
anapolis, Ind.

> FEBRUARY 17, 1911.

First. The O.P.&C.F.I.A. agrees to a mutual interchange of cards with the B.M.&P.I.U., same to cover all cities where the O.P.&C.F.I.A. have locals and the B.M.&P.I.U. has mixed locals, and that the following stipulations be recognized.

Second. The support to be given in the interest of either organization in the localities where the B.M.&P.I.U. controls shall be determined by the Executive Boards of both organizations in conference when the necessity for such support arises. No work to be performed until the conference board comes to a decision.

Third. The B.M.&P.I.U. recognizes and concedes the sole right of the O.P.&C.F.I.A. to organize and charter unions composed of exclusive plasterers in all localities where a sufficient number of bona fide resident plasterers can be secured, and guarantees that no interference on their part shall take place, except under conditions hereafter stated, and that no exclusive plasterers' union shall be chartered by the B.M.&P.I.U. under any circumstance.

Fourth. The conditions existing under which an exclusive union of plasterers is permitted to be organized in territory already controlled by the B.M.&P.I.U. having been a matter of complaint at the conference, the representatives of the B.M.&P.I.U. have determined that the grounds upon which the complaint is based are justified and that same demand a concession upon their part—i.e., that of permitting the bricklayers and stonemasons of a mixed union the right to cast a vote upon the question of the plasterer members being allowed to form a separate union. Said representatives agree to eliminate the bricklayer and stonemason when such votes are being taken in the future, and that only the recognized plasterer members of the union shall be allowed to cast a vote upon

such propositions. That in all cases where two-thirds of such plasterer members vote in favor of separation, the General Secretaries of the O.P.&C.F.I.A. and the B.M.&P.I.U. shall be notified of same by the secretary of the union, and a charter shall be immediately granted.

Fifth. The B.M.&P.I.U. agrees that the subcontracting of the plastering contract of a bona fide employer or general contracting firm shall not be objected to by any of its subordinate unions upon all general contracts exceeding $50,000, pending the convening of the next biennial convention of the B.M.&P.I.U. at which convention legislation will be asked for that will make permanent the relief ordered at this time.

Sixth. That the O.P.&C.F.I.A. charters be withdrawn from Springfield, Newark, and Rochester, and the members of each respective union be admitted to membership in the B.M.&P.I.U. local free of any penalty or initiation fee. All fines placed upon O.P.&C.F.I.A. members covering their actions in the above-named three cities are also hereby removed.

Seventh. In any city under a mixed charter of the B.M.&P.I.U. where there are but three or less plasterers affiliated, and there are five or more plasterers who are bona fide residents who are not members, the O.P.&C.F.I.A. is conceded the right to organize a union, and all B.M.&P.I.U. members following plastering shall become members of the newly chartered exclusive (O.P.&C.F.I.A.) Plasterers' Union free of initiation fee.

"OFFENSIVE AND DEFENSIVE ALLIANCE"

Eighth. That in all movements, "offensive or defensive," no subordinate local of either International Union shall be permitted to take any action whatsoever until

57

the question requiring joint action shall have first been acted upon and determined by the Presidents of the O.P.&C.F.I.A. and the B.M.&P.I.U.

Ninth. No movement of an "offensive" or "defensive" character shall be countenanced in cases where such would be in violation of any existing agreements.

### RULES GOVERNING INTERCHANGEABLE CARDS

The rules governing the issuing of the Interchangeable traveling card and the clearance card shall be subject to the rules agreed upon at the conference of October 30, 1906, and as revised at the conference of February 13, 1909.

In Witness Whereof, We, the undersigned, hereby set our hand and seal this eighteenth day of February, 1911.

> For the O.P.&C.F.I.A:
> JOHN DONLIN, *President.*
> EDW. J. MCGIVERN, *1st Vice-Pres.*

(Seal)

> PETER G. COOK, *3rd Vice-Pres.*
> W. A. O'KEEFE, *Organizer.*

> For the B.M.&P.I.U. of America:
> WM. J. BOWEN, *President.*
> THOS. R. PREECE, *1st Vice-Pres.*
> WM. DOBSON, *Secretary.*

### ACOUSTONE

At a meeting of the Joint Conference between the Executive Boards of the Bricklayers, Masons and Plasterers' International Union of America and the Operative Plasterers and Cement Finishers' International Associa-

tion of the United States and Canada held in Atlantic City, February 27, 1930, it was agreed, that the above-named material and those of a similar character shall be installed on a fifty-fifty basis equally divided between the membership of the Operative Plasterers and Cement Finishers' International Association of the United States and Canada and the Bricklayers, Masons and Plasterers' International Union of America irrespective of thickness.

### ARTIFICIAL STONE

In order to reach an amicable understanding between the B.M.&P.I.U. and the O.P.&C.F.I.A. regarding the installation of the artificial stone or marble, the O.P.&C.F.I.A. concedes to the membership of the B.M.&P.I.U. the installation of artificial stone or marble when same are precast and of 3/4 of an inch or more in thickness. And the B.M.&P.I.U. concedes to the O.P.&C.F.I.A. that installation of said imitation stone or marble when same are less than 3/4 of an inch in thickness, also said artificial stone when same are applied to channel iron furring. It is also understood that each party hereto will confine their method of erection or application to the Craft method of erection or application employed heretofore and that the 3/4 inch thickness referred to heretofore is 3/4 inch in the body of piece not inclusive of any relief members or enrichments appearing on the surface.

### **Tilelayers**

Owing to the fact that the Tilelayers organization has ignored agreements held between themselves and the O.P.&C.F.I.A.; also the B.M.&P.I.U., the agreements were reported abrogated. The B.M.&P.I.U. assuming control of the tilelaying business.

# AGREEMENT

(PREPARATION OF WALLS AND CEILINGS
TO RECEIVE TILE)

Agreement entered into this 22nd day of August, 1917, between the B.M.&P.I.U. and the O.P.&C.F.I.A. pertaining to the preparing or plastering of walls and ceilings which are to receive tile;

First. It is agreed that the Plasterers of the O.P.&C.F.I.A. and the B.M.&P.I.U. shall prepare or plaster all walls which are to receive tile. They shall plumb, rod and square all walls and scratch the same so as to guarantee adhesion of the final coat which shall be put on by the Tilelayer to act as a bed for his tile.

Second. It is further agreed that the Plasterers of either the O.P.&C.F.I.A. of the B.M.&P.I.U. shall prepare or plaster all ceilings which are to receive tile. All ceilings must be leveled and rodded and properly scratched so as to guarantee adhesiveness of the final coat which shall be applied by the Tile Setter and act as a bed for his tile.

Third. It is further agreed that the Plasterers shall use only sand and cement in the preparation of work above stipulated unless otherwise specified by the architect.

Fourth. Any member of either organization that violates the above rules shall, upon conviction, be fined the sum of $25.00.

"Resolved, to qualify the agreement entered into between the Interstate Mantel and Tile Contractors' Association, Operative Plasterers and Cement Finishers' International Union and the Bricklayers, Masons and Plasterers' International Union of America to read:

"That three bathrooms, vestibules and small halls in private residents shall be plastered by the tile setter."

## AGREEMENT

Agreement entered into this ____ day of _____, 1918, by and between the Interstate Mantel and Tile Contractors' Association, the Operative Plasterers and Cement Finishers' Association of the United States and Canada, and the Bricklayers, Masons and Plasterers' International Union of America.

"The purpose of this agreement is to prevent hereafter jurisdictional disputes that have existed for the past twenty years between the tile and plastering interests, and which have resulted in many strikes among the workmen involved to the detriment of employer and employee and the building public.

"First. It is agreed that all materials for plastering work entering into the preparation of all walls, ceilings, etc., to receive tile and other work, and conceded as coming under the jurisdiction of the Mantel and Tile Contractors' Association, shall be included in the estimate and contract and the work shall come under the jurisdiction of the Mantel and Tile Contractors.

"Second. It is agreed that the plasterers of the O.P.&C.F.I.A. and the B.M.&P.I.U. shall prepare or plaster all walls and ceilings which are to receive tile, except the final setting bed, which shall be applied by the tilelayer.

"Third. All preparation work shall be done in a thorough and workmanlike manner, and it is understood and agreed that all walls and ceilings shall be plumbed, leveled and rodded under the direct supervision of the tile layers.

(Signed) ED. J. MCGIVERN,
*President O.P.& C. F. I.A.*

PETER G. COOK,
Vice-President O.P.& C. F. I.A.

T. A. SCULLY,
*Secretary O.P.& C. F. I.A.*

W. A. O'KEEFE,
*General Organizer O.P.& C. F. I.A.*

WM. J. BOWEN,
*President B.M.&P.I.U.*

THOS R. PREECE,
*Vice-President B.M.&P.I.U.*

WM. DOBSON,
*Secretary B.M.&P.I.U.*

**Carpenters and Sheet Metal Workers**

### AGREEMENT

For the purpose of bringing about conditions of harmony and co-operation the following agreement is this day entered into and agreed to by and between the Sheet Metal Workers' International Association and the United Brotherhood of Carpenters and Joiners of America:

It is agreed that members of the United Brotherhood of Carpenters and Joiners of America shall erect and install all interior metal trim such as bucks, jambs, doors, casings, base, chair-rail, picture mouldings, partitions, and all other material generally referred to as trim except toilet partitions, which shall be done by Sheet Metal Workers. Also, when a sheet metal contractor who is engaged in manufacturing and erecting sheet metal products for buildings, such as cornices, sky-lights, metal roofing, ventilating work, etc., manufactures the material referred to as trim, with members of the Sheet Metal Workers' International Association they shall do the

erecting of same in a manner that will comply with the working agreement now in force between the Sheet Metal Workers and said firms.

It is further agreed that in the setting of metal window frames that when frames are set, stayed, plumbed or braced such work shall be done by Carpenters, but if set or placed in an opening in walls left when a building is erected the work shall be done by Sheet Metal Workers. The hanging and adjusting of metal sash shall be done by Sheet Metal Workers. It is further agreed that any metal work in connection with store fronts shall be done by Sheet Metal Workers.

It is further understood and agreed that in the erection of metal column forms the erection shall be done by Sheet Metal Workers. Any framing in connection therewith shall be done by Carpenters.

It is further agreed that the installation of metal lockers, also the erection of ordinary plain metal shelving shall be done by Sheet Metal Workers.

It is further understood and agreed that the members of neither organization shall work on any building where non-union men of the other craft are employed.

If any misunderstanding arises as to the meaning or carrying out of any of the provisions contained herein the matter will be taken up with the General Presidents of the two organizations.

Dated March 21, 1928.

For United Brotherhood of Carpenters and Joiners:

WM. L. HUTCHESON,                    FRANK DUFFY,
                    T. M. GUERIN.

63

For Sheet Metal Workers' International Assn.:

| JOHN J. HYNES, | R. PATTISON, |
| ROBT. BYRON, | W. J. ROONEY, |
| JAMES T. MORIARTY, | THOMAS FAY. |

In the last part of paragraph Two of the Agreement entered into this 21st day of March, 1928, by and between the Sheet Metal Workers' International Association and the United Brotherhood of Carpenters and Joiners of America, beginning with "Also," it is understood and agreed that this refers only to the firms now manufacturing hollow metal doors and trim in their own shops in the City of Chicago, and the erecting of same in accordance with the working agreement between the Sheet Metal Workers and said firms, now in force.

WM. L. HUTCHESON                    JOHN J. HYNES

### Sheet Metal Workers-Asbestos Workers Agreement

Agreement entered into this 13th day of April, 1939, by and between the Sheet Metal Worker's International Association and the International Association of Heat and Frost Insulators and Asbestos Workers covering the application of insulation and acoustical materials on inside and outside of sheet metal ducts and fittings in connection with ventilation and air-conditioning systems.

1. All insulating material applied on outside of sheet metal ducts and fittings is recognized as coming within the jurisdiction of the International Association of Heat and Frost Insulators and Asbestos Workers.

2. All acoustical materials applied inside of sheet metal ducts and fittings, in shop or on job prior to erection of said ducts and fittings by Sheet Metal Workers, is

recognized as coming within the jurisdiction of the Sheet Metal Workers' International Association.

3. All acoustical materials applied inside of sheet metal ducts and fittings on job after said ducts and fittings have been erected by Sheet Metal Workers is recognized as coming within the jurisdiction of the International Association of Heat and Frost Insulators and Asbestos Workers.

4. Any dispute or controversy arising out of the application or interpretation of this agreement shall be referred to and settled immediately by the General Presidents of the two International Unions involved, in accordance with the purpose and intent of this agreement.

(Signed)

FOR SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION,

ROBT. BYRON, *General President.*
JAMES T. MORIARTY.
WM. O'BRIEN, *General Secretary-Treasurer.*
    INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULA-
    TORS AND ASBESTOS WORKERS.
JOSEPH A. MULLANEY, *General President.*
C. W. SICKLES, *General Secretary-Treasurer.*

**Between the United Association of Journeymen Plumbers and Steamfitters and the United Brotherhood of Carpenters and Joiners of America**

BATH AND TOILET ROOM ACCESSORIES AND
MEDICINE CABINETS*

It is agreed that the installation of all bath and toilet room accessories, such as paper holders, towel rails or

bars, glass holders, glass shelves, etc., however installed, shall be the work of the members of the United Association of Journeymen Plumbers and Steamfitters.

Further, that the installation of bath and toilet room medicine cabinets shall be the work of the members of the United Brotherhood of Carpenters and Joiners of America.

UNITED ASSOCIATION OF JOURNEYMEN
PLUMBERS AND STEAMFITTERS.

GEORGE MASTERTON.
JOHN COEFIELD.

UNITED BROTHERHOOD OF CARPENTERS
AND JOINERS OF AMERICA.

M.A. HUTCHESON.
WM. L. HUTCHESON.

Dated at Cincinnati, Ohio, September 29, 1939

* Agreement abrogated by the United
  Brotherhood of Carpenters and Joiners
  of America on November 18, 2003.

# AGREEMENT

**Agreement between the United Brotherhood of Carpenters and Joiners of America and the Operative Plasterers' and Cement Finishers' International Association of the United States and Canada, at the headquarters of the First Named Organization, Carpenters' Building, Indianapolis, Ind., June 13, 1944.**

This Agreement entered into by and between the United Brotherhood of Carpenters and Joiners of America, the Operative Plasterers' and Cement Finishers' International Association of the United States and Canada, in the matter of jurisdiction to govern the fabrication and setting of screeds and forms used in connection with the placing and finishing of cement or concrete, shall be as follows:

1. The setting of screeds of lumber, metal or other materials to determine the proper grade of concrete when used to serve as forms, such as 2" by 4"s, or other plain pieces of material, when held in place by stakes and/or spreaders shall be done by Cement Finishers, members of the O.P.&C.F.I.A. and B.M.&P.I.U.

A screed is a strip of wood or metal used as a guide for leveling or grading a concrete floor, slab or sidewalk.

2. The fabricating of all screeds and stakes, for any purpose, and the construction and setting of all forms shall be done by Carpenters, members of the U.B. of C. & J. of A.

A form is a built-up section of wood, metal or composition board used for the purpose of moulding concrete to a given line or shape.

67

3. Any bulkhead that is one single board in height, and that has no key attached or which is not notched or fitted shall be set and braced or staked by Cement Finishers, providing same is used as a screed. The term bulkhead shall mean a form or screed erected for the purpose of separating pours of concrete. Any bulkhead that must be notched or fitted, or which has a key attached or which is over one board high, or any bulkhead that is not used as a screed, shall be fabricated and set by Carpenters.

For the U.B. of C. & J. of A.:

M. A. HUTCHESON, *First General Vice President.*
JOHN R. STEVENSON, *Second General Vice President.*

For the O.P. & C. F. I. A.:

JOHN E. ROONEY, *General President.*
JOHN J. HAUCK, *First Vice President.*

# MEMORANDUM OF UNDERSTANDING

## By and Between

## The International Brotherhood of Electrical Workers

### and

## The International Hod Carriers', Building and Common Laborers' Union of America*

1. The International Brotherhood of Electrical Workers recognizes the jurisdiction of the International Hod Carriers', Building and Common Laborers' Union of America over such work as all digging, excavating, grading, backfilling, cutting and replacing of all pavements and the handling of all material in connection therewith, performed for Gas Utility Companies, affiliated or non-affiliated with the Electric Utilities, in all cases except where the International Brotherhood of Electrical Workers has agreements now in effect as of this date. Such agreement shall continue until the next termination period effective in said agreements and the International Brotherhood of Electrical Workers agrees to exercise all options to change said agreements to conform with the description of jurisdiction as above outlined by serving such notice as may be required to effect such change. If, however, the International Brotherhood of Electrical Workers, at such period or periods of termination is convinced that the termination of any such agreements would impair the prestige of the Electrical Workers in the Electric Public Utility field, the matter of termination of said agreements will be taken up and discussed by

---

*For full report see page 133 of the Proceedings of the 34th Annual Convention, New Orleans, 1940.

both parties to this memorandum of understanding with the protection of the mutual welfare and interest of both parties to this memorandum of understanding being the paramount and deciding factor. When such termination or changes are effected, the work shall revert to and be considered the work of the Laborers, parties hereto.

2. It is recognized by both parties hereto that all provisions with respect to the work herein defined will apply in the instances of work in connection with water and steam, in the same manner and to the same effect as applies to gas. Likewise, the provisions relative to agreements now in effect apply on steam and water equally with gas.

3. The International Brotherhood of Electrical Workers reserves its established jurisdiction over right of way clearance performed be members of the International Brotherhood of Electrical Workers employed directly by Electric Utilities.

4. The International Brotherhood of Electrical Workers recognizes that the work of right of way clearance, with the exception of the digging of post holes and anchors and the back-filling of same, performed on or in connection with transmission line construction, through contracts, or on R. E. A. projects, is the jurisdiction of the International Hod Carriers', Building and Common Laborers' Union of America.

5. The International Hod Carriers', Building and Common Laborers' Union of America recognizes the jurisdiction of the International Brotherhood of Electrical Workers over handling of all electrical material, beginning with the unloading at the first point of delivery on the job, and continuing through its ultimate use or disposal.

6. Both parties to this understanding and agreement agree that there shall be no compacts entered between either party and any third parties in a jurisdictional issue affecting or involving either party hereto.

7. Both parties hereto agree that in the instance of any issues arising on work not herein covered or outlined, the settlement and disposal of such issues shall be only through procedures before proper tribunals, established within the American Federation of Labor, or through methods agreed upon by the International Presidents of the organizations parties hereto.

The International Brotherhood of Electrical Workers and the International Hod Carriers' Building and Common Laborers' Union of America hereby affix the signatures of the respective International Presidents in acknowledgement of an agreement to terms of understanding herein described, this third day of February, 1940, at Miami, Fla.

(Signed) D. W. Tracy,

*General President, International Brotherhood of Electrical Workers.*

(Signed) Jos. V. Moreschi,

*General President, International Hod Carriers', Building and Common Laborers' Union of America.*

### ARTICLES OF AGREEMENT

**Between the United Association of Journeymen Plumbers and Steamfitters of the United States and Canada, Hereinafter Referred to as the United Association, and the International**

71

**Brotherhood of Boiler Makers, Iron Ship Builders, Welders and Helpers of America, Hereinafter Referred to as Boiler Makers.**

For the purposes of eliminating jurisdictional disputes between the membership of these two International Unions, and for the further purpose of laying the groundwork for extensive cooperation and fraternal good will between the two memberships, and for the additional purpose of cooperating together in the unionization of those industries and firms in which we are jointly interested, the representatives of the two International Unions hereby undertake to dispose of the questions existing between them which have provoked jurisdictional disputes. In so doing it should be understood by all concerned that we are attempting only to settle controversies between ourselves and are not undertaking to settle disputes which either of the organizations herein involved may have with other International Unions, or to dispose of work which properly belongs to any other International Union.

#### Refinery Installation

1. On the equipment that has caused considerable misunderstanding in the industry, the United Association of Journeymen Plumbers and Steamfitters and the International Brotherhood of Boiler Makers, Iron Ship Builders, Welders and Helpers of America have agreed on the following division of work, viz.:

2. The installation of tubes in pipe stills or furnaces, commonly called oil heaters, will be handled, installed and finished by a composite crew equal in number of Boiler Makers and members of the United Association.

3. The erection of furnace frame, casing, doors and support will be performed by Boiler Makers.

4. All circulating piping, pipe hangers and oil burners will be installed by the United Association.

5. The installing or removing of cooler, condenser and heat exchanger tube, or tubes of the shell and tube type of equipment, by any mode or method, shall be the work of the Boiler Maker.

6. The building of cooler, condenser and heat exchanger pipe coils, by any mode or method, shall be the work of the United Association.

7. The handling and setting of all work in connection with bubble or fractionating towers, reaction chambers or evaporators, trays, cups, baffles, tube sheets, tubes or other interior equipment shall be the work of the Boiler Maker.

The United Association shall perform all internal and external piping, valves, strainers and floats.

8. The application or installation of braces and supports, riveted to pressure vessel, is the work of the Boiler Maker.

9. The handling and placing of washers and agitators, including baffles, is the work of the Boiler Maker.

10. Cooling tower pans, frames and condenser boxes is the work of the Boiler Maker.

Coils and all pipe work in connection with same is the work of the United Association.

11. All work in connection with coke stills and asphalt stills is the work of the Boiler Maker.

73

All pipe work in connection with the same is the work of the United Association.

12. The handling and settling of completed heat exchangers is the work of the United Association.

### Pipelines

13. It is hereby recognized that all transportation oil and gas lines is the work of the United Association.

14. Plate fabricated aqueducts or water lines to the point where it enters city or town distributing system, whether riveted or welded, is the work of the Boiler Maker.

Where flange or other patent joints are used it is the work of the United Association.

15. Plate fabricated intake and discharge lines in power plants, where riveted or welded joints are used, is work of the Boiler Maker.

Where flange or other patent joints are used it is the work of the United Association.

16. All other classes of manufactured pipe—regardless of material—used in the pipefitting industry, is the work of the United Association.

### Tanks

17. Completed tanks which are an integral part of a piping job shall be installed by members of the United Association.

Knockdown or completed tanks which are not an integral part of a United Association installation, for exam-

74

ple, brewery vats, distillery vats, etc., in or on buildings, shall be the work of the Boiler Maker.

18. All tankage for the storage of petroleum products in the petroleum industry, including bulk storage plants and all water towers, standpipes or water storage reservoirs, shall be the work of the Boiler Maker.

All pipe work in connection with same is recognized as the work of the United Association.

19. The erection and repair of gas holders is recognized as the work of the Boiler Maker.

All pipe work in connection with same is recognized as the work of the United Association.

### Boilers

20. Hot and cold air and gas ducts in connection with boilers, furnaces or other duct work incidental to Boiler Makers' installation is the work of the Boiler Maker.

21. It is hereby recognized that the building of boilers, including economizers, superheaters, air heaters, casings, burner boxes, down comers, sludge boxes and sluice troughs, completed marine bent tube boilers, breechings, stacks and all air and gas ducts in connection with same is the work of the Boiler Maker.

Soot blowers, fuel piping, valves, boiler trimmings, the setting of completed boilers and knockdown cast iron-boilers and all pipe work in connection with same is the work of the United Association.

22. The burning and welding on work in the jurisdiction of the United Association will be performed by the members of the United Association.

Burning and welding on work in the jurisdiction of the Boiler Maker shall be performed by the Boiler Maker.

23. The handling and rigging of all materials and equipment coming under the jurisdiction of these two trades will be performed by each respective trade.

24. It is understood that each class of work listed above, under the several sub-heads, stands alone by itself and no combination of sub-sections can be used to produce a result not contemplated by this agreement, as this agreement is fairly and honestly entered into and must be so applied.

25. Questions may arise which are not specifically covered by the articles of this agreement and it is understood that our respective officers and representatives will make a sincere effort to reach an amicable understanding based upon the broad principles herein laid down.

26. All new questions which may arise and which are not clearly covered by the terms of this agreement and that have failed of settlement locally between representatives of the two Organizations shall be jointly submitted to the two International Presidents or the officer acting in his place, with all supporting data and argument.

If the International Presidents fail to agree, they may submit same to a neutral umpire, jointly selected by them.

The work disposed of by this agreement shall not be subject to further arbitration or interpretation by any tribunal.

27. This agreement supersedes and voids all previous agreements between the United Association and the International Brotherhood, and likewise voids all decisions on controversies which occurred between the two International Organizations or between their affiliated local unions, affecting the United Association and the Interna-

tional Brotherhood, or by the American Federation of Labor, or the Building and Construction Trades Department of the American Federation of Labor, or by any other tribunal prior to the effective date of this agreement.

> United Association of Journeymen
> Plumbers and Steamfitters of the
> United States and Canada:
>> CHARLES N. RAU
>> LEO A. GREEN
>> MICHAEL F. GARRETT

> International Brotherhood of Boiler
> Makers, Iron Ship Builders, Welders
> and Helpers of America:
>> CHAS. J. MACGOWAN
>> HARRY NICHOLAS

Signed at Chicago, Ill., this 1st day of August, 1941.

Approved:

> GEORGE MASTERTON,
> *General President.*
> WM. E. WALTER.
> J. A. FRANKLIN,
> *International President.*

By the action of the 35th Annual Convention of the Building and Construction Trades Department the agreement made by and between the United Association of Plumbers and Steam Fitters and the International Brotherhood of Boiler Makers, Iron Ship Builders, Welders and Helpers of America was accepted, with the understanding that this agreement incorporated in the permanent record of the Department would not interfere with or alter the jurisdiction of any other National or International Union affiliated with the Building and Construction Trades Department.

# Addendum to Agreement

Re: Clarification—Rule 21—Agreement—International Brotherhood of Boiler Makers, Iron Ship Builders, Welders and Helpers of America and United Association of Journeymen Plumbers and Steamfitters of the United States and Canada.

Subsequent to the writing of the terms of the agreement there has been a question raised regarding the jurisdiction or work in connection with attemporators which was not included in Rule 21 of the above agreement. Hence, it is agreed by the above contracting parties that the word "attemporator" shall be included in Rule 21, paragraph 1, after the word "superheaters."

It is further discovered that a further clarification of Rule 21, paragraph 2, should be made by inserting Rule 21, paragraph 2, in the second line after the word "trimmings" the following language: "All circulating piping for appurtenances and component parts of boiler."

The amended Rule 21 would then read as follows:

"It is hereby recognized that the building of boilers, including economizers, superheaters, attemporators, air heaters, casings, burner boxes, downcomers, sludge boxes and sluice troughs, completed marine bent tube boilers, breechings, stacks, and all air and gas ducts in connection with the same is the work of the Boiler Maker."

"Soot blowers, fuel piping, valves, boiler trimmings, all circulating piping for appurtenances and component parts of the boiler, the setting of completed boilers and knockdown cast iron boilers and all pipe work in connection with same is the work of the United Association."

The agreement of August 1, 1941, between the two International Organizations has reduced jurisdictional dis-

putes between these two Organizations to a very minimum and this clarification is made in the hope that it may entirely eliminate any further jurisdictional misunderstandings.

(Signed) JOHN J. MCCARTIN,
*Special Representative.*

United Association of
Journeymen Plumbers and
Steamfitters.

(Signed) J. A. FRANKLIN,
*International President.*

International Brotherhood of
Boiler Makers.

March 20, 1942.

### AGREEMENT

**Between the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, and the International Brotherhood of Electrical Workers\***

It is hereby agreed that the operators of vehicles delivering electrical material come under the jurisdiction of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers.

It is further agreed that the operators of vehicles used for electrical construction work, maintenance work or electrical repair work—that is, when such vehicles are

---

\*For full report see Case 41 of Executive Council's Annual Report, 1942.

used for transporting man or men and/or material to and from job, and said vehicle remains at job site with man or men in the performance of electrical work, and the operation of the vehicle is an integral part of the work—such operator comes under the jurisdiction of the International Brotherhood of Electrical Workers.

It is understood and agreed that the equipment operated by electrical workers shall only be the truck carrying the line and maintenance crews, tools, etc., to and from the job, or the emergency car from electrical contracting shops carrying only tools and repair equipment for emergency work. Operation of all delivery equipment for the delivery of materials of all character, such as poles, pipes, transformers, cables and electrical appliances, such as refrigerators, radios, etc., shall be the jurisdiction of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers.

Signed this 11th day of February, 1942.

International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers:
JOHN M. GILLESPIE,
*General Secretary-Treasurer.*
DAVE BECK,
*Vice President.*

International Brotherhood of Electrical
Workers:
G. M. BUGNIAZET,
*International Secretary.*
CHARLES M. PAULSEN,
*Chairman, Executive Council.*
EDWARD J. BROWN,
*International President.*

80

### Agreement (Pointing or Caulking Around Steel Window Sash)

Agreement entered into April 12, 1919, at Indianapolis, Ind., between the Executive Officers of the B.M.&P.I.U and O.P.&C.F.I.A. as follows:

"It was agreed that the pointing around steel sash on exclusive concrete shall be done by the members of the O.P.&C.F.I.A. The pointing of all steel sash where whole or part is masonry shall be done by the members of the B.M.&P.I.U."

For the O.P.&C.F.I.A.

EDWARD J. MCGIVERN, *President.*
PETER G. COOK, *First Vice-President.*
THOMAS A. SCULLY, *Secretary-Treasurer.*
W. A. O'KEEFE, *Organizer.*

For the B.M.&P.I.U.

WILLIAM J. BOWEN, *President.*
THOMAS R. PREECE, *First Vice-President.*
WILLIAM M. DOBSON, *Secretary.*

### Agreement for Avoidance of Dispute Between United Slate, Tile and Composition Roofers and Sheet Metal Workers' International Association

(Endorsed by Seattle Convention, Building Trades Department, November, 1913)

DECISION RENDERED, JULY 12, 1922

In the matter of the subject referred to in the foregoing title, it is the decision of the Board that the following agreement be concurred in:

81

Upon that portion of the report of the Executive Council under the above caption the committee reported as follows:

"The representatives of the Sheet Metal Workers and the Slate, Tile and Composition Roofers appeared before your committee and requested that they be given an opportunity to reach an agreement. The request was granted and the following represents the agreement reached by the trades in interest:

"This agreement made and entered into at Atlantic City, N.J., July 25, 1913, by and between the Sheet Metal Workers, party of the first part and the Slate, Tile and Composition Roofers, party of the second part, in pursuance of correspondence and action thereon as found on page 76 of the Report of the Proceedings of the Sixth Annual Convention of the Building Trades Department, whereby the party of the first part agrees to cause its affiliated local unions and their members to respect and observe the trade jurisdiction of the party of the second part as approved by the Building Trades Department of the American Federation of Labor, and refrain from doing any work granted to said party of the second part in the aforesaid jurisdiction in all towns and localities, where the party of the second part has a duly chartered local union.

The party of the second part agrees to cause all its local unions and their members to observe and respect the jurisdiction of the party of the first part as established and approved by the Building Trades Department of the American Federation of Labor."

82

**MEMORANDUM OF UNDERSTANDING**

**Between**

**The Operative Plasterers' and Cement Finishers' International Association**

**The Bricklayers, Masons and Plasterers' International Union**

**and**

**The International Hod Carriers' Building and Common Laborers' Union**

1. This memorandum of understanding shall only cover the performance of work coming under the jurisdiction of either the Cement Finishers or Laborers in connection with the preparation, pouring, placing, spreading, rodding and finishing of cement or concrete on highways, roads, streets and airport runways.

2. The mixing, handling, pouring, puddling, blocking, vibrating and spreading of all concrete shall be the work of the Laborers. The setting, leveling and lining of all slab steel forms on roads, highways and streets shall be the work of the Laborers.

3. All labor on center expansion machine, all expansion and contraction joints, center stripes and center steel shall be the work of the Laborers.

4. The handling of bull floats where bull float is used for strike off shall be the work of the Laborers.

5. The tending to Cement Finishers, the handling and distributing of all material on sidewalks, curbs and gutters is the work of the Laborers.

6. The setting of all forms for sidewalks, curbs and gutters shall be the work of the Cement Finishers.

7. Straight edging, floating, trowelling, edging, rubbing and brushing shall be the work of the Cement Finishers.

8. It is understood that this memorandum is entered into for the purpose of clarifying jurisdiction as outlined above and in the event of any dispute arising in connection with the work as outlined above, the said dispute shall be referred to the General Presidents of the International Unions parties hereto. In the event of any dispute arising on any work not covered by this agreement such as bridge, viaducts and underpasses, the said dispute shall be immediately referred to the General Presidents of the International Unions involved, or to whomever the said General President may assign, for the purpose of attempting to adjust the said dispute amicably. During the period of time that these attempts are being made for adjustment there shall be no stoppage of work on the job.

Operative Plasterers' and Cement Finishers' International Association:

JOHN E. ROONEY,                    JOHN J. HAUCK.
    *President*                    *First Vice President*

Bricklayers, Masons and Plasterers' International Union:

HARRY C. BATES,                    A. J. CLELAND.
    *President.*

International Hod Carriers' Building and Common Laborers' Union of America:

Jos. V. Moreschi,          John W. Garvey.
    *General President.*

July 19, 1948

Attested: RICHARD J. GRAY,
          *President, Building and Construction*
          *Trades Department, AFL.*

84

### AGREEMENT UNDER NATIONAL JOINT BOARD FOR SETTLEMENT OF JURISDICTIONAL DISPUTES, BUILDING AND CONSTRUCTION INDUSTRY

We the undersigned request that Joint Board No. 1 be discharged. "The issue in dispute is the laying of wood fibre conduit underground for the carrying of electrical wires and cables."

It is agreed that this work is the work of the International Brotherhood of Electrical Workers.

Signed this 13th day of July, 1948.

> International Hod Carriers' Building
> and Common Laborers' Union of
> America: JOS. V. MORESCHI,
> *General President.*

> International Brotherhood of Electrical
> Workers: D. W. TRACY,
> *International President.*

Attested: RICHARD J. GRAY,
> *President of the Building and Construction
> Trades Dept., A.F. of L.*

### Iron Workers—Elevator Constructors Directional Elevators

#### AGREEMENT

May 26, 1953

For the purpose of establishing complete harmony and cooperation on the erection of two directional elevators for the Bowser Engineering Company in various parts of the country, the International Association of

85

Bridge, Structural and Ornamental Iron Workers, and the International Union of Elevator Constructors, hereby enter into the following agreement, effective on and from June 1, 1953.

One team of elevator constructors to not less than two iron workers while installing the following: 1—crane rails, 2—crane bridges, 3—hoisting of all elevator equipment necessary to be in place before penthouse roof is poured, 4—optional hoisting of crane drives, 5—all hatchway steel that replaces normal elevator hatchways, 6—catwalks, platforms, stairways and ladders.

The Bowser Engineering Company agrees to pay iron workers the regular wage scale in the jurisdiction of the Local Union in which the project is located plus 25 cents per hour to one iron worker who acts as foreman under the supervision of the elevator mechanic on the job.

Signed for International Association of Bridge, Structural & Ornamental Iron Workers:

JOHN J. MCCARTHY, *Gen. Vice President.*

Signed for International Union of Elevator Constructors:

J. A. ALTMAN, *Reg. Business Representative.*

Attested July 10, 1953

JOHN T. DUNLOP
*Chairman National Joint Board.*

### Boilermakers-Ironworkers

September 23, 1953

The undersigned representatives of the International Association of Bridge, Structural and Ornamental Iron

86

Workers and the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers recommend to the respective General Presidents the attached agreement for the settlement of jurisdictional disputes between the two organizations.

(Signed) J. R. DOWNES,
*International Association of Bridge,*
*Structural and Ornamental Iron Workers*

(Signed) J. P. McCOLLUM,
*International Brotherhood of Boilermakers,*
*Iron Shipbuilders, Blacksmiths, Forgers and*
*Helpers.*

September 23, 1953

### Memorandum of Agreement

This memorandum of agreement between the International Association of Bridge, Structural and Ornamental Iron Workers and the International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers supplements and interprets the agreement of October 15, 1928 between the two organizations and the decision of record of May 19, 1947.

It is the purpose of this agreement to improve relations between the two trades, to eliminate work stoppages which are costly to the membership of both organization and to the industry, to settle jurisdictional disputes directly between the two trades, and mutually to assist each union to secure work coming within its recognized jurisdiction. In order to achieve these objectives, it is mandatory upon the membership of local unions affiliated with both International Unions to comply with the provisions of this memorandum of agreement.

It is expressly understood and agreed that this agreement shall not relate to or have any bearing on jurisdictional disputes that may exist or in the future occur, between either of the parties hereto with any other International Union or subordinate body thereof.

1. WIRE MESH. Wire Mesh when attached or welded directly to the breeching, stacks or vessels shall be installed by Boilermakers, and wire mesh when attached or fastened to lugs, clips, bolts, nuts or any other attachments (which have already been attached or welded to the breeching, stacks or vessels by Boilermakers) shall be installed by Iron Workers.

2. DERRICKS. Where a derrick is used by both crafts, one craft shall erect and the other craft shall dismantle same. Where such derrick is used only by one of the crafts, then that craft shall erect and dismantle same.

3. PRECIPITATORS. Plate work and buckstays and internals shall be the work of the members of the Boilermakers; structural supports shall be the work of the Iron Workers including the house roof. Roof supports or lugs attaching directly to the preciptator shell shall be the work of the Boilermakers. When roof supports attach to lugs, the Boilermakers shall weld the lug to the precipitator shell and the Iron Workers shall erect the roof supports thereto.

4. OVERHEAD SUPPORTING STEEL FOR STEAM GENERATORS.

(a) The erection of structural members, which may be channels, beams or angles, and which are directly attached to and suspended from the building roof steel for the purpose of supporting the steam generating unit shall be the work of the Iron Workers.

88

(b) The erection of all rods or other steel members attached to the members described in paragraph (a), and used for the purpose of supporting tubes and other Boilermakers' work, shall be performed by the Boilermakers.

5. THE ERECTION AND REPAIR OF BLAST FURNANCES

The following work items shall be erected and installed by the Iron Workers:

Foundation rod and bands
Column bases and columns
Main, top furnace platform (except supports which weld, or rivet to shell)
Top super-structure
Bell trolley
Bell beams
Bell cables
Jib-crane and mast
All top mechanism such as large bell, small bell, bell rods, large bell hopper, gas seal hood, distributor, revolving hopper, receiving hopper and small bell seat
Skip bridge
Skip cars and cables
Skip operating mechanism such as skip hoist, large and small bell cylinders
Cast house structural steel and roof
Skip house
Skip bridge A-frame
Iron and cinder runners and cast house auxiliaries
Trestle and stock house parts such as coke, stone and ore bins
Coke and ore chutes
Scale car and larry cars
Pug mill machinery
Elevator shafts

The following work items shall be erected and installed by the Boilermakers:

Hearth jacket
Hearth coolers
Tuyere jacket
Blast furnace shell
Bustle pipe
Furnace top ring and dome
Offtakes—Uptakes
Downcomers and attached wearing plates
Bleeder pipe, valves and stack
Bosh band
Dust catcher
Hot blast stoves
Hot blast valves and castings
Gas washer
Gas mains
Gas precipitators
Cold blast main and mixer line
Stove stacks
Dust legs
Hot ladle cars
Support for main top furnace platform which weld or rivet to shell
Stock line brackets and abrasion or wearing plates
Tuyere stocks

6. CATWALKS, PLATFORMS, STAIRWAYS AND LADDERS

(a) Catwalks, platforms, stairways and ladders erected on storage tanks for liquid or gas, and processing tanks erected by the Boilermakers, and installations commonly referred to as tank farms shall be performed by Boilermakers.

(b) Catwalks, platforms, stairways and ladders supported exclusively by a pressure vessel, shall be erected by Boilermakers.

(c) Catwalks, platforms, stairways, and ladders supported by structural steel supports shall be erected by Ironworkers. When supported by both the pressure vessel and structural steel supports, the erection of the catwalks, platforms, stairways and ladders shall be performed by Iron Workers, except that the welding or attaching of the lug or support directly to the pressure vessel shall be performed by Boilermakers.

(d) Catwalks, platforms, stairways, and ladders in connection with blast furnace construction shall be performed as follows:

(i) The Boilermakers shall attach the lugs or supports directly to the shell of the blast furnace and the Iron Workers shall then erect the catwalks, platforms, stairways, and ladders.

(ii) The erection of catwalks, ladders and stairways on hot stoves and precipitators in connection with the blast furnace construction, in accordance with paragraph (b) of this section, shall be erected by Boilermakers. The erection of the platforms and bridgeways across the top of hot stoves, however, shall be erected by iron workers, except that the welding or attaching of the lugs or support directly to the hot stove shall be performed by Boilermakers.

7. FORCED AND INDUCED DRAFT FANS.

The erection of forced and induced draft fans in connection with the construction of steam generating installations, which come in completed units, shall be performed by Iron Workers. Attachments to the ducts and breeching shall be performed by Boilermakers. On forced and induced draft fans, which come knocked down, the Iron Worker shall erect and install the pedestal and rotor and the Boilermakers shall erect and install the fan housing.

91

## 8. PROCEDURES.

(a) The General President of each organization will designate a representative to be assigned to adjust directly all disputes between the two trades which cannot be adjusted at the local level.

(b) Committees designated by the respective General Presidents shall meet periodically to review work covered by this agreement and to consider new problems which arise in order to adjust same.

(c) Installations in process on the date of this agreement shall be completed in accordance with the existing assignments or ruling of the National Joint Board.

International Association of Bridge, Structural and Ornamental Iron Workers.

St. Louis, Missouri.

(Signed) J. H. LYONS,
*General President*

(Signed) J. R. DOWNES,
*General Secretary*

Approved Nov. 2, 1953,
General Executive Council.

International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers
Kansas City, Kansas.

(Signed) CHAS. J. MACGOWAN,
*International President*

(Signed) WM. J. BUCKLEY,
*International Sec.-Treas.*

Approved Nov. 5, 1953,
International Executive Council.

**Straight Telegram**

St. Louis, Mo., November 2, 1953.

Charles J. MacGowan, International President
International Brotherhood of Boiler Makers, Iron Ship
   Builders and Helpers of America
New Brotherhood Building
Kansas City, Kansas

This is to notify you that the Executive Council of the International Association of Bridge, Structural and Ornamental Iron Workers at its meeting today unanimously ratified and adopted the memorandum of agreement dated September 23, 1953, which supplements and interprets the agreement of October 15, 1928, between our two respective organizations as well as decision of record of May 19, 1947.

JOHN H. LYONS, *General President.*

**International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers**

November 10, 1953.
File: 12(i)-1(c)

Mr. J. H. Lyons, President
Intl. Bridge & Structural Iron Workers
Ste. 300, Continental Building
3615 OliveStreet
St. Louis, Missouri
Dear Sir and Brother:

Under date of November 6, 1953, I wired you as follows:

"This is to officially notify you that our International Executive Council after devoting a full day to the discussion of the proposed memorandum of agreement

93

dated September 23, 1953, which implements and interprets the agreement of October 15, 1928, finally approved same by a unanimous vote of the Executive Council. However, in the discussion it developed that one or two minor clarifications may be necessary in order to avoid future misunderstandings by our respective memberships. These clarifications will in no sense alter the purpose of the memorandum of September 23, but will in truth and in fact be clarifications only. I shall write you the details of the same next week. I am furnishing John Dunlop with a copy of this telegram."

Now, Brother Lyons, it is needless for me to say that the discussions in our International Executive Council were long and earnest over the question of approving the proposed supplementary agreement. While it was finally adopted by a unanimous vote, it was the feeling of the International Executive Council that there was one principle involved which should be protected, from our standpoint, and there were at least two additional clarifications which should be incorporated in order to make the understanding as effective as possible.

The principle to which I refer was the question of our craft deviating from our historic position that all vessels requiring tight joints must be the work of the Boilermakers and the allotment of the bells in blast furnaces to any other trade was a departure from our traditional policy. I assure you it was not the amount of work involved which caused us our difficulty, but rather the principle of a "tight joint." However, in our earnest desire to reach a peaceful understanding between the two International Unions, we accepted the assignment of bells, but with the hope that the two Internationals could agree to an interpretation to be added as a footnote to the first portion

of section 5 captioned, "The Erection and Repair of Blast Furnaces," this footnote to read substantially as follows:

"It is mutually agreed between the two International Unions that the awarding of the blast furnace bells to the Structural Iron Workers is without prejudice to the Boilermakers' historic claims over all vessels requiring tight joints."

In the second portion of section 5, which is the Boilermakers' list of work, it occurred to us that the negotiators unintentionally overlooked the word "mantle" and if it is agreeable to all parties, we would request that the word "mantle" be inserted in the proper place in the list of work awarded to the Boilermakers.

Returning to section 4, captioned, "Overhead Supporting Steel for Steam Generators," it was the opinion of our International Executive Council that while the intent of the two organizations is covered in this section, it was our feeling that in order to avoid future disputes, the language needs clarifying, particularly where in sub-section (a) (Iron Workers' section), the words "for the purpose of supporting the steam generating unit" and in subsection (b) (Boilermakers' section), the words "...used for the purpose of supporting tubes and other Boilermakers' work..." might be interpreted in such a manner as to cause confusion because, after all, the complete boiler is still a steam generating unit from the standpoint of the Boilermaker and tubes are but a part of the steam generating unit. It is our suggestion that after the words "Boilermakers' work" in the third line of section 4(b), the words "which are a part of the steam generating unit" be added so that the whole section will read:

"The erection of all rods or other steel members, attached to the members described in paragraph (a), and used for the purpose of supporting tubes and

95

other Boilermakers' work, which are a part of the steam generating unit, shall be performed by the Boilermakers."

If it is agreeable with you, I would suggest that Secretary Downes and Vice President McCollum have a further meeting and see it if is not possible to work out these suggestions, which, I repeat again, are not intended to change the intent of the agreement in any manner other than to clarify it to avoid confusion.

With best wishes, I am

Fraternally yours,
CHARLES J. MACGOWAN,
*International President.*

CJM:CW
cc: John Dunlop
cc: J. R. Downes
cc: J. P. McCollum
OEIU No. 4-AFL

### International Association of Bridge, Structural and Ornamental Iron Workers

January 9, 1954

Mr. J. P. McCollum, Vice President
International Brotherhood of Boilermakers, Iron Ship
    Builders, Blacksmiths, Forgers and Helpers
New Brotherhood Building
Kansas City 11, Kansas

Dear Sir and Brother:

The correspondence dated November 10, 1953, directed by Charles J. MacGowan, International President of the Brotherhood of Boilermakers, to J. H. Lyons, General President of this International Association, as well

96

as the correspondence dated November 13, 1953, from General President Lyons to International President Charles J. MacGowan, has been reviewed by the writer.

It is the opinion of the officials of this International Association that the suggestions outlined by President MacGowan warrant consideration and that, for the purpose of clarification, further understandings should be developed.

Inasmuch as the "Memorandum of Agreement" dated September 23, 1953—and signed by yourself and the writer—has been ratified by the International Executive council of the Brotherhood of Boilermakers, and the General Executive Council of this International Association, it is our opinion that no change should be made in this document as such action would require further ratification from the Executive Councils of both organizations.

It is agreeable to the officials of this International Association that the following clarifications will be stipulated:

"It is mutually agreed between the two International Unions that the awarding of the blast furnace bells to the Structural Iron Workers is without prejudice to the Boilermakers' historic claims over all vessels requiring tight joints."

It is also understood that the work item "mantle" should be included in the Boilermakers' division of Section 5 of the "Memorandum of Agreement."

It shall be understood that the meaning of Section 4, paragraph (b) of the "Memorandum of Agreement"— captioned OVERHEAD SUPPORTING STEEL FOR STEAM GENERATORS—shall be as follows:—

"The erection of all rods and other steel members, attached to the members described in Paragraph (a) and used for the purpose of supporting tubes and other Boilermaker's work, which are a part of the

97

steam generating unit, shall be performed by the Boilermakers."

I believe that confirmation of these clarifications by International President Charles J. MacGowan and General President J. H. Lyons, as well as yourself and the writer, would be sufficient and thereby eliminate any need to reopen the present "Memorandum of Agreement" as ratified by both International Unions.

I am, with best wishes

Fraternally yours,
J. R. DOWNES
*General Secretary.*
January 18, 1954

JRD:HB

R. J. Gray, President
Building & Construction Trades Department
American Federation of Labor
Washington, D.C.

Dear Mr. Gray:

I am advised that you have received the agreement signed by President J. H. Lyons and President Charles J. MacGowan, dated January 12, 1954 and identical communication which was sent to the National Joint Board.

In accordance with Article III, Section 2 of the Agreement creating the Joint Board, I hereby attest to this agreement.

It is my understanding that the two organizations intend to print the agreement in convenient form in the near future.

Very truly yours,
(Signed) JOHN T. DUNLOP
*Chairman*

JTD: thw                    National Joint board

September 13, 1954

Wm. J. McSorley, General President
Wood, Wire and Metal Lathers International Union
Ambassador Hotel
Los Angeles, Calif.

Dear Sir and Brother:

At your request and in order to avoid any misunderstandings with the Wood, Wire and Metal Lathers International Union, the undersigned wish to advise that Section 1, captioned "Wire Mesh" of the Memorandum of Agreement dated September 23, 1953, entered into between the International Association of Bridge, Structural and Ornamental Iron Workers and the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers is not intended and does not apply to the erection of light iron furring or metal lath used to receive plaster.

Fraternally yours,

(Signed) WM. A. CALVIN,
*International President*,
International Brotherhood of
Boilermakers, Iron Ship
Builders, Blacksmiths,
Forgers and Helpers

(Signed) J. H. Lyons,
*General President*,
International Association of
Bridge, Structural and
Ornamental Iron Workers

99

**Asbestos Workers — Bricklayers**
**Boiler Wall Construction**

January 28, 1954

**AGREEMENT BETWEEN THE INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND ASBESTOS WORKERS AND THE BRICKLAYERS, MASONS AND PLASTERERS' INTERNATIONAL UNION OF AMERICA.**

(1) This agreement covers the installation and application of all insulating materials on boiler wall construction.

(2) In the application of insulating materials over the boiler walls after same is completed, when said insulation is applied in one continuous operation and not in conjunction with the refractory material, this is the work of members of the International Association of Heat and Frost Insulators and Asbestos Workers.

(3) In cases where the insulation on the outside of the boiler walls is applied in conjunction with refractory materials as it progresses (scaffold high), said insulation is the work of members of the Bricklayers, Masons and Plasterers' International Union of America.

(4) In the event that a dispute over the application of this agreement cannot be settled locally, there shall be no stoppage of work, and the dispute shall be referred to the headquarters of both International Unions for settlement.

International Association of Heat and
Frost Insulators and Asbestos Workers:

(Signed) JOSEPH A. MULLANEY,
HUGH E. MULLIGAN,
C. W. SICKLES.

100

Bricklayers, Masons and Plasterers' Inter-
national Union of America:

(Signed) HARRY C. BATES,
JOHN J. MURPHY,
THOMAS F. MURPHY,
A. J. CLELAND.

Attested:

John T. Dunlop, Chairman,
National Joint Board for Settlement
of Jurisdictional Disputes.

February 2, 1954.

DECISIONS OF A. F. OF L.

### DECISION OF AMERICAN FEDERAL OF LABOR IN RE ISSUANCE OF CHARTER TO ELEVATOR CONSTRUCTORS' INTERNATIONAL UNION.

WASHINGTON, D.C. May 9, 1904.

MR. HENRY SNOW, *Gen. Sec-Treas.*
International Union of Elevator Constructors
40 Park Avenue, Chicago, Ill.

Dear Sir and Brother:

Today, Brothers Feeney and Havenstrite, of your organization, called at this office and requested a definite statement regarding matters of jurisdiction of your International Union.

Of course, you are aware that the same subject was under discussion at the Denver meeting of the Executive Council of the American Federation of Labor held last month.

Desirous of rendering the very best possible service I can to your organization, consistent with the rights to which all other organizations are entitled I therefore beg to say that at the time when your organization applied for charter, from the American Federation of Labor, the following claims to work were embodied in your application:

"The assembling of all elevator machinery, to wit: Hydraulic steam, electric, belt and compressed air; also assembling and building escalators, or traveling stairways; the assembling of all cars complete; putting up all guides, either of wood or iron; the setting of all tanks, whether pressure, open or pit tanks; the setting of all pumps (where pumps arrive on job in parts, they are to

be assembled by members of this union). All electric work connected with car machinery and hoisting, including bells, annunciators and lights; all overhead work, either of wood or iron, and supports for the same when required; the setting of all templets, all indicators; all foundations, either of wood or iron, that would take the place of masonry; the assembling of all hydraulic parts in connection with elevators; all locking devices in connection with elevators; the boring, drilling and sinking of all plunger elevators; all link belt carriers, and all work in general pertaining to the erection and equipment of an elevator complete."

Prior to issuance of the charter to your organization, claims to jurisdiction were made by several organizations of some classes of work which were not allowed. Then an agreement was reached between the representatives of the International Union of Elevator Constructors and the International Brotherhood of Electrical Workers, by which your organization yielded to the electrical workers the following classes of work: "The electrical work on flashlights, electrical annunciators and lamps, and feed wires to the controller." With that reservation, and with those claims made by your organization to jurisdiction, the charter was issued by the American Federation of Labor.

Fraternally yours,

(Signed) Samuel Gompers,
*President American Federation of Labor*

## DECISION OF THE AMERICAN FEDERATION OF LABOR IN RE JURISDICTION OF ENGINEERS.

(Decision Norfolk, Va., Convention, American Federation of Labor, November 11-23, 1907, Resolution No. 124.)

Resolved, That hoisting and portable local unions of the International Union of Steam Engineers have jurisdiction over the motive power of all derricks, cement-mixers, hod-hoists, pumps, and other machines used on construction work and be it further

Resolved, That the Building Trades organizations be requested to give all the assistance possible to the Hoisting and Portable Locals of the I. U. S. E. in maintaining the scale of wages now paid on this work.

This shall not, however, be construed as preventing the International Brotherhood of Electrical Workers from using a hand or electric winch for the purpose of pulling wire or cable through conduits, nor the wiring and repairing of all electrical appliances.

## DECISION OF AMERICAN FEDERATION OF LABOR ELECTRICAL WORKERS—ENGINEERS.

(Decision Cincinnati, Ohio, Convention, American Federation of Labor, June 1922.)

That the electrical installation, electrical repairs, overhauling of general electrical apparatus in generating stations, substations and the operating of exclusively electrical-driven machines in the aforementioned plants or stations also that the operation of traveling or other electric cranes for shop or factory purposes shall be Electrical Workers work.

"This decision is not to interfere with the jurisdiction of the Steam and Operating Engineers over operating

104

steam-generating plants, electric hoists in building construction or electric shovels.

These conclusions are not intended to disturb any other conditions obtained that are mutually satisfactory at this time, or that have been provided for by past action of the American Federation of Labor which are not in conflict with this decision."

### DECISION OF AMERICAN FEDERATION OF LABOR IN RE DISPUTE BETWEEN TEAMSTERS AND IRON WORKERS.

The following is a decision of jurisdiction dispute existing between the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, and the Bridge and Structural Iron Workers' International Union, rendered by an Arbitration Committee appointed by the Executive Council and adopted by the Convention of the American Federation of Labor held in Portland, Oreg., October, 1923:

"It is clearly evident that the Bridge and Structural Iron Workers' International Union has gradually and persistently encroached upon the jurisdiction of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America. It has constantly endeavored to broaden the jurisdiction by claiming, and in some instances practicing the rights to load and unload materials off and on wagons, trucks, and automobiles. In the opinion of the Committee, this work clearly belongs to the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America. This work was conceded to this organization through its charter of affiliation with the A. F. of L. All loading, hauling and unloading of materials on and off wagons, trucks and automobiles belong to the International Brotherhood of Team-

105

sters, Chauffeurs, Stablemen and Helpers of America. However, where building material is hauled to buildings under construction and the foreman, contractor, or person in charge of the erection of the building, directs that it be hoisted from the wagon, truck or automobile, such hoisting shall be done by the members of the Bridge and Structural Iron Workers' International organization. Where it is loaded from the wagon, truck or automobile on the ground, street or sidewalk, such work shall be done by the members of the Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America."

## DECISION OF AMERICAN FEDERATION OF LABOR IN RE ERECTION OF ECONOMIZERS.

(Decision El Paso, Tex., Convention, American Federation of Labor, November 17-25, 1924.)

In the controversy existing between the Brotherhood of Boiler Makers and the United Association of Plumbers and Steam Fitters over the erection of economizers, the decision is that in the opinion of the Executive Council the work belongs to the United Association of Plumbers and Steam Fitters.

### United Association of Journeymen Plumbers and Steamfitters

By the decision of the American Federation of Labor, rendered at both the Atlanta and Rochester conventions, the substance of this action of these conventions of the American Federation of Labor was that there was only room for one organization in the pipefitting industry. And, that the United Association of Journeymen Plumbers and Steamfitters is recognized as the only organization having complete control of the pipefitting trade and industry in its entirety throughout the United States and Canada.

Following are the official decisions of the American Federation of Labor:

### Atlanta Decision

The Atlanta Convention of the American Federation of Labor, held in Atlanta, Ga., November 13 to 25, inclusive, 1911, declared "that both for harmony and practicability the pipefitting trade should be represented in the American Federation of Labor, also in the Building Trades Department, by one general association of the pipefitting industry, namely the United Association of Plumbers, Gas Fitters, Steamfitters and Steamfitters' Helpers of the United States and Canada, and further, that the Executive Council of the Building Trades Department be requested to carry that declaration into effect." (See page 339 of the 1912 Rochester Convention proceedings.)

### Rochester Decision

The Adjustment Committee's report to the delegates assembled at the Rochester Convention of the American Federation of Labor, held at Rochester, N.Y., November 11 to 23, inclusive, 1912, is as follows:

Your committee reports that it has considered carefully the efforts made by the Executive Council of the American Federation of Labor to carry out and make effective the instructions of the Atlanta Convention, which declared that both for harmony and practicability the pipefitting trade should be represented in the American Federation of Labor, also in the Building Trades Department, by one general association of the pipefitting industry, namely, the United Association of Plumbers, Gas Fitters, Steamfitters and Steamfitters' Helpers of the United States and Canada.

107

**DECISIONS RENDERED BY THE NATIONAL BOARD FOR JURISDICTIONAL AWARDS IN THE BUILDING INDUSTRY.**

---

### Air Coolers, Air Washers and Blowers, Consisting of the Assembling of Sheet Metal and Pipe Fitting

DECISION RENDERED MARCH 11, 1920

(Subject of dispute between the Amalgamated Sheet Metal Workers' International Alliance and the United Association of Plumbers and Steamfitters.)

The following agreement, between the Amalgamated Sheet Metal Workers' International Alliance and the United Association of Plumbers and Steamfitters was confirmed:

September 9, 1918.

The undersigned committee, appointed by the General Presidents of their respective International Organizations namely, the United Association of Plumbers, Steamfitters and Steamfitters' Helpers and the Amalgamated Sheet Metal Workers' International Alliance, held joint conferences in the City of New York, beginning September 5, 1918 in an endeavor to arrive at an agreement concerning air washers, fans, blowers, the housing of same, and the pipe fitting on same.

After lengthy meetings participated in by all of the undersigned, representing the Joint Conference Committee of both International Unions, the following has been agreed to:

SECTION 1. That all sheet metal work of No. 10 gauge or lighter, when used in air washers, fans, blowers, or on

108

the housing of same, shall be recognized as being the work of the members of the Amalgamated Sheet Metal Workers' International Alliance.

Sec. 2. That all pipe fitting in connection with the above first section shall be recognized as being the work of the Steamfitters, members of the United Association of Journeymen Plumbers, Steamfitters and Steamfitters' Helpers.

Sec. 3. It being thoroughly understood by all of the undersigned that all the assembling and erecting of the work as defined in Section One, shall be the work of the members of the Sheet Metal Workers' International Alliance, excepting pipe fitting of all kinds, which shall be the work of the Steamfitters and Steamfitters' Helpers of the United Association.

Sec. 4. This agreement shall become effective and in full operation for all parties concerned beginning November 1, 1918.

Signed for Sheet Metal Workers this 9th day of September, 1918:

> JAMES LENNON, *Gen. Org.*
> R. PATTISON, *Chairman*,
> W. M. O'BRIAN, *Secretary*,
> WM. H. LYONS
> THOS. WALSH,
> EDW. P. O'NEIL.

Signed for United Association:

> E. W. LEONARD, *Gen. Org.*
> CHARLES M. RAU,
> RICHARD P. WALSH,
> A. P. JOHNSON,
> LEO A. MURPHY.

109

## Low Pressure Heat

(Subject of dispute between the United Association of
Plumbers and Steamfitters and the International Union
of Steam Engineers in the Matter of maintaining tempo-
rary heat while structure is in course of construction.)

DECISION RENDERED MARCH 11, 1920

In the matter of the controversy between the engineer
and steamfitter on the question of low pressure heat dur-
ing completion of the heating system jurisdiction shall
rest with the steamfitters until the initial test is com-
pleted, immediately after which time, whenever neces-
sary to maintain heat, a stationary engineer shall be em-
ployed either by the contractor or the owner.

## Low Pressure Heat (Rehearing)

(Subject of dispute between the International Union of Steam
Engineers and United Association of Journeymen
Plumbers and Steamfitters.)

DECISION RENDERED AUGUST 2, 1923

In the matter of the controversy between the engi-
neers and steamfitters on the question of low pressure
heat during completion of the heating system while the
building is under construction, jurisdiction shall rest
with the steamfitters until the general test has been
made and the work accepted by the owner or his agent.

## Pipe Railing or Guards for Enclosures, Stairways, Hatches, etc.

(Subject of dispute between the Bridge and Structural Iron
Workers' International Association and the United Asso-
ciation of Plumbers and Steamfitters. Claimed by the
Iron Workers entirely except when not used as a conduit
for fluids or vapors claimed by Plumbers and Steamfit-
ters when of standard-sized cut and threaded pipe.)

110

Pipe railing consisting of standard-size cut and threaded pipe, not used in connection with structural or ornamental iron work, is awarded to Plumbers and Steamfitters.

INTERPRETATION RENDERED SEPTEMBER 15, 1920

"Iron pipe railing consisting of a preponderance of slip-joints made rigid with or without set-screws, pinions or rivets, supported by a threaded joint and flange at base or walls, is the work of the Iron Workers. Where, however, the preponderance of joints is of standard-sized cut and threaded iron pipe, it belongs to the Plumbers and Steamfitters."

### Re-enforced Concrete, Cement and Floor Construction

(Subject of dispute between the Bridge and Structural Iron Workers' International Association and the Wood, Wire and Metal Lathers' International Union.)

DECISION RENDERED MARCH 11, 1920

In the matter of the controversy between the Iron Workers and Lathers over re-enforced concrete construction, it is decided that all iron and steel used for re-enforcement in re-enforced concrete, cement and floor construction be awarded to the Iron Workers.

In such cities and localities as are covered by existing agreements with employers awarding Lathers control over re-enforced concrete construction, these agreements are to be maintained inviolate until the date of their expiration, after which this decision shall prevail.

111

In the interpretation of this Board's decision of March 11, 1920, in the matter of the controversy between the Iron Workers and Lathers over re-enforced concrete construction, it is not be understood as abrogating, setting aside or in any way altering the decision of the Rochester Convention of the Building Trades Department, November 29, 1912, awarding jurisdiction over Hy-rib Lath to the Lathers, and it is to be understood that the placing of Hy-rib Lath or any ribbed metal lath, however it may be used, comes within the jurisdiction of the Lathers.

### Vitrolite and Similar Opaque Glass

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union and the Brotherhood of Painters, Decorators and Paperhangers.)

DECISION RENDERED MARCH 11, 1920

That in the matter of the controversy between the Painters and Bricklayers on the subject herewith referred to, jurisdiction over the setting of vitrolite and similar opaque glass is awarded to the Bricklayers.

### Vitrolite and Similar Opaque Glass (Rehearing)

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union and the Brotherhood of Painters, Decorators and Paperhangers.)

DECISION RENDERED MAY 26, 1924

It is the opinion of the Board that the foregoing decision of March 11, 1920, is intended to convey to the Bricklayers all counters and lavatories constructed of vitrolite or carrara glass and such glass when used in mural decorations on buildings in place of marble or

other stone or used in conjunction with marble or other stone as panels on counters.

It is the further opinion of the Board that the foregoing decision is intended to convey all vitrolite, opalite, white opal and other opaque glass installed on false work, furring strips, walls, ceilings, partitions or columns, secured with screw rosettes, molding, putty, expansion, toggle bolts or screws, to the Painters.

The agreement of December 5, 1910, which was concurred in by the Board of Awards on July 12, 1922, remains in effect, and any disputes that may arise in connection with the subject of the agreement with the Board's decisions shall be adjusted in accordance with the provisions contained in Sections 3 and 4 of the agreement.

### Asbestos Plaster for Boiler Rooms, etc.

(Subject of dispute between the Operative Plasterers and Cement Finishers' International Association and the International Association of Heat and Frost Insulators and Asbestos Workers.)

DECISION RENDERED APRIL 28, 1920

In the dispute between the Asbestos Workers and Plasterers on the matter of plastering boiler rooms, etc., it is decided that the insulation and finishing coat on ceilings with asbestos and other insulating material, where the groundwork has been prepared and installed by the Asbestos Workers, shall, including the application of insulating material on boilers, tanks, vats, etc., be awarded to the Asbestos Worker.

### Light Iron Furring, Brackets, Clips, Hangers, Corner Guards, Beads and Metallic Lath

(Subject of dispute between the International Union of Wood,

Wire and Metal Lathers and the International Association
of Bridge and Structural Iron Workers.)
(Award of the Denver Convention, Building Trades Department,
A. F. of L. adopted November, 1908. See printed proceed-
ings, Pages 69 to 71, inclusive.)

DECISION RENDERED APRIL 28, 1920

In the matter of dispute between the International
Union of Wood, Wire and Metal Lathers and the Interna-
tional Association of Bridge and Structural Iron Workers
referred to in the foregoing title, the following award is
concurred in:

"After going into an extended hearing of the jurisdic-
tion claims of both organizations, your committee rec-
ommends that the erection and installation of all light
iron work, such as light iron furring, brackets, clips,
hangers, steel corner guards or beads.* and metallic lath-
ing of all descriptions belong solely to the Lathers.

"This does not give the right, however, to the Lathers
to install or erect any other iron work that as herein
specified and outlined.

"This decision is based on conformity with the agree-
ment entered into by the national officers of both organ-
izations and endorsed by the Kansas City Convention of
Structural Iron Workers and concurred in by the Ameri-
can Federation of Labor."

#### Hy-Rib Lath

In supplement of the foregoing decision the Rochester
Convention of the Building Trades Department, Novem-
ber 29, 1912, awarded jurisdiction over Hy-rib Lath to the
Lathers.
(Note interpretation rendered December 4, 1920, re-enforced
Concrete, Cement and Floor Construction.)

*Note the following decision.

114

### Metallic Corner Beads When Set in Plastic Material

(Subject of dispute between the Operative Plasterers and Cement Finishers' International Association and the Wood, Wire and Metal Lathers' International Union.)

DECISION RENDERED MARCH 11, 1920

In the matter of the controversy between the Plasterers and Lathers on the question of the adherence of corner beads by plastic material, it is the opinion of the Board that deserved consideration was not given the subject when the previous decision was reached. It is therefore agreed that the Plasterers are awarded jurisdiction over sticking with plastic material metallic corner beads.

### Acetylene and Electric Welding

(Subject of dispute between the trades named in the following memorandum.)

DECISION RENDERED APRIL 28, 1920

In the matter of the dispute referred to in the foregoing title, as approved by the Philadelphia Convention of the Building Trades Department, A. F. of L. November, 1914 (see printed proceedings, Page 99), the following agreement is concurred in:

"Representatives of the Electrical Workers, Sheet Metal Workers, Iron Workers, Plumbers and Steamfitter, and Machinists mutually agreed to the following decision:

"Each trade to have jurisdiction over all acetylene and electric welding when such process is used to perform the work of their respective trades."

## Bronzing and Painting of Radiators and Pipe Connections

(Subject of dispute between the Brotherhood of Painters, Decorators and Paperhangers and the United Association of Plumbers and Steamfitters.)

(Award of Rochester Convention, Building Trades Department, A. F. of L. adopted November 29, 1912. See page 141, printed proceedings.)

DECISION RENDERED APRIL 28, 1920

In the matter of the subject referred to in the foregoing title, the following award is concurred in:

Resolved, that the United Association of Plumbers and Steamfitters be and is instructed to require that its affiliated unions desist from further trespass upon the jurisdiction of the Brotherhood of Painters, Decorators and Paperhangers of America, and when and where necessary to notify their employers that neither journeymen nor helpers will be permitted to do this work.

## Application of Damp-Resisting Preparations and Waterproofing

(Subject of dispute between United Slate, Tile and Composition Roofers, Damp and Waterproof Workers' Association and the Brotherhood of Painters, Decorators and Paperhangers.)

DECISION RENDERED APRIL 28, 1920

In the matter of dispute referred to in the foregoing title, the following agreement is concurred in:

Agreement entered into by and between the Brotherhood of Painters, Decorators and Paperhangers of America and the United Slate Tile and Composition Roofers, Damp and Waterproof Workers' Association.

116

First. That the Painters do not claim the right to apply any of the material claimed by the Slate, Tile and Composition Roofers, Damp and Waterproof Workers, except such material as is applied by a brush that is ordinarily used by the Painters in applying the materials covered in their jurisdiction.

Second. That the Slate, Tile and Composition Roofers, Damp and Waterproof Workers do not claim the right to apply any of the material in dispute except when applied by or with a three-knot, long-handled brush, mop, or swab, and spray system employed therein.

### Erection of Scaffolds as Applied to Building Construction

(Subject of dispute between the International Hod Carriers', Building and Common Laborers' Union, United Brotherhood of Carpenters and Joiners, Operative Plasterers and Cement Finishers' International Association and Bricklayers, Masons and Plasterers' International Union.)

DECISION RENDERED APRIL 28, 1920

In the matter of the dispute between the Laborers, Bricklayers, Plasterers and Carpenters over the erection of scaffolds as applied to building construction, it is agreed that the erection and removal of all scaffolds, including trestles and horses used primarily by Lathers, Plasterers, Bricklayers and Masons, shall be done by the mechanics and laborers in these trades as directed by the employer.

Self-supporting scaffolds over fourteen feet in height or any special designed scaffolds or those built for special purposes shall be built by the Carpenters.

The making of horses and trestles other than temporary is the work of the Carpenter.

117

## Marble and Slate Partitions, Backs and Floor Slabs for Urinal Stalls, Closets and Showers, Setting of

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union and the United Association of Plumbers and Steamfitters.)

(Award of Rochester Convention, Building Trades Department, A. F. of L. adopted November 28, 1912. See page 132, printed proceedings. Award of Buffalo Convention, November 9, 1917. See page 92, printed proceedings.)

DECISION RENDERED APRIL 28, 1920

In the matter of the subject referred to in the foregoing title, the following award is concurred in:

Resolved, That the setting of floor slabs, backs, partitions of urinal stalls, closets and shower baths properly belong to the Bricklayers.

The foregoing decision does not concede to the Bricklayers the right to install marble work that is connected with the water supply or sewer or water-tight work regularly catalogued as plumbing fixtures.

## Muslin and Canvas for Decorative Purposes, Tacking of

(Subject of dispute between the Brotherhood of Painters, Decorators and Paperhangers and the I. A. Heat and Frost Insulators and Asbestos Workers.)

(Award of Buffalo Convention, Building Trades Department, A. F. of L. adopted November 10, 1917. See page 108, printed proceedings.)

DECISION RENDERED APRIL 28, 1920

In the matter of the subject referred to in the foregoing title, the following award is concurred in:

Resolved, That this convention notify and instruct the officers of the Asbestos Workers' International Union that the tacking of all muslin and canvas for decorative purposes is the jurisdiction of the Painters and that they instruct their members to refrain from doing any of this work.

### Pile Driving Machinery and Engines, Operation of

(Award of Buffalo Convention, Building Trades Department, A. F. of L. adopted November, 1917. See pages 59 and 105, printed proceedings.)

DECISION RENDERED APRIL 28, 1920

In the matter of the subject referred to in the foregoing title, the following award is concurred in:

Such workmen as are employed in the operation of engines or machinery in connection with a pile driver come under the jurisdiction of the Engineers.

### Sheet Metal Glazing for Sash, Frames, Doors, Skylights, etc.

(Subject of dispute between the Brotherhood of Painters, Decorators and Paperhangers and Sheet Metal Workers' International Association.)

DECISION RENDERED APRIL 28, 1920

In the matter of the dispute referred to in the foregoing title, the following agreement is concurred in:

Agreement entered into by and between the General Executive Board of the Brotherhood of Painters, Decorators and Paperhangers of America, and the Sheet Metal Workers' International Association shall take effect December 1, 1910, and remain in force until amended, revised or changed at a meeting between the

119

representatives of both organizations called for this purpose.

SECTION 1. It is agreed by both parties to this agreement that all glass set in sheet metal sash, frames, doors or skylights, shall be set by Painters, according to their claim of jurisdiction granted by the convention of the Building Trades Department, A. F. of L. at St. Louis, December, 1910; and that all sheet metal work on sheet metal sash, frames, doors or skylights shall be done by Sheet Metal Workers.

SEC. 2. In localities where differences now exist or may arise in the future, such differences shall be adjusted by a committee appointed by and representing the district councils or local unions of both organizations in that locality. Should this committee be unable to agree, a representative of the General Executive Board of each organization shall be called in to assist in the adjustment.

SEC. 3. It is also agreed that the national officers of both organizations where local unions fail to agree shall insist that this agreement be carried out by affiliated unions.

### Slate Treads When Set on Iron Stair Case

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union and the International Association of Bridge and Structural Iron Workers.)

In the matter of the subject referred to in the foregoing title, the following award is concurred in:

DECISION RENDERED APRIL 28, 1920

Slate treads on iron stairs having provoked a dispute in jurisdiction between the organizations above named, was submitted to the Executive Council, November 20, 1909. The action taken follows:

The Executive Council of the Building Trades Department, on being called upon for a decision, awarded the work in question (slate treads) to the Bricklayers.

### Unskilled Labor, with Special Reference to the Loading and Unloading of Material as Applied to Re-enforced Concrete Construction

(Subject of dispute between the International Hod Carriers, Building and Common Laborers' Union and International Association of Bridge and Structural Iron Workers.)

DECISION RENDERED AUGUST 2, 1920
AMENDED DECEMBER 11, 1924

It is the decision of the Board that the loading and unloading, carrying and handling of all rods and materials for use in re-enforcing concrete construction shall be done by laborers under the supervision of such persons as the employer may designate. The hoisting of rods shall be done by laborers, except when a derrick or outrigger operated by other than hand-power is used. This decision applies only to the character of work stipulated herein. In such localities where existing agreements provide otherwise, this decision is to become effective at the expiration thereof.

### Defects in Concrete Caused by Leakage, Bulging, Sagging, etc., Through Defective or Shifting Forms

(Subject of dispute between the Operative Plasterers and Cement Finishers' International Association and the International Hod Carriers, Building and Common Laborers' Union.)

DECISION RENDERED AUGUST 2, 1920

When finishing tools are not used or required, the work shall be done by the laborer.

121

The filling of voids and other work requiring patching, where finishing tools are used and required, shall be done by the cement finisher.

### Setting and Alignment of Tile and Porcelain Bathroom Accessories

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union and the United Association of Plumbers and Steamfitters.)

DECISION RENDERED DECEMBER 4, 1920

In the matter of controversy between the Tile Layers and Plumbers over setting and Alignment of Tile and Porcelain Bathroom Accessories, it is decided that all bath and toilet room accessories made of clay products, built-in tile-faced walls, shall be the work of the tile setter.

### Anchors for Bathroom Accessories

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union and the United Association of Plumbers and Steamfitters.)

DECISION RENDERED NOVEMBER 14, 1923

All bathroom accessories, except those covered by decision rendered December 4, 1920, placed after finished tile wall surfaces are completed, shall be set by Plumbers and Steamfitters. When anchors for bathroom accessories are built into finished tile wall construction, the setting of same shall be done by Bricklayers and Masons and when any such anchors are placed after finished tile wall surfaces are completed, the work shall be done by Plumbers and Steamfitters.

### Jurisdiction Over Foremen on Interior Concrete Columns, Foundations for Engine and Machinery Beds

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union, International Hod Carriers, Building and Common Laborers' Union and the Operative Plasterers and Cement Finishers' International Association.)

DECISION RENDERED DECEMBER 4, 1920

In the matter of the jurisdiction over Foremen on Interior Concrete Columns, Foundations for Engine and Machinery Beds as contested by the Bricklayers, Hod Carrier and Plasterers, it is the decision of the Board that the work shall be done by the Laborers under the supervision of such skilled workmen as the employer may designate.

### Electrical Work on Elevators (Rehearing)

(Subject of dispute between the International Brotherhood of Electrical Workers and the International Union of Elevator Constructors.)

DECISION RENDERED DECEMBER 4, 1920
REVISED AND AMENDED FEBRUARY 2, 1927

In the matter of dispute between the Elevator constructors and the Electrical Workers on the question of all electrical work on elevators, it is agreed that the electrical work involved in the installation of signal systems, fans, telephones, electric light fixtures, illuminate thresholds and feed wires to the controller on all elevators is the work of the Electrical Workers; also the electrical work in connection with interlocking devices on other than automatic elevators is awarded to the Electrical Workers.

123

The term "automatic elevator," as used in this award, includes the full automatic, double push-button single control and department store control elevators.

## Bishopric Board, When Applied as a Substitute for Lath and Sheathing

(Subject of dispute between the United Brotherhood of Carpenters and Joiners and the International Union of Wood, Wire and Metal Lathers.)

DECISION RENDERED DECEMBER 4, 1920

In the matter of the dispute over the installation of Bishopric Board when applied as a substitute for lath, it is the decision of the Board that the work shall be done by the Lathers; where the same is used for sheathing it shall be the work of the Carpenters.

## Flaxlinum Keyboard Insulation

(Subject of dispute between the United Brotherhood of Carpenters and Joiners and the International Union of Wood, Wire and Metal Lathers.)

DECISION RENDERED DECEMBER 4, 1920

In the matter of the dispute over the installation of Flaxlinum Keyboard and Insulation, it is the decision of the Board that when the same is used as a substitute for lath or when any plastic material is to be applied, the work shall be done by the Lathers; when Flaxlinum is used as insulation or sheathing it shall be the work of the Carpenters.

## Installation of Metal Windows

(Subject of dispute between the Sheet Metal Workers' International Association and the International Association of Bridge and Structural Iron Workers.)

DECISION RENDERED MAY 5, 1926

The installation of metal windows having cast-iron sills and cast-iron blocks or in which three or more of the structural parts—that is, the sills, head, jambs and mullions—are heavier than ten-gauge, shall be the work of the Iron Workers; otherwise it shall be the work of the Sheet Metal Workers.

## Hoisting, Lowering and Placing of Elevator Machinery

(Subject of dispute between the Elevator Constructors' International Union and the International Association of Bridge and Structural Iron Workers.)

DECISION RENDERED FEBRUARY 7, 1922

In the matter of the dispute between the Elevator Constructors and Bridge and Structural Iron Workers referred to in the foregoing title, it is decided that the Elevator Constructors be awarded the hoisting, lowering and placing of elevator machinery.

## Glazing as Hereinafter Described

(Agreement for avoidance of dispute between Brotherhood of Painters, Decorators and Paperhangers and Bricklayers, Masons and Plasterers' International Union as endorsed by Building Trades Department, A. F. of L.)

DECISION RENDERED JULY 12, 1922

In the matter of the subject referred to in the foregoing title, it is the decision of the Board that the following agreement be concurred in:

Agreement entered into by and between the General Executive Board of the Brotherhood of Painters, Decorators and Paperhangers of America, and the General

125

Executive Board of Bricklayers, Masons and Plasterers' International Union shall take effect December 5, 1910 and remain in force until amended, revised or changed at a meeting between the representatives of both organizations called for this purpose.

SECTION 1. It is agreed by both parties to this agreement that all plate and window glass, mirrors, beveled plate, rough, ribbed, wire, figured, colored, or art glass set in sash, frames, doors or skylights constructed of wood, sheet metal, iron, stone or other material and set with putty or moulding, shall be set by Painters, and that where glass is used as a substitute for ceramic, mosaic, or encaustic tile, and set on floors, walls and ceilings in mortar, cement or other plastic material used to secure such tile in position, shall be set by Bricklayers when cut to size and shape for setting. It is further agreed by the Bricklayers that all glass delivered on jobs in stock sheets shall be cut to the required size by the painters.

SEC. 2. It is agreed by both parties to this agreement that all plate and window glass, mirrors, beveled plate, rough, ribbed, wire, figured, colored, or art glass set in sash, frames, doors or skylights constructed of wood, sheet metal, iron, stone or other material and set with putty or moulding, shall be set by the Painters, and that where glass is used as a substitute for marble in interior finish or decoration, and is carved, cut, polished or rubbed, shall be set by the Bricklayers.

SEC. 3. Should any differences arise regarding the work as covered by this agreement, a committee appointed by and representing the district council or local union of each organization in that locality, shall meet and adjust such differences. Should the committees of the local unions fail to agree, an executive officer of

126

each international union shall be requested to attend and assist in the adjustment.

SEC. 4. It is further agreed that the national officers of both organizations shall insist that all agreements entered into shall be carried out by affiliated unions.

## Operation of Elevators for Hoisting Materials

(Decision of St. Louis Convention, Building Trades Department, A. F. of L. adopted December, 1910. See printed proceedings, Page 128.)

DECISION RENDERED JULY 12, 1922

In the matter of the subject referred to in the foregoing title, the following decision is concurred in:

The operation of elevators of all kinds when used for hoisting any material used in the construction of buildings is hereby conceded to the Hoisting Engineers affiliated with the International Union of Steam Engineers.

## Corrugated Sheeting

(Subject of dispute between International Association of Bridge and Structural Iron Workers and Sheet Metal Workers' International Association.)

DECISION RENDERED MAY 26, 1923

The erection of corrugated metal sheeting on steel frames construction when the sheets are simply end and side lapped is the work of the Iron Workers; the erection of all other corrugated metal sheeting of No. 10 gauge or lighter is the work of the Sheet Metal Workers.

## Derricks, Erection and Handling for Setting Stone

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union and International Association of Bridge and Structural Iron Workers.)

The stonesetter shall have sole jurisdiction over hand derricks in connection with the setting of stone.

The erection and operation of power derricks for setting stone shall be done by the Iron Workers, under the direct supervision of the stone setter, who shall determine the number of men to be employed.

### Artificial Stone—Granite (Dressing, Altering and Finishing)

(Subject of dispute between Granite Cutters' International Association and Journeymen Stone Cutters Association.)

DECISION RENDERED MAY 26, 1923

In the matter of dispute between the Granite Cutters' International Association and the Journeymen Stone Cutters' Association relative to artificial stone, the dressing, altering and finishing of artificial stone, cast in imitation of natural stone, is the work of Stone Cutters, except that when any such artificial stone, by reason of hardness of texture requires the use of granite cutters' tools for the proper dressing, altering or finishing, it is the work of the Granite Cutters.

### Flat-face Tile

(Subject of dispute between the Bricklayers, Masons and Plasterers' International Union and Union Slate, Tile and Composition Roofer, Damp and Waterproof Workers' Association.)

DECISION RENDERED MAY 26, 1923

In the matter of dispute referred to in the foregoing title, the following agreement is concurred in:

Bricklayers, Masons and Plasterers' International Union

vs.

United Slate, Tile and Composition Roofers, Damp and
Waterproof Workers Association

Agreement entered into this 21st day of February,
1911, amended May 26, 1923, by and between duly ac-
credited representatives of the organizations above
named, to wit:

Jurisdiction is hereby conceded by the Bricklayers
over the laying or setting of flat-faced tile of every de-
scription when laid in mortar on all flat roofs or prome-
nade roofs.

Jurisdiction is hereby conceded the Slate, Tile and
Composition Roofers, Damp and Waterproof Workers
over flat-faced tile of every description, and corrugated
tile, when laid in any preparation of asphalt on roofs, flat
or otherwise.

#### Foremanship Over Concrete Construction

(Subject of dispute between the Bricklayers, Masons and Plas-
terers' International Union, International Hod Carriers'
Building and Common Laborers' Union and Operative
Plasterers and Cement Finishers' International Associa-
tion.)

DECISION RENDERED MAY 26, 1923
AMENDED FEBRUARY 21, 1924
REVISED DECEMBER 11, 1924

In the matter of dispute over concrete construction, it
is decided the work shall be done by laborers under the
supervision of such skilled mechanic as the employer
may designate.

## Conduo Base, Installation of

(Subject to dispute between International Brotherhood of Electrical Workers and Sheet Metal Workers' International Association.)

DECISION RENDERED AUGUST 2, 1923

In the matter of the controversy between the Electrical Workers and the Sheet Metal Workers as to the installation of conduo base, it is decided that the installation of conduo base is the work of the Sheet Metal Workers.

## Setting of Alberene Stone Slabs, Used as Drain Boards or Backs in Connection with Sinks

(Subject to dispute between the Bricklayers, Masons and Plasterers' International Union and the United Association of Plumbers and Steamfitters.)

DECISION RENDERED NOVEMBER 14, 1923

In the matter of the controversy between the Bricklayers and Masons and the Plumbers and Steam Fitters over the Setting of Alberene Stone Slabs used as Drain Boards or Backs in Connection with sinks, it was decided that the setting of Alberene stone slabs used as drain boards or backs in connection with sinks is the work of Plumbers and Steamfitters.

## Gunnite Work of Handling of Cement Gun

(Subject to dispute between the International Hod Carriers, Building and Common Laborers' Union, Operative Plasterers and Cement Finishers' International Association and Bricklayers, Masons and Plasterers' International Union.)

DECISION RENDERED FEBRUARY 21, 1924

In the matter of the dispute referred to in the foregoing title, the following decision was reached:

When work to be performed is to be of the thickness of one and one-half inches or greater, the handling of the cement gun shall be done by the Laborers. When the work is less than one and one-half inches in thickness, the handling and control of the nozzle shall be the work of the Plasterers and Cement Finishers.

It is understood that this decision does not allow the Laborers the right to finish where any finishing tools are required.

The application of a coat of cement mixture by means of the cement gun on steel, as a protection against corrosion is not included in this decision.

### Plastering Work for Preparation of Walls and Ceilings for Tiling

(Subject to dispute between the Bricklayers, Masons and Plasterers' International Union and the Operative Plasterers and Cement Finishers' International Association.)

DECISION RENDERED FEBRUARY 21, 1924

After reviewing the controversy in its various phases, the determination is reached that the agreement previously existing between the two organizations affords the most practical plan of adjustment, and the following award is therefore made as the decision of the Board:

Plasterers shall prepare or plaster all walls and ceilings which are to receive tile, except the final setting bed, which shall be applied by the Tile Layers; the bathrooms, vestibule and small halls in single private residences shall be plastered by the Tile Setters.

### Concrete Slab Re-enforced (Pre-Cast) for Roof Tiling

(Subject of dispute between the Bricklayers, Masons and Plas-

131

terers' International Union and the United Slate, Tile and
Composition Roofers, Damp and Waterproof Workers'
Association.)

DECISION RENDERED DECEMBER 11, 1924

Jurisdiction is awarded Slate, Tile and Composition
Roofers, over pre-cast re-enforced concrete slabs for
roof tiling when pointed up with or laid upon any prepa-
ration of asphalt, roofing cements or other mastics, on
roofs, flat or otherwise.

When laid in cement, lime or gypsum mortars, the
work is awarded to Bricklayers.

### Installation of Air Piping in Connection with Elevator Door Locks

(Subject to dispute between the United Association of
Plumbers and Steamfitters and the International Union
of Elevator Constructors.)

DECISION RENDERED NOVEMBER 11, 1925

When the compressor is used only for elevator work,
the work from the water main to the compressor and re-
turn shall be the work of the plumbers and steamfitters.
The elevator constructor shall set the compressor and
do all the work between the compressor and the locking
device, but when the compressor is used for other pur-
poses than elevator work, then the compressor shall be
set by the plumbers and steamfitters, and the elevator
constructor shall do the necessary piping from the com-
pressor to his work only, all other work to be done by
the plumbers and steamfitters.

### Setting, Installing or Sticking of Artificial Stone

(Subject of dispute between the Bricklayers, Masons and Plas-
terers' International Union and Operative Plasterers and
Cement Finishers' International Association.)

DECISION RENDERED MAY 5, 1926

It is decided that the setting, installing or sticking of artificial stone, the material base of which is gypsum, plaster of Paris or Keene cement, resembling plaster in character and density, wherever used on the interior of building, whether or note reinforced with burlap or other fibrous material, regardless of color, or whether or not faced with any special cement, whether pre-cast or run in place, is the work of the Plasterers.

Wherever artificial stone, the material base of which is of other cements, which comes pre-cast and resembles the natural stone in character and density, regardless of color, whether or not faced with any special cement, the work is that of the Bricklayers.

### Cutting of Chases and Channels in Brick, Tile and other Masonry

(Matter referred to National Board for Jurisdictional Awards by Executive Council, Building Trades Department.)

DECISION RENDERED MAY 5, 1926

Inasmuch as no other trades except the Bricklayers, Plumbers and Steamfitters and Electricians have claimed this work, it is decided that the cutting of chases and channels in brick, tile and other masonry is the work of the Bricklayers, except that the Plumbers and Steamfitters and Electricians shall have jurisdiction to do cutting where required for the installation of their respective work.

### Placing of Trap Rock Floors by Terrazzo Methods

(Subject to dispute between the Bricklayers, Masons and Plasterers' International Union and Operative Plasterers and Cement Finishers' International Association.)

133

DECISION RENDERED MAY 5, 1926

The finishing of cement floors where additional aggregate of stone is added by spreading or sprinkling on top of the finished base and troweled or rolled into the finish and then the surface ground by grinding machines, shall be under the jurisdiction of the Terrazzo Workers. When no additional stone or aggregate is added to the finished mixture, even though the surface may be ground, the work shall be under the jurisdiction of the Cement Finishers.

### Jurisdiction Over Operation of Electric and Traveling Cranes During Construction of Building

(Subject of dispute between the International Union of Steam and Operating Engineers and International Brotherhood of Electrical Workers.)

(Decision Executive Council, American Federation of Labor, March, 1926.)

#### ADOPTED AUGUST 4, 1926

"The Executive Council has been asked for an interpretation of decision rendered by the 1922 Cincinnati Convention of the American Federation of Labor, as it relates to the jurisdiction of overhead or traveling cranes installed as a permanent fixture in building while building is under construction and cranes are being used to handle building material for the construction of building and also for the setting of motors, generators and other electrical equipment.

The decision provides that the Engineers have jurisdiction over the hoists for building material on building under construction, and that the Electrical Workers have jurisdiction over the overhead or traveling cranes for shop or factory purposes. Therefore if the overhead or

134

traveling cranes are used exclusively to handle building
material for the building, cranes shall be operated during
such construction by members of the Steam and Operat-
ing Engineers.

If motors and other electrical equipment are being set
in place while building is under construction and a crane
or cranes are used for such setting, the Engineers shall
operate the crane, handling both building material and
electrical equipment until 50 per cent of the motors or
electrical equipment are set, and then the Engineers
shall cease to operate crane and shall turn same over to
be operated by Electricians, who will operate the crane
for all purposes thereafter.

In the event of two overhead cranes being used to han-
dle building material and electrical equipment, then one
crane shall be operated by Engineer and one be operated
by Electrician for all the work required of that crane, in
which case each operator shall be employed until the
plant is completed, when Engineer shall turn crane over
to Electricians to operate."

**DECISIONS RENDERED AND HELD TO BE OPERATIVE BY THE BUILDING AND CONSTRUCTION TRADES DEPARTMENT.**

### Jurisdiction Over Spot Grounds

DECISION BALTIMORE CONVENTION, 1916

All ground work, continuous or of spot character, for the purpose of receiving trim, shall be done by the Carpenter; all spot ground work, when applied solely for the guidance of plastering work, shall be done by the Plasterer.

### Plaster Boards or Substitute Materials Therefor

JULY 25, 1919

The erection or construction of plaster board ceilings or partitions which are to receive plaster is the work of the Lather. This form of construction is fundamentally and primarily a lathing feature, as is wire lath attached to light iron furring. The studs or runners used in this form of construction are in principle similar to light iron furring as conceded to the Lather.

### Setting of Screeds in Cement Construction and Form Work

MARCH 17, 1920

The decision is that setting screeds in connection with the finishing of cement floors is conceded as Cement Finishers work.

### Setting Electrical Motors

AUGUST 14, 1920

Handling, setting and adjusting of motors and con-

necting of power thereto is work of Electrical Workers. Fastening of motors direct to motor-driven machinery is work of Millwrights.

### Boilers, Moving, Handling and Placing

OCTOBER 3, 1923

Work in question being vital part of Steam Fitters equipment is therefore the work of the Steam Fitter.

### Holorib Deck Roofing

JANUARY 26, 1928

Have received the sample of Holorib deck roofing. This material being less than ten gauge, therefore, under the rulings of this Department, the Sheet Metal Workers have jurisdiction.

### Steeltex Re-enforcement

AUGUST 9, 1929

Welded wire mesh steeltex used primarily for re-enforcing is the work of the iron workers. Paper back steeltex which performs the same function and is used for the same purpose as hy-rib is the work of the Lather.

### Bush Hammering of Concrete Base Foundation

SEPTEMBER 23, 1930

The bush hammering of concrete comes within the jurisdiction of the Cement Finishers.

### Teamster-Engineer Decision

OCTOBER 27, 1939

(Decision rendered by subcommittee of the Executive

Council of the Building and Construction Trades Department, A. F. of L., and approved by the 34th Annual Convention of the Department, New Orleans, La., November, 1940.)

For a complete report of subcommittee see pages 138 to 143, inclusive, of the Proceedings of the 34th Annual Convention.

### DECISION

All power-driven equipment that is used exclusively as a vehicle to transport any material or other matter for building or other construction work comes within the jurisdiction of the Teamsters and Chauffeurs.

All power-driven equipment used on any and all types of building and other construction work, including any and all power-driven equipment that has been in dispute between the Teamsters and Engineers, comes within the jurisdiction of the International Union of Operating Engineers.

> WM L. HUTCHESON, *Chairman*.
> R. J. GRAY, *Secretary*,
> D. W. TRACY.

> January 29, 1940.

The Executive Council,

Building and Construction Trades Department, American Federation of Labor.

Your committee appointed to handle the matter of the dispute between the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers and the International Union of Operating Engineers received a request from President Tobin of the Teamsters for a clarification of the decision.

President Hutcheson, President Tracy and Mr. Gray met with Messrs. Tobin, Gillespie and Farrell on Sunday evening, January 28, and the Teamsters requested information on the following:

1. On agreements on the Pacific coast, west of the Rocky Mountains, which he claimed it would be impossible for him to immediately abrogate without considerable difficulty.

2. The matter of operation of what is known as tractrucks which are used exclusively for the transportation of materials.

3. The questions of the members of Teamster Unions who had been employed as Chauffeurs on what is known as a crane mounted on a truck chassis which is used exclusively in the New York metropolitan area.

The conference adjourned after it was agreed that your committee would confer with the representatives of the Engineers on Monday, January 29.

At the conference with the Engineers the following were present: John Possehl, Brothers Fay, Maloney and Stuhr. President Possehl agreed that he would not call for immediate operation of the decision that would affect any existing agreements on the Pacific coast, west of the Rocky Mountains. However, he expressly stated that this would not apply to any agreements that may have been made after the decision of the committee had been rendered.

On question number two—on the operation of tractrucks used exclusively to transport materials—the Engineers agreed that the operation of such trucks is the work of the Teamster.

The operation of trucks, which have a crane mounted

139

on the truck chassis was next discussed. The Engineers agreed that they would accept any Teamster members who had been employed for any length of time in the driving of these trucks to membership in their organization. Brothers Possehl, Fay and Delaney agreed to sit down with representatives of the Teamsters as far as the metropolitan area of New York was concerned and adjust the matter in a peaceful manner locally.

WM. L. HUTCHESON,
D.W. TRACY,
R. J. GRAY.

### DECISIONS RENDERED BY DR. JOHN A. LAPP, NATIONAL REFEREE FOR THE BUILDING AND CONSTRUCTION TRADES DEPARTMENT, A. F. OF L.

#### Setting Wall Bearing Steel Bar Joists

DECISION RENDERED APRIL 23, 1937

"The work of setting wall bearing steel bar joists comes under the jurisdiction of the International Association of Bridge Structural and Ornamental Iron Workers."

#### Erection of Economizers

DECISION RENDERED SEPTEMBER 20, 1937

"The decision of the Joint Conference Board of Chicago is affirmed and the decision of the Executive Council of the American Federation of Labor is held to be in force. That decision reads as follows:

"In the controversy existing between the Brotherhood of Boiler Makers and the United Association of Plumbers and Steam Fitters over the erection of economizers, the decision is that in the opinion of the Executive Council the work belongs to the United Association of Plumbers and Steam Fitters."

#### Jurisdiction Over Lock Gates and Flood Gates

DECISION RENDERED OCTOBER 21, 1937

"The decision of President Williams is affirmed. The subject-matter of lock gates and flood gates is not covered by the agreement between the Boiler Makers and Iron Workers and the dispute in question is subject to arbitration section of the agreement as follows:

141

"Section 7. Any further disputes that may arise between the parties of this agreement shall be first considered by the respective General Presidents. Upon their failure to agree, the question shall be submitted to arbitration. None of the work definitely decided upon in this agreement shall be subject to further arbitration."

## Jurisdiction Over Operating of Electric Generators for Welding Purposes

DECISION RENDERED OCTOBER 25, 1937

The Decision of the Referee is that the binding national decisions of the American Federation of Labor, the Building and Construction Trades Department of the American Federation of Labor and the National Board of Jurisdictional Awards cover the operation of electrical welding apparatus and that such operation is incident to the trade doing the welding. The decision of the Newark Committee on Jurisdictional Disputes is overruled and the jurisdictional right to operate electric welding sets is held to be, by existing decisions, within the jurisdiction of the trade doing the welding.

## Pointing and Caulking of Steel Window Frames When Incased in Brick Walls

DECISION RENDERED NOVEMBER 18, 1937

The decision of the St. Joseph, Mo., Joint Arbitration Board awarding jurisdiction over the pointing and caulking of steel window frames, when encased in brick walls, to the International Association of Bridge and Structural Iron Workers is reversed and such work, when done with mortar or plastic materials of any kind is held to be within the jurisdiction of the Bricklayers, Masons and Plasterers' International Union of America.

**Decision of the Referee on the Interpretation of the Agreements Between the Bricklayers, Masons and Plasterers' International Union of America and the Operative Plasters and Cement Finishers' International Union of America Relating to Artificial Stone and Marble and Acoustical Tile.**

DECEMBER 20, 1937

The Referee decides that the installation of the material in question on the Library of Congress Annex comes under the 1929 agreement and is, therefore, under the terms of the agreement, within the jurisdiction of the Bricklayers, Masons and Plasterers' International Union of America. The material is in no real sense, except in its acoustical properties, similar to the acoustical tile which was the subject of the 1930 agreement. There may be border line cases between the two types of material covered in the agreements of 1929 and 1930 but this material is not one of them. It is clearly on the side of artificial stone, rather than on the side of materials similar to acoustical tile or, particularly, the U. S. Gypsum product known as Acoustone. Moreover, its installation follows the craft method used by the Bricklayers, Masons and Plasterers' International Union.

This decision applies only to the interpretation of the agreement between the Bricklayers and Operative Plasterers' Unions.

(Signed) JOHN A. LAPP, *Referee*

143

**Jurisdiction Over the Unloading of Ready Mixed Concrete from Certain Types of Trucks to the Ground on Building and Construction Jobs.**

DECISION RENDERED JANUARY 17, 1938

The referee decides that the unloading of ready mixed concrete from trucks to a building or construction job, by means of machinery, attached to the truck, that removes the concrete from the bin of the truck, and the operation of the motor or piece of machinery used in unloading, is the work of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America.

**Decision of the Referee on the Question of Drying and Handling Sludge at the Southwest Sewage Treatment Works in Chicago.**

MAY 2, 1938

THE DECISION

The erection of the process, piping, ducts and equipment for the drying and handling of sludge at the Southwest Sewage Treatment Works at Chicago is within the jurisdiction of the International Brotherhood of Boiler Makers and Iron Ship Builders and Helpers of America.

**Memorandum to the Decision on the Drying and Handling of Sludge at the Southwest Sewage Treatment Works in Chicago.**

MAY 25, 1938

This decision is limited to the fabricated steel ducts, through which sludge passes in the drying process, as explained in the opinion accompanying the decision. It

does not apply to the piping of coal, which was specifically withdrawn from the complaint, nor does it apply to the equipment between the furnace and the pre-heater or between the pre-heater and the roof. It does not apply to any other portion of the equipment which is regularly in the jurisdiction of any other International Building and Construction Trades Union.

(Signed) JOHN A. LAPP, *Referee*,
Building and Construction Trades Dept.,
American Federation of Labor.

### Decision in the Matter of Setting of Vitrolite and Similar Forms of Structural Glass

JUNE 14, 1938

#### THE DECISION

The Referee finds and decides that the setting of vitrolite and similar structural glass on inside work belongs within the jurisdiction of the Bricklayers, Masons and Plasterers' International Union of America, except when such structural glass is set in panels, sash, frames or mouldings or with toggle bolts, screws, rosettes or similar fastenings, or secured in some other manner common to the work of the Glaziers. The Referee finds and decides that vitrolite and similar structural glass, when set on outside walls of buildings or structures, in mortar, cement or plastic material or when anchored to the wall in the manner common to the trade of the Marble Setter, belongs within the jurisdiction of the Bricklayers, Masons and Plasterers' International Union of America.

The Referee finds and decides that all outside work around windows and entrances in store and office fronts opening on streets, arcades, corridors or other public

145

places, including columns at such entrances, belongs to the Brotherhood of Painters, Decorators and Paperhangers of America. The above shall include substantial borders not exceeding three feet around such windows and entrances. Other outside installation of structural glass on exterior walls belongs to the Brotherhood of Painters, Decorators and Paperhangers of America, if set on one or more sides in panels, frames or mouldings or with metal or other strips used to support it or if secured with toggle bolts, screws or similar fastenings, despite the additional use of any form of plastic or mastic composition.

The installation of structural glass, when used as background for store and office signs and advertising, is within the jurisdiction of the Brotherhood of Painters, Decorators and Paperhangers of America.

When glass is used of a thickness of more than one-half inch, its installation belongs within the jurisdiction of the Bricklayers, Masons and Plasterers' International Union of America, unless it is set in sash frames, doors or skylights in a manner similar to that used by Glaziers.

Wherever at this time any local agreement exists which is affected in any way by this decision, the effective date of this decision shall be in such cases three months from this date or September 14, 1938, otherwise the decision is effective as of this date.

The Referee is aware of the fact that there are many variations in the installation of structural glass and that some specific cases may not be covered by this decision. He believes that the International Officers of the two Unions involved can readily find a solution for any specific application on the basis of the broad principles laid

down in this decision and he suggests that on the basis of this decision, provision be made that any dispute over its application be referred for interpretation to the Referee or some other impartial agency.

### Jurisdiction Over the Assembling and Erection of Certain Meal Bins, Grit Bins and Grain Bins in the Eichler Brewery, New York City.

October 31, 1938

#### THE DECISION

The decision of the Building Trades Employers' Association of the City of New York, granting jurisdiction over the erection of grain storage bins in the Eichler Brewery to the International Association of Bridge, Structural and Ornamental Iron Workers is overruled and the dispute is declared to be one which must be submitted to arbitration according to the provisions of Section 7 of the agreement between the International Brotherhood of Boiler Makers, Iron Ship Builders and Helpers and the International Association of Bridge, Structural and Ornamental Iron Workers.

(Signed) JOHN A. LAPP, *Referee.*

### DECISION RENDERED BY PETER ELLER, NATIONAL REFEREE IN DISPUTE OVER ASPHALT AND RUBBER TILE, ROLL AND SHEET LINOLEUM.

July 6, 1942.

United Brotherhood of Carpenters and Joiners of America.

Brotherhood of Painters, Decorators and Paper Hangers.

United Slate, Tile, and Composition Roofers, Damp and Waterproof Workers' Association.

Bricklayers, Masons and Plasterers' International Union.

Operative Plasterers and Cement Finishers' International Union.

In addition, briefs setting forth the claims of the respective organizations were also sent to the Referee.

After due and careful consideration, it is the decision of the Referee that the jurisdiction of the work in question be divided between the United Brotherhood of Carpenters and Joiners, and the Brotherhood of Painters on the following basis:

To the Brotherhood of Painters, Kansas City, Missouri and all territory to the Westward.

To the United Brotherhood of Carpenters and Joiners, all territory East of Kansas City.

In connection with the decision above stated, the following recommendations are made:

1. That members of the Tile Setters affiliated with the B. M. P. I. U., and the Cement Finishers affiliated with the O. P. C. F. I. A. capable of doing this work be taken into either or both the organizations above mentioned without payment of initiation fee and without losing their membership in their own organizations, somewhat on the basis of the agreement now existing between O. P. C. F. I. A. and B. M. P. I. U. relative to the exchange of cards in connection with plastering.

2. On account of the prolonged controversy over the work in question, it is suggested that this decision

be not made effective for three (3) months so as to permit of any necessary adjustments on existing contracts.

3. This decision deals solely with the material mentioned above when used on floors and characterized as "resilient floors" or "resilient floor coverings." It does not cover roofing nor the application of these materials to walls.

P. W. ELLER,
*National Referee.*

**DECISIONS RENDERED BY NATIONAL REFEREE WILLIAM L. HUTCHESON.**

**Decision by the National Referee of the Building and Construction Trades Department, William L. Hutcheson, in the jurisdictional dispute between International Hod Carriers, Building and Common Laborers Union of America and United Association of Journeymen Plumbers and Steamfitters of the United States and Canada in the matter of installation of non-metallic piping for sewers.**

The following is a resume, conclusions and findings by the National Referee for the Building and Construction Trades Department, in the case of the jurisdictional dispute between the International Hod Carriers, Building and Common Laborers' Union of America and the United Association of Journeymen Plumbers and Steamfitters of the United States and Canada, in the matter of: installation of non-metallic pipe for sewers.

The hearing was called to order, by the Referee, on Monday, October 8, 1945, at 10 a. m., in the Netherland Plaza Hotel, Cincinnati, Ohio.

Present at the hearing were representatives of the Hod Carriers and Common Laborers' Union; Plumbers and Steamfitters; Bricklayers International Union and the Brotherhood of Teamsters.

Representatives of the Hod Carriers and Common Laborers' submitted preliminary objections to the Referee having jurisdiction in the dispute.

Their objections were primarily based on the contention that there was in existence an agreement between the Hod Carriers, Building and Common Labor-

150

ers' Union and the United Association of Journeymen Plumbers and Steamfitters, and in substantiation of their contention they submitted an agreement as of the date, January 23, 1941, between the two organizations.

In their remarks in reference to their preliminary objections the statement was made by representatives of the Hod Carriers and Common Laborers' that they were ready to meet any of the trades that have any claim to work covered in the agreement.

Representatives of the United Association of Plumbers and Steamfitters replied to the objection raised by representatives of the Hod Carriers and Common Laborers' but state that they recognized the agreement as of January 23, 1941.

After hearing both parties present their views in reference to the agreement, and listening to considerable discussion, the Referee stated that he was placed in the position of having to make a ruling on the agreement as of January 23, 1941, and ruled that said agreement was a bona fide agreement, without any interpretation of the meaning thereof, and should stand as an agreement between the two organizations; with the understanding that there should be no infringement upon the jurisdiction of other organizations.

After the above ruling was made the two contesting parties were asked to arrange to meet and see if some mutual understanding could be arrived at, after which the hearing was adjourned at 11:30 a. m. (October 8) until the next morning at 10 a. m.

The hearing was reconvened on Tuesday, October 9, at 10 a. m.

A report was asked for by the Referee as to what, if

any, progress was made in reference to reaching an understanding, and it was stated that no understanding was reached.

The Referee then stated that while it was permissible for the two organizations to enter into an agreement, such as was reached January 23, 1941, inasmuch as no understanding was reached yesterday afternoon in the conference that was held by representatives of the two organizations, he would rule that the case which was referred to him by the Acting President of the Building and Construction Trades Department in May, 1944, would be heard as per that arrangement.

A representative of the Hod Carriers then asked if the dispute before the Referee was covered by the agreement.

The Referee, in reply to that question, stated that until he heard the evidence he would not be able to determine whether it came under the agreement, or whether it did not, and that he would reach that conclusion after he had heard the evidence.

A representative of the Hod Carriers and Common Laborers' then stated, if a hearing was going to be held on the merits of the case they were in the unfortunate position of being unable to participate, for the reasons: that the agreement itself is self-explanatory to some degree, and in order to clarify it more, the respective International Presidents of the disputant parties appointed committees for the purpose of clarification, and when they reached an interpretation they sent a letter to the respective International Presidents, which letter they stated they wished to read.

Objections were raised by representatives of the Plumbers which brought forth a discussion as between they and representatives of the Hod Carriers and Common

Laborers' after which the Referee stated that he would allow the letter to be read and then determine whether it would go into the record, or whether it would not.

After the letter was read the Referee asked what the purpose for reading it was, and was answered by a representative of the Hod Carriers and Common Laborers' that the purpose in reading the communication was to show that the interpretation arrived at by the committee was in good faith.

The Referee then ruled that in the original agreement no reference was made in regards to appointing a committee to interpret the meaning thereof, and further ruled that the letter would not appear in the record.

After some discussion and statements by representatives of the two organizations, during which reference was made to a decision rendered by Acting President of the Building and Construction Trades Department, representatives of the Hod Carriers and Common Laborers' asked to be excused on the grounds that participation by them in the hearing on the merits of the case would constitute a waiver of their rights, with leave to appeal the matter further.

In the discussion they were asked if they wished to appeal. They stated: With leave to appeal the matter further. They were informed that it was up to them to follow the laws of the Department and the Federation inasmuch as the Referee had no authority to say whether they had a right to appeal or whether they did not.

Representatives of the Hod Carriers and Common Laborers' further contended if they anticipated that they would waive their rights as the work in contention was covered by the agreement which had been recognized, and inasmuch as they had other tribunals to go to they interjected the last request that they be given leave to appeal.

153

A discussion (off the record) was had at this point, when it was again asked by one of the representatives of the Hod Carriers that his point be made a part of the record. Asked to repeat his statement, he stated, they were unable to participate in the case on its merits. He was asked if he wanted to use the word "unable" or "unwilling." He replied, we are placed in the position of being unable to participate in the hearing by reason of the fact that it would constitute a waiver of our rights, in the absence of a ruling by the Referee as to whether the dispute was covered by the agreement.

They were informed by the Referee that it would be a part of the record as to why they were not going to participate.

The Plumbers then proceeded to present evidence to substantiate their claim for work, as per the decision of Acting President Gray.

They presented extensive briefs and evidence to substantiate their claim, consisting of numerous exhibits and illustrations of installations of the work in contention.

After they completed presentations of their evidence the matter was reported to the Executive Council of the Building and Construction Trades Department for consideration, and action, for the benefit and information of the Referee as to what the desires of the Council were in reference to making a finding and decision, because of the Hod Carriers and Common Laborers' withdrawing from the hearing; after which the Executive Council took the following action:

"Action of Council: Referee should proceed and render decision in accordance with Section 7, Page 26 of Constitution of Department.

"Vote: Unanimous. V. P. Hutcheson not voting."

154

Pursuant to the foregoing action of the Executive Council, and after reviewing the evidence, I have reached the following conclusion:

That the agreement as referred to between the International Hod Carriers, Building and Common Laborers' Union of America and the United Association of Journeymen Plumbers and Steamfitters of the United States and Canada, covers work on subways, tunnels, highways, viaducts, streets and roadways in connection with sewers and water mains, and therefore, does not apply to the question at issue, which is, the decision rendered by the Acting President of the Building and Construction Trades Department, Richard J. Gray, which was rendered under date of March 13, 1944, in the dispute between Laborers and Plumbers over the laying of sewer pipe from main sewer into dwelling, or from inside property line to dwelling, and is not in any way referred to by the agreement of January 23, 1941, entered into between the two organizations.

Records show that the request for a decision came to the Acting President in the regular manner, and that he rendered his finding on the date of March 13, 1944, and in referring to the matter stated it was a jurisdictional dispute between Laborers' and members of the Journeymen Plumbers and Steamfitters over the laying of lateral sewer pipe from main sewer into dwelling or from inside property line to dwelling, and the following decision was rendered:

### "DECISION"

The work in dispute shall be done by members of the United Association of Journeymen Plumbers and Steam Fitters.

In the opinion of the undersigned, acting as Referee, the decision rendered by Acting President Gray, was in

155

conformity with the evidence submitted to me as Referee, and in no way comes under the agreement entered into between the two contending organizations as of January 23, 1941.

Therefore my decision is as follows:

October 13, 1945.

1. That the agreement, dated January 23, 1941, between the International Hod Carriers, Building and Common Laborers' Union of America and the United Association of Journeymen Plumbers and Steamfitters of the United States and Canada is a bona fide agreement between the two organizations, but should not be accepted by the Department until clarifying language is inserted therein giving to the Bricklayers' International organization jurisdiction over work on sewers which they have heretofore performed.

Also that there should be a clarification in reference to the unloading and distributing of pipe so that there would be no infringement upon the recognized jurisdiction of the Teamsters International organization.

There should also be a further clarification if any other organization presents evidence to show that the agreement infringes upon their jurisdiction.

2. That the laying of lateral sewer pipe from main sewer into dwelling, or from inside property line to dwelling is work that should be done by, or under the supervision of, members of the United Association of Journeymen Plumbers and Steamfitters of the United States and Canada.

WM. L. HUTCHESON (Signed)
*National Referee,*
*Building and Construction Trades Department*

*(NOTE—This in no way deletes or expunges from the records of this Department the letter of March 9, 1946, addressed to the Morris County, New Jersey, Building and Construction Trades Council or the advice contained in Vice President Hutcheson's telegram of March 27, 1946.)*

## Pointing, Taping and Filling of Joints on Wall Board

May 19, 1947.

Mr. Richard J. Gray, President
  Building and Construction Trades Department
501 A.F. of L. Building,
Washington 1, D.C.

Dear Sir and Brother:

In the matter of the jurisdictional controversy over the pointing, taping and filling of joints on wallboard in preparing it to receive paint and other wall coverings, involving the Brotherhood of Painters, Decorators and Paperhangers of America; Bricklayers, Masons and Plasterers International Union of America and the Operative Plasterers and Cement Finishers International Association of the United States and Canada, a hearing was held in the Executive Council room, American Federation of Labor building, May 6, 1947.

Representing the organizations involved were: Harry C. Bates, President of the B. M. and P. I. U. of A.; John E. Rooney, President of the O. P. and C. F. I. A.; L. P. Lindelof, General President, B. of P. D. and P. of A.; Joseph P. Hillock, Painters, Washington, D. C.; J. C. Moenick, Secretary-Treasurer, Painters District Council, Chicago, Ill.; Milton R. Stephens, Plasterers, Washington, D. C., and Walter Redmond, International Secretary of the O. P. and C. F. I. A.

157

After giving the statements made, and evidence submitted, careful consideration I have reached a conclusion and render the following decision; to wit:

When plaster material is used to do pointing and filling it shall be the work of members of the Operative Plasterers and Cement Finishers International Association of the United States and Canada—and/or—members of the Bricklayers, Masons and Plasterers International Union of America.

When adhesive materials are used it shall be the work of members of the Brotherhood of Painters, Decorators and Paperhangers of America.

Respectfully submitted,

WM. L. HUTCHESON (Signed)
*Referee,*
*Building and Construction Trades Department.*

Sitting with Referee at hearing were: Vice Presidents Wm. J. McSorley and Robert Byron of the Building and Construction Traders Department.

158

May 19, 1947.

Mr. Richard J. Gray, President
Building and Construction Trades Department
501 A. F. L. Building
Washington 1, D. C.

Dear Sir and Brother:

In the matter of the jurisdictional controversy over the erection of catwalks and stairways involving the International Association of Bridge, Structural and Ornamental Iron Workers and the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America, a hearing was held in the Executive Council room, American Federation of Labor building, May 8, 1947.

Representing the organizations involved were: P. J. Morrin, General President; J. H. Lyons, General Secretary; J. J. Dempsey, General Treasurer, International Association of Bridge, Structural and Ornamental Iron Workers; also Clyde F. Strickland, Vice President and Leslie L. Myers, Washington, for the Iron Workers and J. V. Kearney, International Vice President and T. L. Wants, Special Representative, International Brotherhood of Boilermakers, Iron Ship Builders and Helpers of America.

Representatives of the two Internationals appeared before the undersigned, as Referee, and submitted briefs and evidence to substantiate their claims, and among other things presented an agreement entered into between the two organizations in 1928. Their attention was called to the provisions of Sections 37 and 38 of the Constitution of the Building and Construction Trades Department which set forth:

"Nothing in Sections 37 and 38 is to be construed as giving any organization the right to re-open any case listed by the Building and Construction Trades Department and published in the records of the Department."

After their briefs were presented a full discussion was held in reference to the matter and it is the opinion and conclusion of the undersigned that the decision rendered by the President of the Department under date of January 27, 1947, would seem to be as clear a clarification of their agreement in reference to the erection of catwalks and stairways as could be arrived at under the wording of the agreement, and I herewith quote the decision of the President of the Building and Construction Trades Department as of January 27, 1947.

"Where catwalks, ladders and stairways are erected in connection with bubble towers and tanks and are attached to the structural steel supports this work shall be the work of the members of the International Association of Bridge, Structural and Ornamental Iron Workers.

"Where such catwalks, ladders and stairways are riveted or welded to the watertight sections of the bubble towers or tanks this work shall be done by the members of the International Brotherhood of Boilermakers, Iron Ship Builders and Helpers."

Respectfully submitted
WM. L. HUTCHESON (Signed)
*Referee,*
*Building and Construction Trades Department.*

Sitting with Referee at the hearing were: Vice Presidents Wm. J. McSorley and Martin P. Durkin of the Building and Construction Trades Department.

May 19, 1947.

Mr. Richard J. Gray, President
Building and Construction Trades Department
501 A. F. of L. Building,
Washington 1, D. C.

Dear Sir and Brother:

In the matter of the jurisdictional controversy over the erection of aluminum Q-panels involving the Sheet Metal Workers International Association and the International Association of Bridge, Structural and Ornamental Iron Workers, a hearing was held in the Executive Council room, American Federation of Labor building, May 7, 1947.

Representing the organizations involved were P. J. Morrin, General President; J. H. Lyons, General Secretary and J. J. Dempsey, General Treasurer, International Association of Bridge, Structural and Ornamental Iron Workers; Glenn Hurley, Superintendent, H. H. Robertson Company; George Bigelow, Manager of Erection, H. H. Robertson Company, and George L. Illig, Contract Department, H. H. Robertson Company, and Robert Byron, General President, Sheet Metal Workers International Association and Joseph Fredericks, Sheet Metal Workers International Association.

At the hearing held, briefs were submitted and statements made by the contesting parties, as well as a display of the material in question.

In the statements made by representatives of the two Internationals, considerable emphasis was made in reference to decisions rendered some years ago giving to the Sheet Metal Workers jurisdiction over the installa-

161

tion of metal of ten gauge or lighter, but the question before the Referee in this case was the installation of Q-panels.

After giving the evidence as submitted due consideration I am of the opinion that:

The erection of Q-panels, which was the point at issue, when fastened to the steel structure of a building, should be the work of members of the International Association of Bridge, Structural and Ornamental Iron Workers.

However, any flashing or ventilator work in connection therewith should be the work of the members of the Sheet Metal Workers International Association.

Respectfully submitted,<br>
WM. L. HUTCHESON (Signed)<br>
<em>Referee,</em><br>
<em>Building and Construction Trades Department</em>

Sitting with Referee at the hearing were: Vice Presidents Wm. J. McSorley and Martin P. Durkin of the Building and Construction Trades Department.

## Robertson Protected Metal

May 19, 1947

Mr. Richard J. Gray, President
Building and Construction Trades Department
501 A. F. of L. Building,
Washington 1, D. C.

Dear Sir and Brother:

In the matter of the jurisdictional controversy over the erection of Robertson Protected Metal involving the Sheet Metal Workers International Association and the International Association of Bridge, Structural and Orna-

162

mental Iron Workers, a hearing was held in the Executive Council room, American Federation of Labor building, May 7, 1947.

Representing the organizations involved were P. J. Morrin, General President; J. H. Lyons, General Secretary and J. J. Dempsey, General Treasurer, International Association of Bridge, Structural and Ornamental Iron Workers; George Bigelow, Manager of Erection, H. H. Robertson Company, and Robert Byron, General President, Sheet Metal Workers International Association, and Joseph Fredericks, Sheet Metal Workers International Association.

When this case came on for hearing on the question of erection of Robertson Protected Metal, in presenting their briefs and evidence, the two contestants both referred to a ruling or decision rendered under date of May 26, 1923, by the former Board of Jurisdictional Awards, and while it was admitted by representatives of both International organizations that the ruling made as above referred to; namely May 26, 1923, has been recognized and published in the records of the Building and Construction Trades Department, attention was also called to Paragraph 5, Section 38 of the Constitution of the Building and Construction Trades Department which sets forth:

"Nothing in Sections 37 and 38 is to be construed as giving any organization the right to reopen any case listed by the Building and Construction Trades Department and published in the records of the Department."

Under that provision I can only reach the conclusion that as Referee I would have no right to render a definite decision in the case at issue.

If the two contesting International organizations de-

sire a clarification of the action taken by the former Board of Jurisdictional Awards under date of May 26, 1923, they could by joint request ask for such interpretation or clarification.

Respectfully submitted
WM. L. HUTCHESON (Signed)
*Referee,*

*Building and Construction Trades Department.*

Sitting with Referee at the hearing were: Vice Presidents Wm. J. McSorley and Martin P. Durkin of the Building and Construction Trades Department.

### DECISIONS OF NATIONAL JOINT BOARD FOR SETTLEMENT OF JURISDICTIONAL DISPUTES, BUILDING AND CONSTRUCTION INDUSTRY & HEARINGS PANELS.

### DECISION OF JOINT BOARD NO. 3

#### Beer Lines, Wort Lines, Yeast Lines, $CO_2$ Lines, and Refrigeration in Connection With Attemperator Tanks

AUGUST 20, 1948

Dispute between the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada and the Sheet Metal Workers' International Association.

The issue in dispute is the installation of copper piping in breweries for beer lines, wort lines, yeast lines, $CO_2$ lines, and refrigeration in connection with attemperator tanks.

After carefully considering all of the evidence and argument as presented by both sides, the Joint Board decides as follows:

The installation of streamlined or other manufactured copper pipe or fittings for beer lines, wort lines, yeast lines, $CO_2$ lines is the work of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fittings Industry of the United States and Canada. The installation of copper attemperator coils in the interior of tanks and vats in breweries is the work of the Coppersmiths, members of the Sheet Metal Workers' International Association.

165

The decision of the Joint Board is unanimous.

WM. J. MCSORLEY,
HARRY C. BATES,
ARTHUR H. WELLS,
A. HERRMANN WILSON,
JOHN T. DUNLOP,

*Chairman.*

## DECISION OF JOINT BOARD NO. 15

### Steel Decking, Roofing, Flooring, Raceway for Electrical Wiring

AUGUST 21, 1948

Dispute between the Sheet Metal Workers International Association and the International Association of Bridge, Structural and Ornamental Iron Workers.

The issue in dispute is that involved in cases 15 and 22. The Joint Board may consider the whole issue of the installation of steel decking in accordance with the agreement between the two unions.

After carefully considering all of the evidence and argument as presented by both sides, and two intervening organizations, the Joint Board decides as follows:

The installation of steel decking for roofing, if 10 gauge or lighter, is the work of the Sheet Metal Workers International Association. The installation of steel decking for flooring is the work of the International Association of Bridge, Structural and Ornamental Iron Workers. This decision cannot alter previous decisions of record, such as January 26, 1928 (Holorib), May 19, 1947 (Q-Panel), June 3, 1948 (Metro-Deck). Whenever steel decking for flooring or roofing is used as a raceway for electrical wiring the electrical work in connection with the

166

raceway is that of the International Brotherhood of Electrical Workers.

The decision of the Joint Board is unanimous.

WM. E. MALONEY,
L. P. LINDELOF,
ARTHUR H. WELLS,
ALBERT BEEVER,
JOHN T. DUNLOP,

*Chairman.*

## JOINT BOARD NO. 2

### Pre-Heating and Stress Relieving of Welds

SEPTEMBER 22, 1948

Dispute between the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada and the International Brotherhood of Electrical Workers.

The issue in dispute is the pre-heating and stress relieving of welds.

After carefully considering all of the evidence and argument as presented by both sides the Joint Board decides as follows:

The installation of induction pre-heating and stress relieving equipment, including the wrapping of coils, is the work of the International Brotherhood of Electrical Workers.

The installation of manufactured resistance coils shall be the work of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry.

167

The operation of the pre-heating and stress relieving equipment and instruments for pipe welding is the work of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry.

The decision of the Joint Board is unanimous.

WM. J. MCSORLEY,
L. P. LINDELOF,
ARTHUR H. WELLS,
C. J. ESBENSHADE,
JOHN T. DUNLOP,

*Chairman.*

### CLARIFICATION BY JOINT BOARD NO. 2

FEBRUARY 28, 1949

Board of Trustees,
National Joint Board for Settlement of
   Jurisdictional Disputes,
901 Massachusetts Avenue, N. W.,
Washington 1, D. C.

Re: JOINT BOARD NO. 2

Dear Sirs:

Joint Board No. 2 has carefully considered the issues raised by correspondence from the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry and the International Brotherhood of Electrical Workers concerning our decision of September 22, 1948, as directed by the Board of Trustees of January 11, 1949.

The Joint Board finds that the issues now referred to it concerns the unwrapping of induction coils, the handling and moving of the equipment including the secondary cable leads, the installation of water cooled

168

coils and the wrapping of resistance coils—as distinguished from the installation of manufactured resistance coils.

The Joint Board has reviewed the full record of its proceedings, and the recent letters from the two organizations, and has unanimously concluded that these issues are covered by paragraph one of its decision.

Very truly yours,

(Signed) WM. J. McSORLEY,
L. P. LINDELOF,
ARTHUR H. WELLS,
C. J. ESBENSHADE,
JOHN T. DUNLOP,
*Chairman.*

## DECISION OF JOINT BOARD NO. 17

### Operation of Gasoline Driven Electric Generators for Welding

OCTOBER 27, 1948

In the dispute between the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada and the International Union of Operating Engineers.

The issue in dispute is the operation of gasoline driven electric generators for welding.

After consideration of the evidence and argument advanced by all parties, the Joint Board decides that the work in dispute is covered by Resolution 124 (American Federation of Labor, Norfolk Convention) and is the jurisdiction of the International Union of Operating Engineers.

The decision of the Joint Board is unanimous.

JOHN E. ROONEY,
L. P. LINDELOF,
FRANK W. BARNES,
CYRIL J. STATT,
JOHN T. DUNLOP,

*Chairman.*

## ASH HOPPERS AND FURNACE BOTTOMS

OCTOBER 6, 1950

The dispute referred to the Hearings Panel, which held its hearing in Washington, D.C., on August 29, 1950, is decided as follows:

The installation of ash hoppers is within the jurisdiction of the Iron Worker; the installation of furnace bottoms is within the jurisdiction of the Boilermakers.

For the purposes of providing a line of demarcation between furnace bottoms and ash hoppers for the purpose of determining the jurisdiction of work between the two trades:

(a) A furnace bottom shall be defined as that bottom part of the furnace or chamber subject to direct and continuous exposure to the fire in the furnace that is air and/or water tight.

(b) An ash hopper is any container for ash which is not subject to direct and continuous exposure to the fire in the furnace whether or not air or water tight.

As stated in the minutes of the hearing of August 29, 1950, the above decision does not affect the recognized jurisdiction of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Indus-

170

try of the United States and Canada, United Brotherhood
of Carpenters and Joiners of America, Sheet Metal Work-
ers International Association, International Union of Op-
erating Engineers, and the Bricklayers, Masons and Plas-
terers' International Union of America as stipulated on
the record by both the Iron Workers and Boilermakers
during the hearing.

> (Signed) HARRY C. BATES,
> CHARLES AQUADRO,
> JOHN T. DUNLOP.

### INSTALLATION OF CEILING SYSTEMS

JANUARY 15, 1968

This dispute, which was referred by the National Joint
Board on November 23, 1965, was the subject of hear-
ings before the Hearings Panel in Washington, D. C.,
March 4, 1966, and May 16 and 17, 1966. The decision of
the Hearings Panel was issued August 24, 1966, but was
stayed because of court litigation until January 15, 1968.
The decision of the Hearings Panel, which was upheld
by decisions of the U. S. District Court for the District of
Columbia, the U. S. Court of Appeals for the District of
Columbia Circuit and the Supreme Court of the United
States, is as follows:

1. The decision of this Hearings Panel is limited to
the jurisdictional disputes or work assignments in con-
troversy between lathers and carpenters involved in
the installation of ceiling systems. Nothing in this deci-
sion shall affect the jurisdiction or work assignment of
any other trade, such as, but not limited to, the sheet
metal workers, electricians, iron workers, etc., with a
claim or interest in the installation of ceiling systems.
Contractors shall use this decision as a basis for mak-

171

ing work assignments only with regard to work in the installation of ceiling systems involving carpenters and lathers.

2. The installation of gypsum wallboard and other types of panels fastened directly to ceiling joists shall be performed by carpenters. In the event that a carrying channel is used with gypsum wallboard or other types of panels attached thereto, notwithstanding paragraph 4(a) below, the contractor may use carpenters to install the carrying channel in areas not exceeding 300 square feet where there are no lathers on the job.

3. The installation of light iron work in ceiling systems with gypsum, Portland cement, acoustical or other plasters sprayed-on or trowel-applied over lath or directly to structural members shall be performed by lathers.

4. The following types of ceiling systems are included in this paragraph: Direct Hung Suspension Systems; Attached Concealed System without Backing Board; Furring Bar Attached System; Furring Bar Suspension System; Indirect Hung Suspension System or similar systems.

(a) The installation of the 1½" channel or similar carrying channel and hangers in any of the above types of systems shall be performed by lathers.

(b) The installation of all other work, including the installation of a ceiling system in its entirety if no 1½" channel or other carrying channel is used, shall be performed by carpenters.

5. This decision shall be effective on all work assignments made on construction contracts let after January 15, 1968.

HEARINGS PANEL
PETER T. SCHOEMANN (Signed)
HUNTER P. WHARTON
WM. E. NAUMANN
ED. S. TORRENCE
JOHN T. DUNLOP
    *(Impartial Umpire)*

### DECISION ON THE
### POINTING AND TAPING OF DRYWALL
### SURFACES

### March 1, 1978

The Hearings Panel is aware that a number of crafts, including the carpenters and the laborers, have a genuine interest in issues defined as broadly as those referred to the Hearings Panel by the July 15, 1976 letter of the Joint Administrative Committee. So do their employers. However, in order to facilitate this proceeding, and in order to dispose of the matter presented to us by the Joint Administrative Committee of the Plan and the Impartial Jurisdictional Disputes Board, the Hearings Panel will limit the issue to be decided to certain matters (set forth below) in controversy between the Painters and the Plasterers (whether represented by the Operative Plasterers and Cement Masons International Association or by the International Union of Bricklayers and Allied Craftsmen). No action or decision of the Hearings Panel will in any way affect the jurisdiction or work assignments involving any trade other than the International Broth-

erhood of Painters and Allied Trades, the Operative Plasterers and Cement Masons International Association, and the International Union of Bricklayers and Allied Craftsmen. No fourth trade union with a claim or interest in the assignments which have been considered by this Hearings Panel shall be affected in any way by a decision of this Panel. Any action or decision of the Hearings Panel shall explicitly contain language stating that the interest of any other trade shall in no way be affected and that contractors shall use such decisions as a basis for making assignments only with regard to assignments involving the painters and the plasterers.

The preponderance of the evidence before us supports the resolution of the dispute submitted to us in the following manner:

(1) All pointing and taping, regardless of material used, is painters' work, provided the drywall surfaces are not to receive plaster, acoustical or imitation acoustical finishes.

(2) Pointing and taping, regardless of material used, of drywall surfaces which are to receive plaster, acoustical or imitation acoustical finishes shall be the work of plasterers.

(3) The surface produced by the application of the same plaster pointing material as used in the pointing and taping of the joints to the entire drywall surface for the purpose of producing a uniform surface compatible with the pointed and taped joints shall be considered a plaster finish, and the pointing and taping in connection therewith shall be the work of plasterers.

174

This decision shall be effective on all work assignments made on or after thirty days from this date.

HEARINGS PANEL
F. JOHN BARLOW (Signed)
HAROLD J. BUOY
EDWARD J. CARLOUGH
WILLIAM E. NAUMANN
DANIEL Q. MILLS
   *(Impartial Umpire)*

### **Decision on Cement Finishing and Plastering Work Tasks**

#### **February 11, 2004 and March 11, 2004**

After an arduous review of the evidence entered into this arbitration, the Panel finds good and sufficient reason to render the following decision.

Henceforth, all jurisdictional disputes between the BAC and the OPCM that are brought before the Plan shall be resolved in favor of the work assignment of the involved Employer. Jurisdictional disputes between the BAC or OPCM and LIUNA, or any other union(s) brought before the Plan shall be resolved under the procedures of Article V of the Plan.

On March 2, 2004, the Joint Administrative Committee requested clarification regarding the scope of the work encompassed in all jurisdictional disputes solely between the BAC and the OPCM to be resolved in favor of the work assignment of the involved Employer. Such scope is limited to <u>cement finishing and plastering work tasks.</u>

**NATIONAL ARBITRATION PANEL**
Thomas G. Pagan, Chairman (Signed)
Andy Douglas (Signed)
John McMahon (Signed)

**Acetylene and Electric Welding**.................................... 115
**AGREEMENTS** ......................................................... 39-101
  Asbestos Workers and Bricklayers............................ 100
  Boiler Makers and Iron Workers ........................... 46, 86
  Boiler Makers and Plumbers.................................... 71-72
  Bricklayers, Laborers, Plasterers ................................. 83
  Bricklayers and Operative Plasterers.......................... 55
  Carpenters and Lathers............................................... 45
  Carpenters and Painters.............................................. 39
  Carpenters and Plasterers .......................................... 67
  Carpenters and Plumbers............................................ 65
  Carpenters and Sheet Metal Workers.......................... 62
  Electrical Workers and Laborers............................ 69, 85
  Engineers and Plumbers.............................................. 52
  Iron Workers and Elevator Constructors............... 50, 85
  Lathers and Sheet MetalWorkers................................ 40
  Painters and Plasterers ............................................... 43
  Sheet Metal Workers and Asbestos Workers............... 64
  Sheet Meal Workers and Boiler Makers...................... 49
  Sheet Metal Workers and Plumbers ........................... 54
  Sheet Metal Workers—Roofers .................................. 81
  Tilelayers, Bricklayers and Operative
    Plasterers .............................................................. 59
  Teamsters and Electrical Workers .............................. 79
**Acoustone (agreement)** ................................................ 58
**Air Coolers, Air Washers and Blowers, etc.** .................. 108
**Air Piping in Connection with Elevator Door
  Locks** ........................................................................ 132
**Alberene Stone Slabs used as Drain Boards or
  Backs in Connection with Sinks, Setting of**............. 130
**Artificial Stone—Granite (Dressing, Altering
  and Finishing)**............................................................ 128
**Artificial Stone—Setting and Installing**........................ 132
**Artificial Stone, Decision by Dr. Lapp on
  Interpretation of Agreement** .................................... 143
**Asbestos Plaster for Boiler Rooms, etc** ........................ 113
**Ash Hoppers and Furnace Bottoms** ............................. 170

**Asphalt and Rubber Tile** .............................................. 147
**Bathroom Accessories, Anchors for**.............................. 122
**Bathroom Accessories, Tile and Porcelain**.................... 122
**Bishopric Board, When Applied as a substitute
  for Lath and Sheathing** ............................................ 124

Boilers, Moving, Handling and Placing ........................... 137

Bronzing and Painting of Radiators and Pipe
  Connections ...................................................................... 116

Bush Hammering of Concrete Base Foundation............ 137

Catwalks and Stairways ................................................. 159

Caulking of Steel Window Frame When Incased
  in Brick Walls, Pointing and ........................................ 142

Caulking Around Steel Window Sash, Pointing or ....... 81

Ceiling Systems, Installation of .................................... 171

Celotex (Agreement) ....................................................... 45

Cement Finishing and Plastering Work Tasks............... 176

Concrete Slab Reinforced (Pre-cast) for Roof
  Tiling ................................................................................ 131

Conduo Base .................................................................... 130

Copper Piping.................................................................. 165

Corrugated Sheeting........................................................ 127

Craftex (Agreement)........................................................ 43

Cranes, Jurisdiction Over, Operation of Electric
  and Traveling .................................................................. 134

Cutting Chases or Channels in Brick, Tile,
  Masonry, etc.................................................................... 133

Decisions of American Federation of Labor ........... 102-107

Decisions of Hearings Panels .................................. 170-175

Decisions of Referees.............................................. 141-164

Decisions Rendered and Held To Be Operative
  by the Building and Construction Trades
  Department ................................................................ 136-140

Decisions by National Joint Board for Settlement
  of Jurisdictional Disputes ....................................... 165-170

Defects in Concrete Caused by Leakage, Bulging,
  Sagging, etc..................................................................... 121

Derricks, Erection and Handling for Setting Stone ....... 127

Directional Elevators...................................................... 85

Drying and Handling of Sludge..................................... 144

Economizers, Erection of, Decisions of A. F. of L.
  and Referee .............................................................. 106, 141

Electric Generators for Welding Purposes,
  Jurisdiction Over Operation.................................... 142

Electric and Acetylene Welding.................................... 115

Electrical Motors, Setting of ........................................ 136

Electrical Workers—Engineers, Decision of
  A. F. of L. ...................................................................... 99

Electrical Work on Elevators (Rehearing) .................... 123

Elevator Constructors, International Union,
  Decision A. F. of L. ...................................................... 102

Elevator Machinery, Hoisting, Lowering and
  Placing of ............................................................. 125
Elevators for Hoisting Material, Operation of ............... 127
Engineers Decision of A. F. of L. in re
  Jurisdiction of.......................................................... 104
Flat-Faced Tile ............................................................. 128
Flaxlinum Keyboard and Insulation ............................. 124
Foremanship Over Concrete Construction .................... 129
Foreman on Interior Concrete Columns,
  Foundations for Engine and Machinery Beds ........... 123
Furnace Bottoms and Ash Hoppers ............................. 170
Gasoline Driven Elec. Generators................................. 169
Gates, Jurisdiction Over Lock and Flood...................... 141
Glazing......................................................................... 125
Gunnite Work or Handling of Cement Gun .................. 130
Hearings Panel Decision ............................................... 173
Holorib Deck Roofing.................................................... 137
Hi-rib Lath................................................................... 114
Light Iron Furring, Brackets, Clips, Hangers,
  Corner Guards, Beads and Metallic Lat..................... 113
Low Pressure Heat ....................................................... 110
Low Pressure Heat (Rehearing).................................... 110
Marble and Slate Partitions, Back and Floor
  Slabs for Urinal Stalls, Closets and Showers,
  Setting of ................................................................. 118
Meal Bins, etc., Assembling and Erection of................. 147
Metallic Corner Beads When Set in Plastic
  Material.................................................................... 115
Metal Windows, Installation of..................................... 124
Muslin and Canvas for Decorative Purposes,
  Tacking of ................................................................ 118
Non-Metallic Pipe ........................................................ 150
Pile Driving Machinery and Engines, Operation of........ 119
Pipe Railings or Guards for Enclosures,
  Stairway, Hatches, etc. ............................................. 110
Plan for the Settlement of Jurisdictional
  Disputes ............................................................... 16-38
   Article I Scope of Application ................................... 16
   Article II Stipulation Requirements ......................... 17
   Article III Joint Administrative Committee............... 18
   Article IV Rules and Regulations.............................. 19
   Article V Resolution of Jurisdictional Disputes ........ 21
   Article VI Continuation of Work............................... 27
   Article VII Enforcement............................................ 29

179

**Article VIII Local Boards**.................................... **31**
**Article IX Obligations of the Parties**..................... **31**
**Article X National Arbitration Panel**.................... **32**
**Article XI Technological Changes**.......................... **35**
**Article XII National Agreements Regarding
   Jurisdiction**.............................................................. **36**
**Article XIII Effective Date, Termination
   Change and Withdrawal**.................................... **37**
**Plaster Board or Substitute Materials Therefor**............. **136**
**Plastering Work for Preparation of Walls and
   Ceilings for Tiling**...................................................... **131**
**Pointing or Caulking of Steel Window Frames
   When Incased in Brick Walls**.................................. **142**
**Pointing and Taping**.................................................... **157**
**Pointing and Taping of Drywall Surfaces**.................... **173**
**Pointing or Caulking Around Steel Window Sash**........... **81**
**Power Driven Equipment**.............................................. **138**
**Procedural Rules and Regulations**.............................. **1-15**
**Article I Contractors' Responsibility**......................... **1**
**Article II Union's Responsibility**................................ **3**
**Article III Strikes and Impediments to Job Progress**..... **3**
**Article IV Filing a Complaint**..................................... **6**
**Article V Time Constraints Under the Plan**................. **7**
**Article VI Direct Resolution**...................................... **8**
**Article VII Selecting an Arbitrator**............................. **9**
**Article VIII Resolution by Arbitration**...................... **10**
**Article IX Policy Regarding Directives**...................... **12**
**Article X Appeals from Decisions of
   Recognized Local Boards**.................................... **13**
**Sample Stipulation Form**.......................................... **15**
**Q-Panels**.................................................................... **161**
**Reinforced Concrete, Cement and Floor Construction**.. **111**
**Robertson Protected Metal**.......................................... **162**
**Roll and Sheet Linoleum**.............................................. **147**
**Scaffolds as Applied to Building Construction,
   Erection of**................................................................. **117**
**Screeds in Cement Construction and Form
   Work, Setting of**........................................................ **136**
**Sheet Metal Glazing for Sash, Frames, Doors,
   Skylights, etc.**.......................................................... **119**
**Slate Treads When Set on Iron Staircase**...................... **120**
**Spot Grounds, Jurisdiction Over**.................................. **136**

**Steel Bar Joists, Setting of Wall Bearing** ...................... 141
**Steel Decking** ............................................................ 166
**Steeltex Re-enforcement** ........................................... 137
**Stress Relieving and Preheating of Welds** ..................... 167
**Clarification of Above Decision** ................................... 168
**Teamster-Engineer Decision (Power Equipment)** .......... 137
**Teamsters and Iron Workers, Decision A. F. of L.** ......... 105
**Textone (Agreement)** ..................................................... 43
**Trap Rock Floors by Terrazzo Methods, Placing
   of Unloading of Ready Mixed Concrete** .................... 133
**Unskilled Labor, with Special Reference to the
   Loading and Unloading of Materials as
   Applied to Reinforced Concrete Construction** ........... 121
**Vitrolite and Similar Opaque Glass** .............................. 112
**Vitrolite and Similar Opaque Glass (Rehearing)** ............ 112
**Vitrolite and Similar forms of Structural Glass** ............. 145
**Waterproofing, Application of Damp-resisting
   Preparations and** ..................................................... 116
**Wood Fibre Conduit (Agreement)** .................................. 85